FILED

August 31, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003737682

Doc 65

**71 PAGES**

Gregory C. Nuti (CSBN151754)
E-Mail: gnuti@schnader.com
Kevin W. Coleman (CSBN 168538)
E-Mail: kcoleman@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for
Chapter 11 Trustee, Bradley D. Sharp

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| IN RE: | **Case No. 09-29162-D-11** |
| SK FOODS, L.P., A CALIFORNIA LIMITED PARTNERSHIP, | **Chapter 11** |
| DEBTOR. | |
| BRADLEY D. SHARP, et al., | **Adv. Pro. No. 11-2337** |
| Plaintiff, | **DC No. SH-1** |
| vs. | |
| SKPM CORP., INC., SSC & L 2007 TRUST, MONTEREY PENINSULA FARMS, LLC, FREDRICK SCOTT SALYER AKA SCOTT SALYER IN HIS CAPACITY AS TRUSTEE OF THE SCOTT SALYER REVOCABLE TRUST AND TRUSTEE OF THE SSC&L 2007 TRUST, SCOTT SALYER REVOCABLE TRUST, FAST FALCON, LLC, HENRY JOHN HEATH, AND DOES 1-5, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| Defendants. | Date:     September 1, 2011<br>Time:     10:00 a.m.<br>Place:     Courtroom 34<br>              501 I Street, 6th Floor<br>              Sacramento, CA 95814<br><br>Judge:     Hon. Robert S. Bardwil |

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1

# TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................... 3

    A.    The SK Foods Bankruptcy Case and the Cedenco Entities ............................. 3

    B.    Attempted Pre-Petition Transfers of Intercompany Loan and Cedenco Stock ............... 5

    C.    The Debtors Were Insolvent in April 2008 ..................................................... 8

    D.    Attempted Post-Petition Transfer of Cedenco Stock ...................................... 10

    E.    Facts Establishing Need for Injunctive Relief................................................. 12

ARGUMENT ............................................................................................................... 17

    A.    Standards for Granting a Preliminary Injunction ........................................... 17

    B.    The Trustee Has Demonstrated a Likelihood of Success on the Merits ........... 19

    C.    The Trustee Has Demonstrated a Likelihood of Immediate, Irreparable Harm Absent an Injunction ................................................................................. 27

    D.    This Court is Authorized to Appoint a Receiver ............................................. 28

    E.    The Balance of Equities Favors an Injunction ............................................... 30

    F.    An Injunction is in the Public Interest........................................................... 31

    G.    Service on Fast Falcon is Proper .................................................................. 31

CONCLUSION............................................................................................................ 34

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

PHDATA 3585925_1

**MEMORANDUM IN SUPPORT OF MOTION FOR TRO PRELIMINARY INJUNCTION**
Adv. Proc. No. 11-2337

# TABLE OF AUTHORITIES

Page(s)

CASES

Asseo v. Pan Am. Grain Co.,
   805 F.2d 23 (1st Cir. 1986)..........................................................18

Boryk v. deHavilland Aircraft Co.,
   341 F.2d 666 (2d Cir. 1965)..........................................................33

Campbell Soup Co. v. ConAgra, Inc.,
   977 F.2d 86 (3d Cir. 1992)...........................................................17

Coben v. Lebrun (In re Golden Plan of California, Inc.),
   37 B.R. 167 (Bankr. E.D. Cal. 1984)...............................................17

Commodity Futures Trading Comm'n v. Weintraub,
   471 U.S. 343 (1985)...................................................................19

Connecticut Gen. Life Ins. Co., v. New Images of Beverly Hills,
   321 F.3d 878 (9th Cir. 2003) ...................................................17, 28

Fisher v. Hamilton (In re Teknek, LLC),
   343 B.R. 850 (Bankr. N.D. Ill. 2006) ..............................................30

Flynt Distributing Co. v. Harvey,
   734 F.2d 1389 (9th Cir. Cal. 1984)..................................................18

Frierdich v. Mottaz,
   294 F.3d 864 (7th Cir. 2002) ........................................................22

Graham Paper Co. v. Pembroke,
   124 Cal. 117 (1899) ...................................................................21

Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,
   997 F.2d 581 (9th Cir. 1993) ........................................................19

Hirsch v. Bank of America,
   107 Cal.App.4th 708 (2003) .........................................................26

Hopkins v. D.L. Evans Bank (In re Fox Bean Co.),
   287 B.R. 270 (Bankr. D. Idaho 2002), aff'd, 144 Fed. Appx. 697 (9th Cir. 2005) ................26

Houdini Inc. v. Goody Baskets LLC,
   166 Fed. Appx. 946 (9th Cir. 2006)..................................................18

In re Beverly Mfg. Corp.,
   29 B.R. 513 (Bankr. S.D. Fla. 1983)................................................20

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

**MEMORANDUM IN SUPPORT OF MOTION FOR TRO PRELIMINARY INJUNCTION**
Adv. Proc. No. 11-2337

<u>In re Focus Media, Inc.,</u>
　　387 F.3d 1077 (9th Cir. 2004) ...................................................................17, 27, 32

<u>In re Monroe Well Service, Inc.,</u>
　　67 B.R. 746 (Bankr. E.D. Pa. 1986) ........................................................................31

<u>In re PTI Holding Corp.,</u>
　　346 B.R. 820 (Bankr. D. Nev. 2006) ........................................................................31

<u>In re Schlein,</u>
　　178 B.R. 82 (Bankr. E.D. Pa. 1995) .........................................................................30

<u>In re Sierra Steel, Inc.,</u>
　　96 B.R. 275 (9th Cir. BAP 1989)...........................................................................9, 24

<u>In re Stadium Management Corp.,</u>
　　95 B.R. 264 (Bankr. D. Mass 1988) .........................................................................31

<u>In re Xonics Photochemical, Inc.,</u>
　　841 F.2d 198 (7th Cir. 1988) .................................................................................9, 24

<u>Kamen Soap Products Co. v. Struthers Wells Corp.,</u>
　　159 F.Supp. 706 (S.D.N.Y.1958) .............................................................................33

<u>Kane v. Union of Soviet Socialist Republics,</u>
　　267 F.Supp. 709 (E.D. Pa., 1967) ............................................................................32

<u>Manchester Modes, Inc. v. Lilli Ann Corp.,</u>
　　306 F.Supp. 622 (S.D.N.Y., 1969) ...........................................................................33

<u>Perez v. Van Groningen & Sons, Inc.,</u>
　　227 Cal.Rptr. 106, 41 Cal.3d 962 (1986)..................................................................25

<u>Raul International Corp. v. Nu-Era Gear Corp.,</u>
　　28 F.R.D. 368 (S.D.N.Y.1961) .................................................................................33

<u>Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,</u>
　　970 F.2d 552 (9th Cir. 1992) ....................................................................................29

<u>Republic of the Philippines v. Marcos,</u>
　　862 F.2d 1355 (9th Cir.1988) (en banc) ...............................................................17, 18

<u>Rogers v. Transamerica Corp.,</u>
　　36 Cal. App. 2d 233 (1939) ......................................................................................21

<u>Rosenblatt v. Credit Discount Co.,</u>
　　37 Cal. App. 2d 108 (1940) ......................................................................................21

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

**MEMORANDUM IN SUPPORT OF MOTION FOR TRO PRELIMINARY INJUNCTION**
Adv. Proc. No. 11-2337

Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
 102 F.3d 12 (1st Cir. 1996) ............................................................................17

Scotts Co. v. United Industries Corp.,
 315 F.3d 264 (4th Cir. 2002) ..........................................................................30

SEC v. Cherif,
 933 F.2d 403 (7th Cir. 1991) ..........................................................................18

Shersher v. Superior Court,
 154 Cal.App.4th 1491 .....................................................................................26

United States ex rel. Rahman v. Oncology Assocs., P.C.,
 198 F.3d 489 (4th Cir. 1999) ..........................................................................27

United States v. Imperial Chemical Industries, Ltd.,
 100 F. Supp. 504 (S.D.N.Y.1951) ..................................................................33

United States v. O'Brien,
 836 F. Supp. 438 (S.D. Ohio 1993) ................................................................18

Univ. of Texas v. Camenisch,
 451 U.S. 390, 101 S. Ct. 1830 (1981) .............................................................18

Ward v. Taggart,
 51 Cal.2d 736 (1959) ......................................................................................26

Williams Electric Games, Inc. v Garrity, et al,
 366 F. Supp. 569 (2004) .................................................................................26

Winter v. Natural Res. Def. Council, Inc.,
 129 S. Ct. 365 (2008) ......................................................................................30

STATUTES

11 U.S.C. § 105(a) .......................................................................................................30

11 U.S.C. § 541(a) .......................................................................................................19

11 U.S.C. § 548(a)(1)(B) .............................................................................................22

11 U.S.C. §§ 548(a), 550(a) ........................................................................................27

11 U.S.C. § 548(d)(1) ......................................................................................22, 23, 26

11 U.S.C. § 548(d)(2) ............................................................................................22, 24

11 U.S.C. § 1106(a) .....................................................................................................19

11 U.S.C. § 1108 ..........................................................................................................19

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

MEMORANDUM IN SUPPORT OF MOTION FOR TRO PRELIMINARY INJUNCTION
Adv. Proc. No. 11-2337

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

11 U.S.C §362(a)(3).................................................................................19, 20, 22

Cal. Civ. Code § 955.1(b)......................................................................................21

Cal. Civ. Code §§ 955 & 955.1(a).....................................................................21, 23

Cal. Civ. Code § 1624.5(a)...............................................................................21, 23

Cal. Civ. Code § 3439...........................................................................................22

Cal. Civ. Code §§ 3439.04, 3439.05, 3439.07........................................................27

Cal. Civ. Code § 3439(a)(3)..................................................................................29

Cal. Code Civ. Proc. § 564(b)(1)............................................................................29

Cal. Code Civ. Proc. § 564(b)(9)............................................................................29

Cal. Civ. Code § 3439.07(a)(3)..............................................................................29

Cal. Code Civ. Proc. § 564....................................................................................29

OTHER AUTHORITIES

COLLIER ON BANKRUPTCY ¶ 7064.01-7064.02 (15th ed. rev. 2005)........................29

Fed. R. Bankr. Proc. 7004(b)(3)............................................................................32

Fed. R. Bankr. Proc. 7005.....................................................................................31

Fed. R. Bankr. Proc. 7064...............................................................................28, 29

Fed. R. Civ. Proc. 5(b)(1)......................................................................................31

Fed. R. Civ. Proc. 64.......................................................................................28, 29

Re Exclusive Master Book-Binding And Manufacturing Pty Ltd
   (1977) 2 ACLR 549 (Australia)......................................................................20

Olsson v. Dyson
   (1969) HCA 3; 120 CLR 365 (Australia).........................................................21

PHDATA 3585925_1

**MEMORANDUM IN SUPPORT OF MOTION FOR TRO PRELIMINARY INJUNCTION**
Adv. Proc. No. 11-2337

1    Bradley D. Sharp, the duly appointed and acting Chapter 11 Trustee for SK Foods, L.P., a

2    California limited partnership ("SK Foods" or "Debtor"), submits this memorandum of law in

3    support of his motion for entry of temporary restraining order and preliminary injunction.  As

4    described below, this adversary proceeding concerns approximately $50 million in cash held by

5    the liquidators for SK Foods Australia Pty, Ltd. ("Cedenco") and related entities in Australia.

6    Competing claims to this fund have been made by the Trustee and an entity controlled by Scott

7    Salyer called Fast Falcon, LLC.  In essence, Defendants claim that the Debtors transferred the

8    underlying assets sold to generate the $50 million on November 1, 2006 to other Salyer-

9    controlled entities, and that Fast Falcon, LLC is the current holder of the right to the funds held

10   by the Australian liquidators.  The Trustee, however, contends that none of the documentation

11   that would be legally required to effect a transfer of the Debtors' interests occurred prior to the

12   bankruptcy cases being filed, and as a result, these assets remained property of the Debtors and

13   became property of the bankruptcy estate on the Petition Date.  Thus, Defendants (in particular,

14   Scott Salyer and Fast Falcon, LLC) execution of documents *post*-bankruptcy purporting to

15   transfer the Debtors' interests, their exercise of the Debtors rights as a shareholder in SK Foods

16   Australia Pty, Ltd., and other acts to assert claims to this money in the Cedenco liquidation have

17   all violated the automatic stay and are void.  Alternatively, even if the Court assumes that the

18   underlying assets *were* transferred pre-bankruptcy, any such transfer is avoidable because the

19   Debtors were insolvent at the earliest possible point when the asserted transfer could have

20   occurred, and they received no consideration in exchange.

21       Thus, regardless of how the ownership dispute may be resolved under Australian law, the

22   Trustee is entitled to judgment in his favor in this action.  If it is determined that the Debtors'

23   interests were not validly transferred, then Defendants' post petition efforts to do so have clearly

24   violated the automatic stay, and they will be liable for damages.  If it is determined that the

25   Debtors' interests were transferred pre-bankruptcy, any such transfer is avoidable, and any

26   distribution from the Australian liquidation must be safeguarded pending trial in this matter.  The

27   purpose of this adversary proceeding and this motion seeking entry of a temporary restraining

28

Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

2

order and preliminary injunction is to ensure that the estate is not deprived of the remedies to which it is entitled.

For reasons described more fully below, recent revelations about violations by Salyer, Cary Collins, and other Defendants of the Court's previous injunctions clearly demonstrate that if the $50 million comes into Salyer/Fast Falcon's hand for a nanosecond, that money will be secreted to overseas bank accounts beyond this Court's jurisdiction.[1]  Consequently, the Trustee is requesting a temporary restraining order preventing Fast Falcon and others acting in concert with it from further transferring their rights and claims in the $50 million to another entity, and after a further hearing, entry of a preliminary injunction that *inter alia* appoints a receiver to take possession of any funds that may be distributed to Fast Falcon from the Cedenco Liquidation in order to prevent Fast Falcon and the other Defendants from dissipating those funds pending trial on the Trustee's claims in this action.  Under well established Ninth Circuit law and California law, preliminary injunctive relief including the appointment of a receiver are well recognized remedies in the circumstances presented here.  As discussed below, Defendants' actions clearly demonstrate that they cannot be trusted and are willing to dissipate or misappropriate funds even if subject to Court orders prohibiting them from doing so, and for that reason, appointment of a receiver is the only remedy that will truly protect the estate and allow this Court to grant a meaningful remedy in this action.

## FACTUAL BACKGROUND

### A.  The SK Foods Bankruptcy Case and the Cedenco Entities

1.    On May 7, 2009 ("Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "SK Foods Bankruptcy Case").  The Trustee was appointed the Chapter 11 trustee in the SK Foods Bankruptcy Case and presently serves in that capacity.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

---

[1]    In event the Australian Liquidator finds in favor of Fast Falcon, it is doubtful Fast Falcon/Salyer would allow any such distribution to even enter the United States.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

2.　　　　The Debtors established foreign operations in New Zealand and Australia that mirror the Debtors' operations in California in many respects based on their participation in the tomato and vegetable processing industry and on their corporate interrelationships among each other and with Debtor SK Foods' general partner and limited partner. The Australian entities are referenced collectively as "Cedenco."[2] *See* Declaration of Bradley D. Sharp ("Sharp Decl."), filed herewith, ¶ 4.

3.　　　　As described below, as of the Petition Date, SK Foods was listed as the owner of record of stock held in SK Foods Australia Pty, Ltd ("Cedenco Stock"), but Scott Salyer asserts that the Cedenco Cedenco Stock was transferred to SKPM Corp. and the Scott Salyer Revocable Trust prior to the Petition Date. *See* Sharp Decl. ¶ 6, 12-13, Exh. 2-3.

4.　　　　Moreover, Cedenco's books and records reflect that it owes approximately $18 million to the Debtors (the "Intercompany Loan"), but again, Salyer contends that the Intercompany Loan was assigned pre-petition to the SSC&L 2007 Trust, a trust where Scott Salyer is the trustee and sole beneficiary, and then subsequently to Fast Falcon, another Salyer controlled entity. *See* Sharp Decl. ¶ 7.

5.　　　　Cedenco is subject to liquidation proceedings in Australia ("Australian Liquidation"). Prior to the commencement of the Australian Liquidation, Cedenco's secured lenders placed it into receivership. The assets were sold, producing proceeds sufficient to pay all creditors of Cedenco in full, including the Intercompany Loan, and provide payment to on

---

[2]　　　Cedenco includes SK Foods Australia Pty Ltd (Aus), Cedenco JV (Aus), and Cedenco Australia (AUS).

In New Zealand, the entities are Cedenco Ohakune (formerly Mountain Carrots) (NZ), SK Foods International (NZ), and Cedenco Foods (NZ). Another entity, Sunrise Coast (Japan), merged into Cedenco Foods (NZ). The Trustee has assigned any claims associated with these entities to BMO under the terms of the settlement with the secured lenders. The liquidation of these New Zealand entities paid general unsecured creditors, but did not generate sufficient funds to make a distribution to equity.

---

4

account of SK Food's Cedenco Stock in an amount in excess of $32 million.[3] *See* Sharp Decl. ¶ 8.

6.        After Cedenco was placed into receivership, Scott Salyer applied for the appointment of Ian Lock and John Sheahan of Sheahan Lock Partners in Adelaide, Australia as Joint Liquidators ("Sheahan/Lock" or the "Liquidator"). The Liquidator will take possession of the proceeds remaining after payment of the secured debt, and is obligated to distribute them to Cedenco's unsecured creditors and interest holders. Under Australian insolvency procedures, the Liquidator makes the initial determination as to which claims should be paid. Once the Liquidator determines that a claim should be paid, interested parties must petition the Australian court to oppose and enjoin disputed payments. *See* Sharp Decl. ¶ 9.

7.        The Trustee submitted claims to the Liquidator for payment on account of the Intercompany Loan and the Cedenco Stock. *See* Sharp Decl. ¶ 10.

8.        As noted above, Fast Falcon, LLC, an entity controlled by Salyer, has also submitted claims to the Liquidator for payment on account of the Intercompany Loan and Cedenco Stock claiming SK Foods transferred the Cedenco Stock to the Scott Salyer Revocable Trust and SKPM Corp. and the Intercompany Loan to the SSC&L 2007 Trust pre-petition, and that those entities subsequently transferred these assets to Monterey Peninsula Farming, another Salyer-controlled entity, and ultimately to Fast Falcon, LLC. *See* Sharp Decl. ¶ 11, Exh. 1.

**B.    Attempted Pre-Petition Transfers of Intercompany Loan and Cedenco Stock**

9.        In 2007, the accounting firm of Moss Adams was engaged to prepare audited financial statements for SK Foods' fiscal years ending October 31, 2006, and June 30, 2007.[4] During the course of the audits, Moss Adams informed SK Foods that *inter alia* because SK Foods held the Cedenco Stock and Intercompany Loan, U.S. accounting standards required that

---

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

---

[3]    Under Australian law, a receiver liquidates a company for the benefit of the secured creditor. Once the secured creditor is paid in full, the receiver turns over any excess proceeds to a liquidator for distribution to the other creditors and equity.

[4]    SK Foods changed the end of its fiscal year from October 31 to June 30 during this period.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1 Cedenco's financials be consolidated with those of SK Foods (referred to hereafter as the "FIN

2 46" issue). This created a burdensome accounting task as Cedenco's year end differed from the

3 Debtors, and Cedenco's financial statements were audited under Australian accounting standards

4 which required a conversion to U.S. accounting standards prior to consolidation. To avoid the

5 time and cost of the accounting requirements, Scott Salyer, Dan Nutley,[5] Mark McCormick,[6]

6 Gary Perry,[7] Wayne Boos,[8] John Iacopi,[9] and others tried to devise a strategy for eliminating

7 these assets from SK Foods financial statements while still complying with GAAP accounting

8 standards. However, they did not want to create a taxable event,[10] nor did they want to show a

9 decrease in SK Foods' equity on the balance sheets.[11] The debate on how to manipulate the

10 corporate structure to accomplish this goal continued from July 2007 through at least December

11 2007. Included in the debate was whether to make any transfers "effective" November 1, 2006

12 or June 30, 2007. *See* Sharp Decl. ¶ 14, Exh. 4.

13       10. In August 2007, Gary Perry provided documents to transfer the equity. Wayne

14 Boos instructed Salyer to destroy those drafts as the transaction as structured created a tax

15 liability. *See* Sharp Decl., Exh. 4 at SHARP_CH15 268 – 275. It appears through e-mails

16 exchanged between SK Foods and its outside advisors that they continued to debate how to

17 accomplish the divestiture without any apparent resolution through October 2007. *See* Sharp

18 Decl., Exh. 4 at SHARP_CH15 268 – 298. Nevertheless, on January 15, 2008, Moss Adams

19

---

20 [5]    An accountant at Moss Adams.

21 [6]    SK Foods' Executive Vice President & Treasurer.

22 [7]    Outside attorney.

23 [8]    Outside accountant at Boos & Associates.

24 [9]    Outside accountant at Iacopi, Lenz & Company.

25 [10]    *See* e-mails between Wayne Boos and Scott Salyer dated August 29, 2007, attached to
    Sharp Decl., Exh. 4 at SHARP_CH 15 275.

26

27 [11]    *See* e-mail from Scott Salyer to Dan Nutley and Mark McCormick dated September 13,
    2007 (attached to the Sharp Decl., Exh. 4 at SHARP_CH 15 280) and dated September
    14, 2007 (attached to the Sharp Decl., Exh. 4 at SHARP_CH 15 281).

28

issued its audit for the period ending June 30, 2007 reflecting a transfer of the Cedenco Stock and the Intercompany Loan "effective" November 1, 2006. *See* Sharp Decl., Exh. 6. Recent Rule 2004 examination testimony given by Dan Nutley of Moss Adams confirms that it did so, however, based solely upon the management representation letter, discussions with management and adjusted journal entries. Moss Adams never received the legal documents purportedly effectuating the transfers. *See* Declaration of Gregory C. Nuti ("Nuti Decl."), filed herewith, ¶¶ 17-19, Exh. 10. Similarly, SK Foods' subsequent auditors, Stoughton Davidson, or tax advisor, Wayne Boos, never reviewed or ever even found the underlying legal documents evidencing these purported transactions. *See* Nuti Decl., ¶¶ 20-24, Exh. 11-12.

11.     The June 30, 2007 audited financial statements reflected a reduction in owner's equity by approximately $4.8 million. The Intercompany Loan remained as an asset on the balance sheet, but now payable by the SSC&L Trust. No cash or other property was transferred to the Debtors at any time in exchange for the Cedenco Stock. There is no document evidencing SSC&L's purported obligation to SK Foods for payment of the Intercompany Loan.

12.     On March 28, 2008, Gary Perry emailed to an SK Foods employee, Lisa Crist, what appear to be execution copies of documents intended to evidence a transfer of the Cedenco Stock ("2008 Transfer Documents"). *See* Sharp Decl., Exh. 7. Ms. Crist left two days later to attend conferences in Australia and New Zealand. *See* Sharp Decl., Exh. 8. Although Salyer was present in Australia and New Zealand at the same time, Ms. Crist testified that she did not have Salyer sign any documents during the trip. *See* Nuti Decl. ¶¶ 25-26, Exh. 13. Salyer's itinerary indicates he was scheduled to arrive back to Monterey on Friday, April 11, 2008. *See* Sharp Decl., Exh. 9.

13.     On October 27, 2008, Jeanne Johnston sent an email to Mark McCormick attaching signed copies of the 2008 Transfer Documents.[12] *See* Sharp Decl., Exh. 10 at SHARP_CH15 968-970. This is the earliest record of signed copies of any 2008 Transfer Documents. Although they could have been executed anytime between April 12, 2008 and

---

[12] Note that the 2008 Transfer Documents bear a November 1, 2006 date.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

October 27, 2008, for purposes of this Motion, the Trustee is assuming that if a transfer of the Cedenco Stock occurred, it occurred at the earliest of these possible dates.

**C.  The Debtors Were Insolvent in April 2008**

14.  SK Foods was insolvent at least as early as April 2008.  According to its audited financial statements for the period ending June 30, 2008, the Debtors' assets totaled $276.068 million, and its liabilities were $191.166 million.  Although nominally suggesting that SK Foods was solvent on June 30, 2008, the audited financials – financials for which the auditor Stoughton Davidson later withdrew its opinion – do not take into account liabilities the Debtors had incurred as a result of criminal activities to which several officers and agents of SK Foods subsequently plead guilty.[13]  *See* Exhibits 9-11 to the Request for Judicial Notice ("RJN"), filed herewith.  The bribery, price-fixing, and fraudulent mislabeling of product to which guilty pleas have been entered became public on April 16, 2008 when the FBI raided the Debtors' premises.

15.  Prior to the Debtors' bankruptcy filing, Morningstar Packing Co. filed an action against the Debtors alleging that the bribery activity caused it damage through lost sales.  The Debtors were also sued by representatives ("Class Representatives") of a class of purchasers of tomato products seeking damages for the alleged price-fixing activity.[14]  In addition, after the bankruptcy cases were filed, several customers of the Debtors who were induced to purchase tomato products as a result of the bribery filed un-liquidated proofs of claim seeking

---

[13]  The Trustee believes that SK Foods was in fact insolvent at a much earlier date before taking into account any liabilities arising from criminal activities, and he reserves all rights with respect to establishing the Debtors' insolvency for other purposes in this adversary proceeding and other actions related to SK Foods's bankruptcy case.

[14]  The complaints are as follows: (1) Four In One Company, Inc.  v. SK Foods, et.al., pending in the United States District Court for the Eastern District of California, case no. 08-cv-03017 filed on December 12, 2008; (2) Diversified Foods and Seasonings, Inc.  v. SK Foods, et.al., pending in the United States District Court for the Eastern District of California, case no. 08-cv-03074, filed on December 18, 2008; (3) Bruce Foods Corporation v. SK Foods, et.al., pending in the United States District Court for the Eastern District of California, case no. 09-cv-00027, filed on January 5, 2009; (4) Morning Star Packing Company, et. al.  v. SK Foods, et.al., pending in the United States District Court for the Eastern District of California, case no. 09-cv-00208, filed on January 22, 2009; and (5) Cliffstar Corporation  v. SK Foods, et.al., pending in the United States District Court for the Eastern District of California, case no. 09-cv-00442, filed on February 13, 2009.

compensation for damages they suffered.  *See* RJN, Exh. 12-18.  The various complaints and proofs of claim asserted damages for illegal conduct occurring from 1999 through 2008.  All the acts giving rise to these liabilities had occurred prior to April 2008, the very earliest date Salyer could have signed the 2008 Transfer Documents.

16.    Under Statement of Financial Accounting Standards No. 5 ("FAS 5"), the liabilities arising from the defendants illegal actions must be accounted for and considered at the time the actions are taken.  Therefore, any contingent liability arising from actions taken in 2008, or earlier must be reflected on the company's balance sheets as of 2008.  *See* <u>In re Xonics Photochemical, Inc.</u>, 841 F.2d 198, 200 (7th Cir. 1988); <u>In re Sierra Steel, Inc.</u>, 96 B.R. 275, 278 (9th Cir. BAP 1989).  Pursuant to compromises approved by this Court on or about January 24, 2011, the Court allowed claims to Morningstar and the Class Representatives totaling $121 million.  *See* RJN Exh. 19.  When these additional liabilities are added to the Debtors' June 30, 2008 balance sheet, it is clear that the Debtors were insolvent, before even accounting for the bribery and fraud damage claims that can be asserted by direct purchasers.  The Trustee's preliminary analysis is that customers induced to purchase product as a result of bribes would have accrued damages claims of at least $40 million by April 2008.  *See* Sharp Decl. at ¶35.

17.    To the best of the Trustee's knowledge, no material change occurred to the Debtors assets, liabilities, or financial condition between April 2008 and June 30, 2008.  *See* Sharp Decl., ¶ 33.  Hence, for purposes of this Motion, the Debtors can be presumed insolvent on the earliest date a transfer of the Cedenco Stock occurred.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

**D.**     **Attempted Post-Petition Transfer of Cedenco Stock**

18.     Under Cedenco's Constitution (its organizational document) and Australian law, a legal transfer of the Cedenco Stock is not effective unless it is accomplished using instruments in the proper form, and is noted on the company's share registry ("Share Register").  *See* Sharp Decl., ¶ 24, Exh. 11.  As of the Petition Date, SK Foods, LP (not SKPM Corp., the Scott Salyer Revocable Trust, or Fast Falcon, LLC) was listed as the record owner of the Cedenco Stock on Cedenco's Share Register and in the public records maintained by the Australian Securities & Investments Commission ("ASIC").[15]

19.     Article 5.1 of the Cedenco Constitution specifies certain requirements that must be met in order to effect a valid transfer of Cedenco's shares.  Subparagraph (d) of Article 5.1 further provides that:

(d)     A transferor of shares remains the holder of the shares transferred until the transfer is registered and the name of the transferee is entered in the register of members in respect of the shares.

20.     In addition, Article 2.4 of the Cedenco Constitution provides in pertinent part:

(a)     Except as otherwise required by law or provided by this constitution, the company is entitled to treat the registered holder of a share as the absolute owner of that share and is not:

(i)     compelled in any way to recognize a person as holding a share upon any trust, even if the company had notice of that trust; or

(ii)     compelled in any way to recognize, or bound by, any equitable, contingent, future or partial claim to or interest in a share on the part of any other person except an absolute right of ownership in the registered holder, even if the company has notice of that claim or interest.

21.     As noted, on the Petition Date, SK Foods, LP remained listed as the record owner of the Cedenco Stock on the Share Register and in the official public records maintained by ASIC.

---

[15]     As noted, no documentation has surfaced indicating that there ever was a transfer of the Intercompany Loan to the SSC&L Trust.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

22.     The Office of the United States Trustee appointed Mr. Sharp to serve as Chapter 11 trustee in this case on May 14, 2009.

23.     Scott Salyer travelled to and was in Australia/New Zealand on May 15, 2009.  *See* Sharp Decl., ¶ 21, Exh. 9.  Not coincidentally, on May 15, 2009, Nick Frankish, then the CFO of Cedenco, transmitted the 2008 Transfer Documents prepared by Gary Perry in late March 2008 (now executed by Salyer) via facsimile to Henry John Heath, a Cedenco director.  The facsimile transmission sheet begins with the instruction "Looks like we need to advise ASIC of ownership change."  *See* Sharp Decl., Exh. 12 at SHARP_CH15 1438 – 1448.  Documents obtained by the Trustee further indicate that on May 15, 2009, Mr. Heath and Blayney Morgan, a Client Manager in the Melbourne office of Deliotte Touche Tohmatsu exchanged emails.  Mr. Heath asked Ms. Morgan how to advise ASIC of the ownership change.  Ms. Morgan responded by indicating that the 2008 Transfer Documents were not sufficient, and that she would need to prepare other documentation required by Australian law and the Cedenco Constitution (she notes that approval from Cedenco's lenders also needed to be obtained).  Mr. Frankish is copied on Ms. Morgan's email, to which he responds "The notification of [SK Foods Australia] ownership change needs to be done ASAP so please advise once forms are ready for signing and submission."  *See* Sharp Decl., Exh. 12 at SHARP_CH15 1450.  Ms. Morgan and Mr. Frankish exchange further emails discussing the share transfer issue, including the fact that ASIC will impose a fine due to the apparently late submission based upon a November 1, 2006 transfer date.  Mr. Frankish confirmed to her that the November 1, 2006 date should be used, despite the fact that it will result in the imposition of a fine.  *See* Sharp Decl., Exh. 12 at SHARP_CH15 1449 – 1450.

24.     It appears that Blayney Morgan ultimately sent the required share transfer forms to Nick Frankish and Mr. Heath on July 16, 2009.  *See* Sharp Decl., Exh. 13 at SHARP_CH 15 1453 – 1469.  Mr. Frankish then forwarded them on to Richard Lawrence, Cedenco's former CEO and director, on July 19, 2009, stating "These are the share transfer documents for you, Scott, and Harry [Heath] to sign.  Shall I get Scott to sign in NZ next week or email JJ [Jeannie Johnson, Scott's assistant]."  *See* Sharp Decl., Exh. 13 at SHARP_CH15 1453.

25.     The Trustee believes that the foregoing emails and other documentation obtained by the Trustee confirm that the documentation necessary to effect a valid transfer of the Cedenco shares was not created until July 16, 2009, and that Salyer could not have executed the documents to transfer shares of Cedenco from SK Foods to the Scott Salyer Revocable Trust and/or SKPM Corp. until July 19, 2009 at the earliest.  However, by that date, SK Foods was already in bankruptcy, the Trustee had been appointed, and Salyer was no longer even employed by SK Foods.  Thus, the purported conveyance of the Cedenco shares is void because Salyer did not have legal authority to execute the documents transferring the Cedenco shares at the time he signed them.  Moreover, under the terms of the Cedenco Constitution and applicable Australian law, the Debtors are deemed to be the legal owners of the Cedenco Stock as of its bankruptcy filing, and any attempt to transfer the Debtors' interest in that stock is void as a violation of the automatic stay.

26.     Further, Fast Falcon claims it obtained an assignment of these assets "effective" on June 29, 2009 from Monterey Peninsula Farming, which in turn obtained its assignments "effective" on January 17, 2009.  *See* Nuti Decl. ¶ 16, Exh. 9.

**E.   Facts Establishing Need for Injunctive Relief**

Drum-Line

27.     In *Sharp v. CSSS, LP*, Adv. Proc. No. 09-2543, hereinafter the "Drum line litigation"), this Court issued a temporary restraining order on August 24, 2009 prohibiting CSSS, LP ("CSSS") from selling, transferring or encumbering the drum line [Doc. No. 15].  On September 3, 2009, the Court issued a preliminary injunction continuing the restraints and injunctions imposed in the August 24, 2009 Order [Doc. No. 34].

On May 9, 2011, the Court issued its Memorandum Decision in the Drum Line litigation denying a motion for summary judgment on the Trustee's contempt motion against Larry Lichtenegger (the "Memorandum Decision").  *See* Nuti Decl., Exh. 1.  As the Court and parties are well aware, the contempt proceedings involve the shipment of the so-called Drum Line to New Zealand in violation of this Court's temporary restraining order and preliminary injunction.  In its Memorandum Decision, this Court found "[i]t is undisputed that on August 24, 2009, the day of

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

the [TRO] hearing, the drum line was in the Port of Oakland awaiting documentation that would

allow it to be exported, and it did not leave the Port of Oakland for New Zealand until a week

later, August 31." Id., p. 2, lines 17-21. Thus, this Court has already determined its orders have

been violated; the only thing left to do is to specifically identify the parties responsible and their

level of culpability. Obviously, one of those potentially responsible is Scott Salyer, who controls

Fast Falcon.

2009 Transfers to Overseas Bank Accounts

28. In addition, Salyer has taken steps to transfer or sell other assets that are either

properly considered assets of the Estate or are the subject of preference/avoidance actions.

Salyer was indicted in February 2010 on a number of different charges, including alleged

violations of the Racketeer Influenced and Corrupt Organizations Act and mail and wire fraud.

In that criminal matter, the government filed numerous pleadings in connection with Salyer's

Pretrial Detention and filed dozens of exhibits in support of detention [Doc. Nos. 11 and 12,

Case No. 2:10-cr-00061-LKK-1]. *See* RJN Exh. 4. According to the Government, Salyer had

been preparing to flee the country and to live overseas in order to avoid criminal prosecution.

*See* Exhibit C, ¶ 87-88 of the Government's Motion, attached as RJN, Exh. 4. Further, Salyer

instructed his assistant to sell or distribute various assets, and his residence in Pebble Beach was

up for sale. *See* Exhibit C, ¶ 89 of the Government's Motion, attached as RJN, Exh. 4. Mr.

Artley's Affidavit further states as follows:

> . . . in aid of SALYER's flight to avoid prosecution, she [J.J.] along with certain other individuals, assisted SALYER in transferring millions of dollars to banks in foreign countries. Specifically, J.J. has indicated that SALYER instructed J.J. to move **millions of dollars in assets from accounts that were originally associated with various SK Foods entities involved in the tomato processing business**, and which were located at Bank of the West and Wells Fargo Bank, to other accounts located at Mechanics Bank in San Francisco, According to J.J., SALYER then instructed certain personal accountants and individuals at Mechanics Bank to transfer the funds at Mechanics Bank to financial institutions in the West Indies and in Liechtenstein. I have reviewed email correspondence, provided to the government by J.J., from a bank employee at Mechanics Bank to SALYER and J.J., which references two bank accounts that have been established for SALYER in Liechtenstein and Charlestown, West Indies, respectively.

Artley Affidavit, ¶ 92 (emphasis added).

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

29.     In addition, according to the government's evidence, $2.1 million was transferred from different accounts at Mechanic's Bank to Salyer's personal accountant in San Francisco, and an additional $3,200,000 was transferred to his personal accountant's bank account. *See* Exhibit KK of the Government's Motion, attached as RJN, Exh. 4. One of the overseas accounts was in the name of "Fast Falcon", and Salyer's personal notes indicate that he intended to distribute the "F. Falcon $" to himself personally. *See* Exhibit FF of the Government's Motion, attached as RJN, Exh. 4. Indeed, Mr. Salyer identifies himself as "Manager" of Fast Falcon. *See* Exhibit NN of the Supplemental Exhibits, attached as RJN Exh. 5. According to a Portfolio Valuation submitted to Mr. Salyer, Fast Falcon, LLC had $4,382,077 in assets, which includes $3,838,000 at Volksbank AG. *See* Exhibit RR to the Government's Opp. To Review of Salyer's Detention Order, attached as RJN Exh. 6.

30.     Cary Collins assisted Salyer in moving the foregoing sums overseas. *See* Exhibits Y, Z, and AA-LL to the Government's Opp. To Review of Salyer's Detention Order, attached as RJN, Exh. 6. Mr. Collins facilitated the transfer of funds to Fast Falcon using his own personal bank accounts at Mechanics Bank. The size and amount of the transactions drew them to the attention of the Bank's security officer, who interviewed Mr. Collins's account manager. The account manager reported that Mr. Collins admitted to her that the funds were being transferred to Fast Falcon in order to <u>conceal</u> Salyer's interest in those funds. *See* RJN, Exh. 7. It should also be noted that Mr. Collins is a convicted felon, having plead guilty to charges of bank fraud. *See* RJN, Exh. 8. According to Mr. Collins's counsel in Australia, "[Collins is] involved in assisting Mr. Salyer with his legal representation and his entities." *See* Nuti Decl, Exh. 2. Thus, Mr. Collins has engaged in a series of questionable activities, and he clearly is playing a significant role in assisting Salyer in keeping Salyer controlled assets out of the reach of creditors.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

<u>Violations of the Preliminary Injunction in the Substantive Consolidation Action</u>[16]

31.     On October 13, 2010, this Court entered an amended preliminary injunction ("Oct. 13 Order") in the action *Sharp v. Salyer, et al*, Adv. Proc. No. 10-2014 [Doc. No. 160], which provides that funds realized from the sale of a property sold by SSC Farming could be used only to pay "regular salaries, lease payments, mortgage payments or utilities of SSC Farming, incurred by it, in the in the ordinary course of its business, that become due and payable, up to the amounts listed on the budget attached hereto as Exhibit C for the months of August through December 31, 2010." *See* RJN, Exhs 1-3; Carlson Decl. ¶ 3.  The budget attached to the order provides for total monthly expenditures not exceeding $27,400.  *See* RJN, Exh. 2.  Thus, the total amount that could be spent for the five month period of August through December was $137,000.  The Oct. 13 Order goes on to provide (a) that "no [other] withdrawals will be made from [the account] without further order of the Court" and (b) that monies in the account "may not be used to pay the expense of any entity other than SSC Farming or to pay expenses other than those specified in Paragraph 5, without further order of the Court."  *Id.* at ¶ 6.  *See also* Declaration of Michael Carlson ("Carlson Decl.") at ¶ 3.

32.     The terms of the Oct. 13 order were plainly violated.  Among other things, on November 1. 2010, $150,000 was wire transferred to Collins and Associates.  On December 3, 2010, check 1003 for $100,000 was written to Collins and Associates.  On January 11, 2011, check 1008 for the amount of $50,000.00 was written to Collins and Associates.  SSC Farming had no authorization to pay Collins under the terms of the Oct. 13 order.  Finally, on December 1, 2010, check 1002 was written to F. Scott Salyer for $15,000.00.  The reference on the check states that it was payment for services of a farm manager.  While the Oct. 13 Order did provide for payments to a farm manager, the Trustee had been told that the farm management was being

---

[16]     The Trustee raises the facts and issues discussed below to illustrate the potential irreparable injury that may occur if in fact the Defendants are allowed any access to the proceeds from the Cedenco assets.  The Trustee will seek an appropriate remedy for these acts by separate motion in the appropriate proceedings once he has completed discovery.

provided by Grewal Consulting (which had in fact received in excess of $23,000 during the period purportedly for farm services), not Scott Salyer – who at the time was and still is under house arrest in Pebble Beach with no ability to travel to Lemoore, which at a minimum calls into question his ability to act as the farm manager. *See* Carlson Decl. ¶¶ 6-7.

33.    On December 27, 2010, the Farming Entities provided an accounting for October 28, 2010 through November 30, 2010. This accounting failed to disclose the $50,000 check and the $150,000 wire transfer to Collins. The Farming Entities also falsified the ending balance to conceal these payments. *See* Carlson Decl. ¶ 27.

34.    In early January 2011, counsel for Salyer proposed further revisions to the Oct 13 order to allow the Farming Entities to lease a portion of the waste water land. On January 13, 2001, the Trustee provided a revision to the proposal which included a requirement, for the first time, that Defendants provide copies of the monthly bank statements of the Sales Proceeds Account "or any other account in which the Sales Proceeds are deposited or flow through." The language proposed was eventually incorporated into a further modified injunction (the "Feb. 16 Order"). Thus, from at least January 13, 2011, the Defendants knew that the Trustee was going to insist on receiving banks statement for the Sales Proceeds Account as a condition for modifying the Preliminary Injunction Orders. *See* Carlson Decl. ¶¶ 12-14.

35.    On January 24, 2011, Collins deposited $353,000.00 into the account to cover up the earlier unauthorized withdrawals. As set forth above, the parties were negotiating to allow the Farming Entities to lease a portion of their land. Trustee's insistence on seeing actual bank statements most likely prompted the reimbursement. However, the later received accounting for January 2011 failed to disclose this deposit. *See* Carlson Decl. ¶ 11.

36.    The Trustee received its first accountings under the Feb 16 Order on February 22, 2011. This accounting for the period of October 2010 through December 31, 2010 again failed to disclose the first three payments made to Collins & Associates totaling $353,000.00. The ending balance for December 31, 2010 was falsified to overstate the account balances to further conceal the payments. The Farming entities did not contemporaneously provide the bank records so the Trustee was unable to immediately compare the ending balance set forth in the accounting

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

16

to the bank statements.  This accounting further misidentified the $15,000 payment to Scott

Salyer as fees paid to the "Farm Manager."  *See* Carlson Decl. ¶¶ 15, 23, 24, 25.

37.    On February 2, 2011, Collins, Pruett, et. al. paid two checks to Collins &

Associates totaling $461,969.  In early March 2011, when they provided the Trustee the

accounting for February 2011, they misidentified these payments as going to Gary Parry for legal

fees.  Upon the Trustee's objections to the payments, the Defendants returned the funds, but

without admitting the payments were unauthorized, or revealing that Collins was the true

recipient of the funds.[17]  The Trustee just recently discovered that these payments were made to

Collins after receiving the bank's response to a subpoena.  *See* Carlson Decl. ¶¶ 29, 30, 31.

Thus, but for the Trustee's diligence in policing the use of funds, the Salyer Entities and Collins

would have taken in excess of $800,000 in violation of this Court's orders.[18]

## ARGUMENT

### A. Standards for Granting a Preliminary Injunction

It is well recognized that injunctive relief is available to enforce the automatic stay, as

well as to prevent the dissipation or further transfer of assets a trustee seeks to recover under his

avoidance powers.  In re Focus Media, Inc., 387 F.3d 1077, 1087 (9th Cir. 2004) (preliminary

injunction in fraudulent transfer action);  Coben v. Lebrun (In re Golden Plan of California, Inc.),

37 B.R. 167, 170 (Bankr. E.D. Cal. 1984) (preliminary injunction granted for stay violations).

A plaintiff in a fraudulent transfer action is entitled to preliminary equitable relief if it

shows a likelihood of success on the merits, and the possibility of irreparable injury.  Focus

Media, 387 F.3d at 1087.  A "substantial likelihood of success on the merits" does not require

absolute certainty in terms of the outcome in the litigation, but rather, means that the evidence in

support of preliminary injunctive relief is sufficient for the court to conclude that plaintiff has "a

---

[17]    Shortly after Collins was compelled to return the funds, he filed a proof of debt in the
Cedenco Liquidation seeking payment of approximately $418,000.00 in fees he
ostensibly earned performing services to Cedenco from June 2009 to May 2010.

[18]    That the account was replenished gives little comfort.  The funds may well have been
spent and another yet unknown source used to "cover the tracks".

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   fair chance of success." Republic of the Philippines v. Marcos, 862 F.2d 1355, 1362 (9th

2   Cir.1988) (en banc). Irreparable harm consists of harm that cannot be remedied by an award of

3   monetary damages, or an injury that cannot be quantified monetarily. Ross-Simons of Warwick,

4   Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996); Campbell Soup Co. v. ConAgra, Inc., 977

5   F.2d 86, 91 (3d Cir. 1992). However, the possibility of irreparable harm is established where the

6   plaintiff can show prior instances where the defendant has dissipated or concealed assets, or they

7   have defied court orders regarding asset location and information, because such conduct

8   demonstrates a significant risk that the defendant will seek to conceal or move assets beyond the

9   jurisdiction of the court. Connecticut Gen. Life Ins. Co., v. New Images of Beverly Hills, 321

10  F.3d 878, 881 (9th Cir. 2003).

11          A preliminary injunction is customarily granted on the basis of procedures that are less

12  formal and evidence that is less complete than in a trial on the merits. Univ. of Texas v.

13  Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981). This is because a hearing for

14  preliminary injunction is generally a restricted proceeding, often conducted under pressured time

15  constraints, on limited evidence and expedited briefing schedules, hence, the Federal Rules of

16  Evidence are held not to strictly apply to preliminary injunction hearings. See, e.g., SEC v.

17  Cherif, 933 F.2d 403, 412 n.8 (7th Cir. 1991); Asseo v. Pan Am. Grain Co., 805 F.2d 23, 25-26

18  (1st Cir. 1986); United States v. O'Brien, 836 F. Supp. 438, 441 (S.D. Ohio 1993). At the

19  preliminary injunction stage, it is often difficult to obtain affidavits from persons who would be

20  competent to testify at trial. For that reason, Courts have discretion to consider evidence that

21  might be inadmissible at the time of a trial upon the merits. As the United States Court of

22  Appeals for the Ninth Circuit has held:

23          The urgency of obtaining a preliminary injunction necessitates a prompt
            determination and makes it difficult to obtain affidavits from persons who would
24          be competent to testify at trial. The trial court may give even inadmissible
            evidence some weight, when to do so serves the purpose of preventing irreparable
25          harm before trial. 11 C. Wright and A. Miller, Federal Practice and Procedure,
            Civil, § 2949 at 471 (1973).
26

27          Flynt Distributing Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. Cal. 1984). See also

28  Houdini Inc. v. Goody Baskets LLC, 166 Fed. Appx. 946, 947 (9th Cir. 2006) ("[T]he district

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  court did not abuse its discretion in considering hearsay . . . because the rules of evidence do not

2  strictly apply to preliminary injunction proceedings."); <u>Marcos</u>, 862 F.2d at 1363 ("It was within

3  the discretion of the district court to accept this hearsay for purposes of deciding whether to issue

4  the preliminary injunction.").

5      **B.  <u>The Trustee Has Demonstrated a Likelihood of Success on the Merits</u>**

6          Here, there is a strong likelihood that the Trustee will succeed on the merits of his claims

7  for violation of the automatic stay, or alternatively, that any transfers of the Debtors' assets are

8  avoidable fraudulent conveyances.

9          1.      Defendants Post-Petition Actions Which Resulted in the Transfer of the
                   Cedenco Stock and Recordation of Defendants' Asserted Interest on the
10                 <u>Share Registry Violated the Automatic Stay</u>

11         As the Court is well aware, the filing of a bankruptcy petition creates an estate consisting

12 of all legal and equitable interests of the debtor in property held as of that date.  11 U.S.C. §

13 541(a).  Among other things, actions seeking to exercise control over property of the estate

14 violates Section 362(a)(3) of the Bankruptcy Code.  11 U.S.C. § 362(a)(3).  Upon his

15 appointment, the Trustee assumed sole and exclusive control and authority over the Debtors

16 property.  11 U.S.C. § 1106(a).  The Trustee's appointment completely divests the rights and

17 powers the Debtors management and Board of Directors (i.e., Salyer) previously could exercise

18 over the Debtors' property.  <u>Commodity Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343,

19 351-52 (1985); <u>Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n</u>, 997 F.2d 581, 587 (9th Cir.

20 1993) ("Where a trustee is appointed, he may assume control and operation of the debtor's

21 business. 11 U.S.C. § 1108.  In such circumstances the debtor corporation's directors are

22 completely ousted and retain virtually no management powers.").

23         With respect to the claims for violation of the automatic stay, Defendants cannot possibly

24 dispute that, as shown by the series of emails starting with that sent by Nick Frankish to John

25 Henry Heath on May 15, 2009, Defendants attempted to transfer the Cedenco Stock to SKPM

26 Corp. and SSRT and register their asserted interest on the company Share Register after the

27 bankruptcy cases were filed.  Nor can they refute the documentation establishing without doubt

28 that Salyer executed the legally required documents to transfer the Cedenco Stock under the

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

19

1　Cedenco constitution and Australian law after July 16, 2009 – after the Trustee was appointed

2　and even after Salyer's employment with SK Foods was terminated.

3　　　　　As noted above, Articles 2.4 and 5.1 of the Cedenco constitution provide that Cedenco is

4　entitled to treat the holder of the shares appearing on the company's share registry as the absolute

5　owner of the shares, and is not compelled in any way to recognize, or be bound by, any

6　equitable, contingent, future or partial claim, regardless of whether the company has notice of

7　another's claim to ownership.  Pursuant to Section 231 of the Australian Corporations Act 2001

8　(Cth), a copy of which is attached at Appendix 1, legal ownership in shares in an Australian

9　company is not transferred until the buyer member is entered into the members' register of the

10　company, and the seller member is removed, or the record of their shareholding reduced

11　accordingly.  Rights under equity will not override an express provision in the statute; therefore

12　equity will not grant an unregistered member an interest as against the company.  Re Exclusive

13　Master Book-Binding And Manufacturing Pty Ltd (1977) 2 ACLR 549 (holder of unregistered

14　shares had no entitlement in liquidation of company).  A copy of the *Master Book Binding* case

15　is attached at Appendix 2.  In sum, to properly effect a legal transfer of stock in an Australian

16　company, the transferee must be entered on the share registry.

17　　　　　As of May 5, 2009, Cedenco's share registry and ASIC's data base disclosed that SK

18　Foods, L.P., and only SK Foods, L.P., owned the shares in question.  Thus, even if Cedenco had

19　notice of the intended assignment of the stock to SKPM Corp. and SSRT, Cedenco was not

20　bound by that notice.  Only the execution of the legally required documentation and the

21　amendment of the Share Registry could effect a transfer of SK Foods's legal title and equitable

22　interest in the Cedenco Stock.  Thus, the Defendants' actions in executing the July 2009 Transfer

23　Documents and causing Cedenco to change the ownership of the Cedenco Stock on the Share

24　Registry altered the Debtors' interests in property, and therefore violated the automatic stay.  11

25　U.S.C. § 362(a)(3) ("any act to obtain possession of property of the estate or of property from the

26　estate, or to exercise control over property of the estate" is stayed); In re Beverly Mfg. Corp., 29

27　B.R. 513, 515 (Bankr. S.D. Fla. 1983) (execution of written stock transfer instrument post-

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

petition memorializing pre-petition agreement to convey stock was void as a violation of the automatic stay).

2.      Defendants Assertion of Proofs of Debt and Proofs of Interest for the
        <u>Cedenco Assets Violated the Automatic Stay</u>

Under Australian law, a debt is a legal chose in action, which can be assigned at law only if the debtor receives a written notice signed by the creditor telling the debtor the debt has been transferred and is now payable to an identified third party.  In Victoria where the debt would be located it is section 134 of the Property Law Act. In New South Wales is section 12 of the Conveyancing Act 1919.  A copy of this statute is attached at Appendices 3. The intercompany debt owing by the Australian company would be subject to one of those statutes, most likely New South Wales.  The requirements of the statutes for written notice are mandatory to effect a legal assignment:  <u>Olsson v Dyson</u>, [1969] HCA 3; (1969) 120 CLR 365.  A copy of the *Olsson* case is attached at Appendix 6.  A debt can be assigned in equity without serving the requisite notice, but only for valuable consideration.  If a creditor purports to assign a debt as a "gift" without giving the requisite notice, it will fail as a gift- 'Equity will not perfect an imperfect gift': <u>Olsson v Dyson,</u> [1969] HCA 3; (1969) 120 CLR 365 per Windeyer J at [10].

California law similarly requires that a contract for the sale of personal property worth more than $5,000.00 must be in writing, and must be signed by the party charged with the conveyance of its interest.  Cal. Civ. Code § 1624.5(a).  California law also clearly provides that transfers of non-negotiable instruments and general intangibles must be in a writing that is endorsed and delivered to the transferee.  Cal. Civ. Code §§ 955 & 955.1(a).  Where a debtor assigns the same right of action twice to *bona fide* purchasers, the assignee who first gives notice to the account debtor has priority.  Cal. Civ. Code § 955.1(b); <u>Graham Paper Co. v. Pembroke</u>, 124 Cal. 117, 120 (1899); <u>Rogers v. Transamerica Corp.</u>, 36 Cal. App. 2d 233, 241 (1939); <u>Rosenblatt v. Credit Discount Co.</u>, 37 Cal. App. 2d 108, 109 (1940).  The Inter-Company Loan exceeds $18 million, so any agreement for its assignment implicates the statute of frauds, and under Civil Code Sections 955 and 955.1, it must be in writing in order to be legally effective.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

As mentioned, after well over a year of searching for it in connection with Sheahan/Lock's investigation, Fast Falcon and the SSC&L 2007 Trust have failed to produce *any* document memorializing a transfer of the Inter-Company Loan. In addition, the liability continued to be reflected on Cedenco's balance sheet as an obligation owed to SK Foods, rather than the SSC&L 2007 Trust or Fast Falcon, which further negates the inference that a transfer of the Inter-Company Loan to SSC&L 2007 Trust occurred as a matter of Australian law. Moreover, SK Foods received no money or property from the SSC&L 2007 Trust or Fast Falcon. Accordingly, any purported assignment of the Debtors' interest in the Inter-Company Loan to the SSC&L 2007 Trust is unenforceable under both Australian and U.S. law. Consequently, it remained property of the Debtors and passed to the bankruptcy estate upon the filing of this case.

Nevertheless, Defendant Fast Falcon, LLC, has asserted proofs of debt in the Cedenco Liquidation claiming to be the owner of the Inter-Company Loan. Notably, Fast Falcon's proof of debt fails to attach an assignment instrument signed by SK Foods transferring the Inter-Company Loan to the SSC&L 2007 Trust, nor does it attach any document purporting to assign that debt from the SSC&L 2007 Trust to Fast Falcon. Fast Falcon therefore has no valid claim to the Inter-Company Loan, and its assertion of rights to an asset that belongs to the estate violates 11 U.S.C. § 362(a)(3).

3.    Any Transfer of the Cedenco Stock and Inter-Company Loan is
       Avoidable as a Fraudulent Conveyance

Section 548(a)(1)(B) and Section 544(a) (incorporating the correlating provision of the California Civil Code) provide that a trustee may avoid any transfer of an interest in property of the debtor made within two years (four years under Cal. Civ. Code § 3439) of the Petition Date where the Debtor received less than reasonably equivalent value in exchange for the transfer, and was insolvent on the date of the transfer. 11 U.S.C. § 548(a)(1)(B). "Value" for purposes of Section 548 means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or a relative of the debtor." 11 U.S.C. § 548(d)(2). A "transfer" for avoidance purposes is deemed to occur when such transfer would be deemed valid against a *bona fide* purchaser of the asset under non-

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

22

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1  bankruptcy law.  11 U.S.C. § 548(d)(1); <u>Frierdich v. Mottaz</u>, 294 F.3d 864, 868-69 (7th Cir.

2  2002) (analyzing whether instruments executed by debtor were sufficient to convey stock under

3  Illinois law).

4         *a.  Transfer of the Cedenco Stock*

5         Although under Sections 231 of the Australian Corporations Act 2001, as well as Articles

6  2.4 and 5.1 of the Cedenco constitution, a legal transfer of shares is not deemed valid and

7  effective until the change of ownership is reflected on the company's share register, at a

8  minimum, to be binding on a *bona fide* purchaser, the transfer must be in writing and be signed

9  and delivered to the transferee.  *See, generally*, <u>Frierdich</u>, 294 F.3d at 869 (although holding that

10  execution of a stock power instrument was not sufficient).  The Trustee will assume for purposes

11  of this Motion, however, that the 2008 Transfer Documents prepared by Gary Perry would be

12  sufficient to effect the transfer of the Cedenco Stock under Australian law.

13         But even if they are deemed valid, the earliest possible date Salyer could have executed

14  the 2008 transfer documents is sometime after April 11, 2008, when he returned from Australia.

15  This is because the documents were not sent to Lisa Crist until March 28, 2008.  In her Rule

16  2004 examination, Ms. Crist testified that she did not obtain Salyer's signature on any documents

17  during her trip.[19]  *See* Nuti Decl., ¶¶ 25-26, Exh. 13.  Thus, if the 2008 Transfer Documents are

18  in any way effective, the transfer still could not have occurred any earlier than April 12, 2008,[20]

19  less than 2 years before these cases were filed on May 5, 2009.

20         *b.  Transfer of the Inter-Company Loan*

21         Both Australian law and California law require the execution and delivery of a written

22  instrument to transfer the Debtors' rights in the Inter-Company Loan.  *See* Cal. Civ. Code §§ 955

23

---

24  [19]  Defendants have asserted that the transfer occurred on November 1, 2006, based solely
25  on footnotes to the Debtors' June 30 2007 audited financials prepared by Moss Adams.
    But again, the subsequent email exchanges show that no documents existed as of
    November 1, 2006, or even the date of the issuance of the auditor's opinion on January
26  15, 2008.  Rather, as Dan Nutley testified, Moss Adams relied solely on a representations
    provided by management and journal entries.  *See* Nuti Decl., ¶¶17-19, Exh. 10.

27  [20]  This is the Saturday after Salyer returned from his trip.

28

23

& 955.1, Cal. Civ. Code § 1624.5(a). Defendants have produced nothing to suggest that a transfer ever actually occurred. Nor have they shown that notice of the purported assignment was given to Cedenco, which continued to reflect the liability as owing to SK Foods, LP up to the filing of its bankruptcy case. Since the purported transfer was unperfected vis-à-vis a subsequent *bona fide* purchaser, assuming that it was transferred, the effective date for the transfer for avoidance purposes is deemed to be immediately prior to the Petition Date. 11 U.S.C. § 548(d)(1).

### c. The Debtors Received No Value

The Debtors received no cash or other property from SKPM Corp. or SSRT in exchange for the Cedenco Stock. Neither did the transfer to SKPM Corp. nor SSRT reduce any indebtedness, or secure any indebtedness owed to them. Similarly, the SSC&L 2007 Trust gave no cash or property, or credited SK Foods on any obligation owed to it in exchange for the transfer of the Inter-Company Loan. Hence, the Debtors received no value in exchange for these transfers within the meaning of the fraudulent transfer laws. 11 U.S.C. § 548(d)(2).

### d. The Debtors Were Insolvent

Although Stoughton Davidson would later withdraw its audit opinion, the financial statement prepared closest in time to the asserted transfer of the Cedenco Stock was the Debtors' financial statement for the fiscal year ending June 30, 2008. *See* Sharp Decl., ¶33, Exh. 15. According to that statement, the Debtors assets exceeded its liabilities by approximately $84 million. However, the June 30, 2008 financials fails to take into account any of the liabilities resulting from the Debtors' criminal activities. Those liabilities must be included in order to get an accurate picture of the Debtors' true financial condition.

Where a debtor has engaged in acts giving rise to a potential liability, that liability must be accounted for based upon the size of the potential liability discounted for the probability that a claim will in fact be asserted. In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir.1988) (contingent liability must be discounted by the probability that the contingency will occur and the liability will become real). Similarly, under Statement of Financial Accounting Standards No. 5 promulgated by the Financial Accounting Standards Board ("FAS 5"), a

Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

24

contingent liability must be reflected on a company's balance sheet if the auditor determines that future realization of the loss is within the "probable" range, that is, the future event or events causing the liability to mature are likely to occur.[21]

In this case, one former director of SK Foods, Randall Rahal, and three former high level officers/employees, Steve King, Alan Huey, and Jennifer Dahlman, have already entered into plea agreements in which they admit to having engaged in criminal conduct over a period spanning 1999 to 2008 – bribery and price-fixing in the case of Mr. Rahal, falsifying product documentation in the cases of Mr. King, Mr. Huey, and Ms. Dahlman. *See* RJN, Exhibits 9-11. These individuals clearly were SK Foods's agents/employees. The acts to which they admitted in their guilty pleas all arise out of and relate to the sale of SK Foods's products to customers. While we can assume Defendants will maintain that Salyer knew nothing of the criminal activity, even if that were true, SK Foods nevertheless is liable for the wrongful acts of its employees and agents committed in the course and scope of their employment, regardless of Salyer's personal culpability. <u>Perez v. Van Groningen & Sons, Inc.</u>, 227 Cal.Rptr. 106, 109, 41 Cal.3d 962, __ (1986) (under the doctrine of respondeat superior, an employer is liable for servant's torts committed as part of the transaction of the master's business, even though employer did not authorize the conduct and the injury results from actions contrary to the master's express orders).

Direct purchasers of product from the Debtors who were victims of the bribery and scheme to falsify product quality documentation did ultimately file proofs of claim in this case. In addition, claims were filed by Morningstar Packing Co. which claimed that it lost profits as a result of the diversion of sales due to the bribery, and by representatives of a class of purchasers who alleged that the price-fixing scheme caused them to pay supra-competitive prices for tomato products. *See* RJN, Exhs. 12-18. This Court has entered orders on or about January 24, 2011 approving compromises with Morningstar and the Class Representatives allowing them claims in

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

---

[21]    While not controlling, GAAP standards may serve as useful guides in assessing a debtor's solvency. <u>In re Sierra Steel, Inc.</u>, 96 B.R. 275, 278 (9th Cir. BAP 1989).

1 the amount of $121 million.  *See* RJN, Exh. 19.  In addition, claims of direct purchasers for

2 bribery damages and fraud would also have to be factored in.

3 　　　Other professionals in the Trustee's firm engaged in a preliminary analysis of the

4 potential damage claims to customers related to the direct bribery activities.[22]  In this analysis,

5 the professionals examined the plea agreements entered into by the Debtors' agents and

6 purchasing managers at the Debtors' customers.  From those, the professionals were able to

7 ascertain which customers were bribed, and over what period of time.  They then determined

8 what product was sold to each bribed customer over the period of admitted bribery for that

9 customer up to April 2008, and estimated the damage claims the bribed customers would be

10 legally entitled to assert.  *See* Sharp Decl. at ¶¶ 34.  Under applicable California law, a victim of

11 commercial bribery can recover their actual damages, or disgorgement of the tortfeasor's profits,

12 whichever is greater.  <u>Williams Electric Games, Inc. v Garrity, et al</u>, 366 F. Supp. 569 (2004);

13 <u>Shersher v. Superior Court</u>, 154 Cal.App.4th 1491, 1500(2007); <u>Hirsch v. Bank of America</u>, 107

14 Cal.App.4th 708, 722 (2003); <u>Ward v. Taggart</u>, 51 Cal.2d 736, 741-742 (1959).  Using this

15 methodology, on a preliminary basis the Trustee estimates that actual damages were at least $40

16 million as of April 2008, exclusive of any exemplary, punitive damages or attorneys fees to

17 which the bribed customers would also be entitled.  Given the plea agreements by the Debtor's

18 agents, the FBI investigation and the subsequent actual assertion of claims, the Court can

19 reasonably infer that the likelihood of claims being asserted in April 2008 for bribery and other

20 illegal activities was in the "probable" range for purposes of FAS 5.

21 　　　It is accepted practice to establish insolvency at a prior date through "retrojection," an

22 approach in which later-in-time financial reports or indices showing insolvency are coupled with

23 an analysis of whether or not changes occurring in the intervening period would have affected

24 the debtor's solvency.  <u>Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)</u>, 287 B.R. 270, 282

25 (Bankr. D. Idaho 2002), *aff'd*, 144 Fed. Appx. 697 (9th Cir. 2005).  The foregoing demonstrates

26

27 [22]　　The Trustee reserves the right to amend or supplement this analysis at any time before
trial.

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

that instead of being solvent on June 30, 2008, SK Foods was in reality hopelessly insolvent. Its liabilities exceeded its assets by at least $80 million. Nothing significantly affected the value of the Debtors' assets of liabilities between April 12, 2008, the earliest date the Cedenco Stock could have been transferred, and June 30, 2008. Thus, given the absence of intervening events occurring in the short interval between the deemed transfer date and June 30, 2008, the Trustee submits that this is more than sufficient to establish a "fair chance" of proving at trial the Debtors' insolvency as of April 12, 2008.

With regard to the transfer of the Inter-Company Loan, as noted above, Section 548(d)(1) deems that transfer to have occurred immediately prior to the Petition Date. Given that the Debtor was insolvent on June 30, 2008, and no events occurring between June 30, 2008 and May 4, 2009 would have substantially reduced the Debtors' liabilities or increased the value of its assets, the Trustee submits that there is more than sufficient evidence to establish a "fair chance" of proving at trial that the Debtors' were insolvent one day prior to the Petition Date.

## C. **The Trustee Has Demonstrated a Likelihood of Immediate, Irreparable Harm Absent an Injunction**

In the event an injunction is not issued and Defendants are permitted to dissipate or transfer assets beyond the reach of this Court, the Trustee will suffer irreparable harm. Return of the fraudulently transferred property is a remedy provided by both federal and California law under these circumstances. 11 U.S.C. §§ 548(a), 550(a); Cal. Civ. Code §§ 3439.04, 3439.05, 3439.07. If Defendants dissipate or move them beyond the reach of the Court, then this Court cannot provide the Trustee with the remedy to which he is entitled. Thus, Courts have held that a preliminary injunction freezing the transfer of assets is proper where fraudulent conveyance is alleged in a bankruptcy case. Focus Media, 387 F.3d at 1086-87; *See also* United States ex rel. Rahman v. Oncology Assocs., P.C., 198 F.3d 489, 501 (4th Cir. 1999).

The present motion is quite similar to *Focus Media*, where the Ninth Circuit approved the granting of a temporary restraining order and preliminary injunction freezing assets that the Trustee sought to recover from the defendant. There, the trustee had brought an adversary proceeding against the sole shareholder of debtor, alleging that the debtor had fraudulently

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

conveyed substantial sums of money, through loans and otherwise, to the shareholder. On the same day that the complaint was filed, the trustee also sought to freeze the shareholder's assets by filing an *ex parte* motion for a temporary restraining order and a motion for a preliminary injunction. The *ex parte* motion alleged the trustee's belief that the shareholder defendant resided in France and that the TRO was necessary to preserve the assets. The bankruptcy court granted the TRO, and the Ninth Circuit affirmed, finding that evidence that the shareholder might "ma[ke] away" with the funds that the Trustee sought to recover "raise[d] the specter of irreparable harm to the bankruptcy estate if these funds are not frozen." Focus Media, 387 F.3d at 1086.

The same is true here. Defendants might "make away" with the Cedenco Assets that the Trustee seeks to recover in the adversary proceeding, if not enjoined. This possibility raises the specter of irreparable harm to SK Foods's estate.

As shown by the Declaration of Michael Carlson relating the facts surrounding violations of the preliminary injunction entered in the substantive consolidation action, Salyer and those acting on concert with him (Cary Collins and Robert Pruett) are willing to misappropriate assets and conceal those activities by giving false accountings, even in the face of a Court Order. Prior misconduct in hiding or depleting assets is "extremely relevant to the concern that [defendants] might conceal or dissipate assets" again and is properly considered in granting an injunction. New Images of Beverly Hills, 321 F.3d at 882.

Moreover, through its criminal investigation, the government has uncovered evidence of actual transfers of assets to overseas accounts, and a stated intent to continue doing so. Given the Defendants' past conduct in improperly transferring assets (as evidenced both by the Drum Line litigation and the criminal complaint), it is reasonably foreseeable that these entities will do the same if given the slightest opportunity to get their hands on the $50 million held in the Cedenco Liquidation.

**D.  This Court is Authorized to Appoint a Receiver**

Federal Rule of Bankruptcy Procedure 7064, which incorporates Federal Rule of Civil Procedure 64,[23] permits a bankruptcy court to award a plaintiff whatever prejudgment remedies are available under state law. *See* 10 Alan N. Resnick & Henry J. Sommer eds. COLLIER ON BANKRUPTCY ¶ 7064.01-7064.02 (15th ed. rev. 2005). Under Section 564 of the California Code of Civil Procedure, a court may appoint a receiver in actions by a creditor seeking to subject property or a fund to the creditor's claim, Cal. Code Civ. Proc. § 564(b)(1), and in any other action "where necessary to preserve the rights or property of any party." Cal. Code Civ. Proc. § 564(b)(9). Moreover, it is "always appropriate to grant intermediate relief of the same character as that which may be granted finally." Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc., 970 F.2d 552, 560-61 (9th Cir. 1992) (internal quotes omitted). Section 3439.07(a)(3) of the

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

---

[23] Rule 64 of the Federal Rules of Civil Procedure, made applicable through Rule 7064 of the Federal Rules of Bankruptcy Procedure, provides:

**Seizing a Person or Property**

(a) Remedies Under State Law — In General.

At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies.

(b) Specific Kinds of Remedies.

The remedies available under this rule include the following — however designated and regardless of whether state procedure requires an independent action:

• arrest;

• attachment;

• garnishment;

• replevin;

• sequestration; and

• other corresponding or equivalent remedies.

Fed. R. Civ P. 64, as incorporated by Fed. R. Bankr. P. 7064.

California Civil Code specifically allows plaintiffs seeking to recover fraudulently transferred assets to obtain:

> (A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or its proceeds.
>
> (B) *Appointment of a receiver to take charge of the asset transferred or its proceeds*.
>
> (C) Any other relief the circumstances may require.

Cal. Civ. Code § 3439(a)(3) (emphasis added).

Appointment of a receiver prior to entry of judgment is therefore a remedy available to the Trustee under California law. Similarly, other courts have acknowledged the propriety of appointing a receiver to hold fraudulently transferred assets pending trial under Section 105. Fisher v. Hamilton (In re Teknek, LLC), 343 B.R. 850, 873 (Bankr. N.D. Ill. 2006) (using 11 U.S.C. § 105(a) and Fed. R. Bank. P. 7064); *cf.* In re Schlein, 178 B.R. 82 (Bankr. E.D. Pa. 1995) (using only 11 U.S.C. § 105(a)). Accordingly, in order to preserve the Trustee's ability to avoid and recover the Cedenco Assets and to prevent any further deceptive behavior regarding the assets pending trial, the Court should order the appointment of a receiver to take possession of any instruments underpinning Fast Falcon's claim to the Cedenco Assets, to serve notice of his authority upon the Liquidators or courts in Australia, and to accept and hold any distribution that may be determined to be payable to Fast Falcon from the Cedenco Liquidation.

**E. The Balance of Equities Favors an Injunction**

Because a preliminary injunction is an extraordinary remedy, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008). The issue is whether the injury that the defendant will suffer if it is enjoined outweighs the injury that plaintiff will suffer from defendant's conduct if it is not enjoined. Scotts Co. v. United Industries Corp., 315 F.3d 264, 284 (4th Cir. 2002).

In this case, the assets at issue consist of rights to payment of money, and the proceeds thereof. Fast Falcon, LLC has no business, other than to shield Salyer's interest in funds he has

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

Schnader Harrison Segal & Lewis LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

transferred overseas.  While granting preliminary injunctive relief will undoubtedly interfere with Salyer's plans to keep the Cedenco Assets for himself, this is not a cognizable harm.

In contrast, the harm to the Estate if these assets are dissipated or further transferred is obvious.  If Salyer/Fast Falcon is permitted to do so, the principal source of repayment to creditors in this case will vanish.

For these reasons, the balance of equities weighs strongly in favor of granting the injunction.

**F.  An Injunction is in the Public Interest**

In deciding whether to grant preliminary injunctive relief, Court must "pay particular regard for the public consequences …." Winter, *supra*, 129 S.Ct. at 376-77.  The public has an interest in the successful and just resolution of the affairs of a bankrupt debtor.  *See* In re PTI Holding Corp., 346 B.R. 820, 832-33 (Bankr. D. Nev. 2006); In re Stadium Management Corp., 95 B.R. 264, 269 (Bankr. D. Mass 1988);  In re Monroe Well Service, Inc., 67 B.R. 746, 756 (Bankr. E.D. Pa. 1986).  Specifically here, there is a public interest in preserving the assets of the estate of SK Foods for the benefit of its creditors.  Moreover, it is certainly in the public interest to prevent fraudulent transfers of assets for the purpose of avoiding the claims of creditors, especially where the individuals involved have a track record of doing so.

**G.  Service on Fast Falcon is Proper**

Rule 7005 of the Federal Rules of Bankruptcy Procedure (incorporating Rule 5 of the Federal Rules of Civil Procedure) provides that pleadings and other papers served after the filing of the original complaint are to be served on party's attorney if it is represented by counsel in the action.  Fed. R. Civ. Proc. 5(b)(1).  In this instance, on August 5, 2011, Dean Gloster and Kelly Woodruff of Farella Braun Martel LLP ("FBM") entered a general notice of appearance and request for notice on behalf of all Defendants except John Henry Heath, *including* Fast Falcon LLC [Doc. No. 28].[24]  Fast Falcon is mentioned three times in that notice of appearance.  FBM

---

[24] The appearance was made on behalf of "Defendants SKPM Corp., SSC&L 2007 Trust, Monterey Peninsula Farms LLC, Scott Salyer in his capacity as Trustee for the SSC&L 2007 Trust and the Scott Salyer Revocable Trust, Scott Salyer Revocable Trust, and Fast Falcon, LLC.

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

1   has also appeared on behalf of the "Salyer Parties" in Rule 2004 examination proceedings

2   conducted by counsel for Sheahan/Lock in the Chapter 15 proceedings seeking to investigate

3   competing ownership claims to the Cedenco Assets.  No other counsel made an explicit

4   appearance for Fast Falcon in the Ch.15 proceedings.  But as noted above, only Fast Falcon LLC

5   has asserted proofs of debt or proofs of equity interests in the Cedenco Liquidation.  Salyer's

6   story is that whatever rights SKPM Corp., SSRT, and the SSC&L 2007 Trust had were assigned

7   to Fast Falcon.  Therefore, the only reasonable inference to draw from FBM's appearance on

8   behalf of the "Salyer Parties" in the Chapter 15 proceedings is that Fast Falcon is in actuality

9   FBM's client.

10      The Trustee pointed out to FBM on August 25, 2011 that it had appeared as counsel for

11  Fast Falcon in this action and appeared at five (5) 2004 exams in the Chapter 15 proceedings

12  which are seeking to investigate the competing claims made by the Trustee and Fast Falcon to

13  the Cedenco Assets.  Without responding to the Trustee's request for clarification about who it

14  represented, on August 26, 2011, FBM purported to withdraw its appearance for Fast Falcon.

15  [Doc. No. 58].  Notably, the withdrawal does not explicitly disclaim any representation of Fast

16  Falcon.  However, in view of: (1) FBM's prior general appearance for both Fast Falcon and

17  Salyer in this action, (2) its appearance in the Chapter 15 proceedings in which, of all the Salyer

18  Parties, only Fast Falcon ostensibly has an economic stake, and (3) the fact that Fast Falcon is

19  Sayler's alter ego (because he is Fast Falcon's Manger, and Fast Falcon's only purpose is to

20  shield Salyer's true interest in funds held in overseas bank accounts), the Trustee submits that

21  service upon FBM is sufficient to provide notice of these proceedings to all Defendants,

22  including Fast Falcon.

23      Alternatively, Rule 5(b)(2) provides that papers may be served on an unrepresented party

24  in several ways, including (B) leaving it at a person's office or the person's dwelling or usual

25  place of abode, and (C) mailing it to the person's last known address.[25]  Fed. R. Civ. Proc.

---

26

27  [25]  It should be noted that Fast Falcon, LLC was served with the summons and complaint in this action several times.  Most recently, Fast Falcon was served on August 25, 2011 c/o Scott Salyer, Manager at his residence in Pebble Beach. [Doc. No. 55].  Since Salyer is

28  Fast Falcon, LLC's Manager and has the power to transfer its funds, (Exhibit NN of the

*...Continued*

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

5(b)(2). In an abundance of caution, copies of this Motion and all related documents are also

being served contemporaneously with their filing by messenger to Fast Falcon, c/o Scott Salyer,

Manager, at 3903 Rhonda Road in Pebble Beach, California where he is under house arrest, and

to Fast Falcon, c/o Cary Collins, its Authorized Agent, at 3450 21st Street, San Francisco,

California. As noted above, Salyer is Fast Falcon, LLC's Manager, and has authority to transfer

its funds. His own characterization of his position with Fast Falcon and authority to transact

bank business establish that Salyer either occupies a position of control, or alternatively,

occupies a position that gives a high probability of assurance that process will be delivered to

Fast Falcon's responsible individuals, which is all that is required to find that service upon him is

proper to join Fast Falcon. Moreover, Cary Collins has also represented himself to be Fast

Falcon's agent in connection with asserting its proof of debt and proof of interest in the Cedenco

---

*Continued from previous page*

    Supplemental Exhibits, attached as RJN Exh. 5), service upon him is proper under Fed. R. Bankr. Proc. 7004(b)(3) (permitting service upon a domestic or foreign corporation by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent). Moreover, Fast Falcon, LLC was served with the summons and complaint on June 10, 2011, c/o Cary Collins, its Authorized Agent. [Doc. No. 21]. Authority to accept service need not be explicit, but rather, may be implied based upon the type of relationship that exists between the defendant and the agent. <u>Focus Media</u>, 387 F.3d at 1082. According to representations made in the proof of debt filed in the Cedenco Liquidation, Cary Collins had authority to execute and attest to the proof. *See* Sharp Decl., ¶ 11, Exh. 1. Thus, Fast Falcon delegated responsibility to Cary Collins in connection with the assertion of its claims to the Cedenco Assets, and to receive any distribution on account of same. This responsibility implies that Collins has in fact been delegated authority to defend challenges to Fast Falcon's interests, which the Trustee is doing via this action. *See* <u>Kane v. Union of Soviet Socialist Republics</u>, 267 F.Supp. 709, 713 (E.D. Pa., 1967) ("Agreement requiring Mor-mack to 'take all necessary steps to protect the interest of the vessel in connection with all claims that may be made against the vessel.' is broad enough to authorize Mor-mack to accept service of process on behalf of Black Sea for asserted causes of action which arose out of transactions, occurrences or events which took place upon a vessel operated by Black Sea while that vessel was in this District and subject to the terms of the Agreement."); <u>Manchester Modes, Inc. v. Lilli Ann Corp.</u>, 306 F.Supp. 622, 626 (S.D.N.Y., 1969) ("Even assuming that Greenberg was not defendant's officer, director, managing or general agent, or authorized by appointment of law to receive service of process, he was the agent in charge of defendant's New York showroom. As such, service upon him justifies the belief that defendant will be apprised of the suits pending against it. <u>Boryk v. deHavilland Aircraft Co.</u>, 341 F.2d 666 (2d Cir. 1965); <u>Raul International Corp. v. Nu-Era Gear Corp.</u>, 28 F.R.D. 368, 372 (S.D.N.Y.1961); <u>Kamen Soap Products Co. v. Struthers Wells Corp.</u>, 159 F.Supp. 706, 710-711 (S.D.N.Y.1958); <u>United States v. Imperial Chemical Industries, Ltd.</u>, 100 F. Supp. 504 (S.D.N.Y.1951); see <u>Bomze v. Nardis Sportswear, Inc.</u>, *supra* 165 F.2d at 37-38.").

Liquidation. According to Mr. Collins's counsel in Australia, "[Collins] was involved in assisting Mr. Salyer with his legal representation and his entities." This admission further confirms that Salyer has delegated responsibility for Fast Falcon legal affairs to Collins, and that Collins therefore has implied authority to accept service on Fast Falcon's behalf in matters germane to the rights Fast Falcon is asserting in the Cedenco Liquidation. *See* SUPRA at note 25.

## CONCLUSION

For the foregoing reasons, the Trustee has demonstrated a substantial likelihood of succeeding on the merits of his claims, has demonstrated a likelihood of irreparable harm and has demonstrated that issuance of the requested injunction is favored by a balance of the equities and the public interest. The Trustee respectfully requests that the Court issue a temporary restraining order preventing Fast Falcon and any of the other defendants from making any further transfer of its asserted rights and claims to the Cedenco Assets, and after a further hearing, enjoin Fast Falcon and the other Defendants from taking any action to dissipate or transfer the Cedenco Assets, appoint a receiver to take possession of any instruments evidencing Fast Falcon's rights and claims to the Cedenco Assets, authorize him to notify the Liquidators and Australian courts of his authority, and to take possession of any distribution payable to Fast Falcon from the Cedenco Liquidation, and enjoin Defendants from taking any actions to interfere with the receiver pending trial.

Dated: August 31, 2011          SCHNADER HARRISON SEGAL & LEWIS LLP


                                /s/*Kevin W. Coleman*
                                Kevin W. Coleman
                                Attorneys for Bradley D. Sharp. Chapter 11 Trustee

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

# Appendix 1



# Corporations Act 2001

**Act No. 50 of 2001 as amended**

**VOLUME 1**   includes: Chapters 1–2K (ss. 1 – 282)

This compilation was prepared on 2 March 2005
taking into account amendments up to Act No. 8 of 2005

The text of any of those amendments not in force
on that date is appended in the Notes section

The operation of amendments that have been incorporated may be
affected by application provisions that are set out in the Notes section

**VOLUME 2**       includes: Chapters 2L–5B (ss. 283AA – 601DJ)
**VOLUME 3**       includes: Chapters 5C–6D (ss. 601EA – 742)
**VOLUME 4**       includes: Chapter 7 (ss. 760A – 1101J)
**VOLUME 5**       includes: Chapters 9 and 10 (ss. 1274 – 1471)
                              Schedules 3 and 4
                              Table of Acts
                              Act Notes
                              Table of Amendments
                              Endnotes
                              Table A

Prepared by the Office of Legislative Drafting and Publishing,
Attorney-General's Department, Canberra

Filed 08/31/11　　　　　　　　Case 11-02337　　　　　　　　Doc 65

Section 231

# Chapter 2F—Members' rights and remedies

### 231　Membership of a company

A person is a member of a company if they:

(a) are a member of the company on its registration; or

(b) agree to become a member of the company after its registration and their name is entered on the register of members; or

(c) become a member of the company under section 167 (membership arising from conversion of a company from one limited by guarantee to one limited by shares).

# Appendix 2

Filed 08/31/11                     Case 11-02337                                    Doc 65

1 of 1 DOCUMENT: Australian Corporation & Securities Reports (& ACLR)/Judgments/AUSTRALIAN COMPANY LAW
REPORTS/2 ACLR/Re EXCLUSIVE MASTER BOOK-BINDING AND MANUFACTURING PTY LTD - 2 ACLR 549 - 15
September 1977

4 pages

# Re EXCLUSIVE MASTER BOOK-BINDING AND MANUFACTURING PTY LTD – (1977) 2 ACLR 549

SUPREME COURT OF SOUTH AUSTRALIA
Bray CJ

14 September, 15 September 1977
-- Adelaide

**Companies -- Winding up petition -- Contributory -- Creditor -- Rectification of register -- Petitioner's name not on register of members -- No order in existence for rectification -- Allegation that company unable to pay its debts -- No allegation of fraud -- Possibility of recovery as against officer -- Whether petitioner competent to present petition -- (SA) Companies Act 1962 ss 155, 221, 222**

A petition for winding up alleged that the company was unable to pay its debts. There was no allegation of fraud in the sense of deceit but there was an allegation that a certain officer of the company had been using the company's money for his own purposes.

The petitioner at the time of the presentation of the petition was not a registered shareholder but proceedings had been taken for the rectification of the company's register of members by the insertion of his name as a shareholder.

The petition disclosed that the petitioner was not only a shareholder, or a potential shareholder, but also a creditor in respect of a large sum of money.

**Held:** (i) The petitioner as a creditor had an interest in seeing that the assets of the company were not dissipated; and the allegation in the petition that the company was unable to pay its debts was, in the circumstances of the case, no bar to the success of the petition even on the basis that it was only a contributory's petition.

> *Re Rica Goldwashing Co* (1879) 11 Ch D 36; *Re Diamond Fuel Co* (1878) 13 Ch D 400; *Re Haycraft Gold Reduction and Mining Co* [1900] 2 Ch 230, referred to

(ii) Since at the time of the presentation of the petition the petitioner was not on the register of members and there was no order in existence directing that he be so registered, the petitioner was not entitled in the character of a contributory to present the petition.

> *Re Gattopardo Ltd* [1969] 2 All ER 344, applied

(iii) The petitioner should be allowed an opportunity to argue that he could present the petition in the character of a creditor.

**Petition for Winding up**

This petition for winding up came on before Bray CJ in the circumstances hereunder appearing.

> *A R Keay*, for the petitioner.

> *D J Bridges*, for the respondent company.

Bray CJ.

This is a petition for winding up.

The petitioner, Mr Nicholas, sets out the usual particulars in the petition. He alleges that he is the holder of one ordinary share in the capital of the company and a director of the company, and that one Oscar Walker is also the holder of one ordinary share and a director, and

that he and Mr Walker are the only shareholders and directors of the company. The petition goes on to allege that the company

is insolvent and unable to pay its debts. The petitioner says that he does not know the full details of the company's indebtedness, but he mentions several debts including one to himself of $10,000 and two others to himself of $150 and $350 resectively. He says that there is no possibility of the company carrying on business at a profit. He refers to disagreements between himself and Mr Walker and says that Mr Walker has assumed control of the company's premises and affairs and has refused to explain his actions to the petitioner and has excluded him from the company's premises and from access to the company's books of account. The petition goes on to say that the petitioner wants to wind up the company because it is unable to meet its debts but that Mr Walker will not agree to this and further alleges that Mr Walker has taken business trips of unnecessary length, has refused to produce his receipts in relation to expenses incurred on those trips and has used the company's money to repay a private loan. It is further alleged that the company's accountant has not been supplied with details of the company's transactions and has been unable to keep the books up to date. It is further alleged that it is just and equitable that the company should be wound up.

The petitioner obtained an appointment of a provisional liquidator by order of the Deputy Master dated 25 August 1977.

An affidavit has been filed by Mr Walker. He says that he and one Chesterman purchased the company Allroads Haulage Pty Ltd, the previous name of the present company, that Chesterman desired to get out of the business and that the petitioner agreed to purchase Chesterman's share. He produces a copy of a share transfer from Chesterman to the petitioner but he says that that transfer was never stamped or entered in the register of members. That is admitted. He suggests that the company is now receiving orders and that if it is allowed to carry on it will be able to meet all its debts.

When the petition was called on Mr Bridges for the company in effect demurred to the petition. He took two points. The first is that the petitioner is not entitled to present a petition for winding up as a contributory. In the first place he is not a contributory at all, since he is not a registered shareholder, but in any event his share was certainly not held by him and registered in his name for at least six months during the 18 months before the presentation of the petition within the meaning of s 221 (2) (a) (ii) of the Companies Act 1962 as amended. Hence he was not eligible to present the petition. To this it is replied by Mr Keay for the petitioner that proceedings have been taken for the rectification of the company's register by the insertion of the name of the petitioner as a shareholder and that it will be asked in those proceedings that he be entered on the register as a shareholder as from 29 October 1976, the date of the transfer from Chesterman to himself, and that when that is done he will be retrospectively qualified within the meaning of s 221 (2).

The second point taken by Mr Bridges is that the petition itself says that the company is unable to pay its debts and that a winding up order will not be made under those circumstances on the petition of the holder of fully paid up shares in the company because the order would be useless to him as, if the company is insolvent, there will be no surplus of assets for division amongst the shareholders. To that Mr Keay replies

*2 ACLR 549 at 551*

that there are exceptions to that rule and that this case comes within those exceptions.

I deal with the second point first. The general principle referred to by Mr Bridges is derived from the case of *Re Rica Goldwashing Co* (1879) 11 Ch D 36 and there is no doubt as to its existence, but there is also no doubt as to the existence of exceptions as contended by Mr Keay. One of them is where there is an allegation of fraud made with sufficient particularity and where something may be recovered by proceedings against the officers of the company, see *Re Diamond Fuel Co* (1878) 13 Ch D 400; *Re Haycraft Gold Reduction and Mining Co* [1900] 2 Ch 230. Here there is no allegation of fraud in the sense of deceit, but there is an allegation that Mr Walker has been using the company's money for his own purposes. If that were so, then no doubt he could be made to refund in a winding up. It seems to me that this allegation has a similar effect to an allegation of fraud. The reason behind the rule is that in the normal case, if there is no surplus of assets over liabilities, there will be no benefit to the shareholder in the winding up order. However, this petition discloses that Mr Nicholas is not only a shareholder, or a potential shareholder, but also a creditor in respect of a large sum of money. As such he clearly has an interest in seeing that the assets of the company are not dissipated. *Cessante ratione legis, cessat ipsa lex.* In my view the allegation that the company is unable to pay its debts is in the circumstances of this case no bar to the success of the petition, even on the basis that it is only a petition by a contributory and not by a creditor. That is a matter to which I will return later.

The first objection is more formidable and, indeed, I think it succeeds if the petition is to be regarded merely as the petition of a contributory. Mr Keay referred to cases where an order for rectification of the share register has been made and the court has directed that the name of a shareholder be entered on the register retrospectively, eg *Re Sussex Brick Co* [1904] 1 Ch 598. These cases are, I think, merely an application of the general rule that equity regards as done what ought to be done. That rule, however, must give way to the peremptory demands of a statute. In *Re Patent Steam Engine Co* (1878) 8 Ch D 464 the petitioner was allowed to present a petition notwithstanding that he was not entered on the register of contributories at the date of the petition, but there an order of the court had been made against the company directing it to register the petitioner and that order, as I read the report, had been made before the date of the presentation of the petition. In *Re Gattopardo Ltd* [1969] 2 All ER 344 the Court of Appeal treated that case as very exceptional. Indeed, it seems to me that doubt was thrown on its correctness, see per Russell LJ, as he then was, at 346, but in any event it is plain that the Court of Appeal did not think that it should be extended. In the *Gattopardo Case* an order in a suit between the vendor and the purchaser of shares declared that the petitioner, the purchaser, was entitled to be registered. The order was made on 23 April 1968. The shares were not transferred until 9 October 1968. The petition was presented on 18 December 1968. Therefore, if the six months for the purposes of s 221 (2) (a) (ii) was to be calculated from the date of the court order, the petitioner was within the section. If it was to be calculated from the date of actual registration, she was outside it. The Court of Appeal held that the petition was incompetent. It dismissed an appeal against its dismissal. The learned judges founded on the words of

Vaughan Williams J, as he then was, in *Re a Company* [1894] 2 Ch 349 where the ancient principle of equity was invoked and the learned judge said: "There is an express statutory provision as to the qualification of a contributory to present a winding-up petition, and that cannot be modified by saying that he ought to be in a position in which he is not. The provisions of s 40 [the then applicable section] are not complied with, and I see no reason why the company should not set up that defence." I think I must follow the decision in the *Gattopardo Case* which is, after all, a decision of the Court of Appeal. At the time the petition here was presented the petitioner was not on the register of shareholders and there was no order then in existence directing that he be so registered. Accordingly I think that he was not entitled to present a petition as a contributory.

However, that is not the end of the matter. The petition also alleges that the petitioner is a creditor for a sum of money in excess of $10,000. Further, it alleges that the company is unable to pay its debts. I am not sure from the affidavit of Mr Walker whether that is disputed or not. If it is disputed, then, of course, one of the company's objections would disappear, but I have already decided that there is no substance in that particular objection.

One of the grounds for making a winding up order is that the company is unable to pay its debts (s 222(1)(e)). Section 222(2) sets out the circumstances in which a company is deemed to be unable to pay its debts. The first is failure after three weeks to comply with a demand for payment duly served. The second is that execution on a judgment in favour of the creditor has been returned unsatisfied. The third is if it is proved to the satisfaction of the court that the company is unable to pay its debts. I have held earlier in this month's sittings in this jurisdiction that, whereas the first two grounds can be proved by simply proving the objective fact of the service of the demand and non-compliance or the return to the execution, as the case may be, the third ground is not proved simply by the allegation that the company is unable to pay its debts, because the court has to be satisfied that that is so. However, in an earlier case of this kind I said that I would give the petitioning creditor an opportunity to prove that the company was unable to pay its debts.

The question of whether the petition could be treated as a creditor's petition was not discussed during the hearing and I am prepared to give Mr Bridges an opportunity to argue it. Further, if it is denied on the part of the company that it is unable to pay its debts, and I treat the petition as a creditor's petition, I will give each of the parties an opportunity, if they desire it, to present evidence on that topic. Accordingly I think the best thing to do now is to adjourn the hearing of the petition, but I will hear counsel on the matter.

In the meantime I reserve the right to edit or to amplify these reasons.

    Solicitors for the petitioner: *Playford, Nicolle, Burr & Ackland.*

    Solicitors for the company: *Mollison, Litchfield.*

H H EDNIE
BARRISTER-AT-LAW

# Appendix 3

 **South Australian Consolidated Acts**

[Index] [Table] [Search] [Search this Act] [Notes] [Noteup] [Previous] [Next] [Download] [Help]

## LAW OF PROPERTY ACT 1936 - SECT 15

### 15—Assignment of debts and choses in action

(1)      Any absolute assignment by writing under the hand of the assignor (not purporting to be by way of charge only) of any debt or other legal chose in action, of which express notice in writing has been given to the debtor, trustee, or other person from whom the assignor would have been entitled to receive or claim such debt or chose in action, shall be effectual in law (subject to equities having priority over the right of the assignee), to pass and transfer from the date of such notice—

(a)      the legal right to such debt or chose in action; and

(b)      all legal and other remedies for the same; and

(c)      the power to give a good discharge for the same, without the concurrence of the assignor.

(2)      However, if the debtor, trustee, or other person liable in respect of such debt or chose in action has notice—

(a)      that such assignment is disputed by the assignor, or any person claiming under him; or

(b)      of any other opposing or conflicting claims, to such debt or chose in action,

he may, if he thinks fit, either call upon the persons making claim thereto to interplead concerning the same, or pay the debt or other chose in action into court, under the provisions of the *Trustee Act 1936* .

---

**AustLII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback

Appendix 4

Filed 08/31/11                    Case 11-02337                    Doc 65

 **Victorian Consolidated Legislation**

[Index] [Table] [Search] [Notes] [Noteup] [Previous] [Next] [Download] [Help]

## Property Law Act 1958 - SECT 134

**Legal assignments of things in action**

134. Legal assignments of things in action

Any absolute assignment by writing under the hand of the assignor (not purporting to be by way of charge only) of any debt or other legal thing in action, of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor would have been entitled to claim such debt or thing in action, shall be and shall be deemed to have been effectual in law (subject to equities having priority over the right of the assignee) to pass and transfer from the date of such notice-

    (a)  the legal right to such debt or thing in action;

    (b)  all legal and other remedies for the same; and

    (c)  the power to give a good discharge for the same without the concurrence of the assignor:

Provided that, if the debtor, trustee or other person liable in respect of such debt or thing in action has notice-

    (a)  that the assignment is disputed by the assignor or any person claiming under him; or

    (b)  of any other opposing or conflicting claims to such debt or thing in action-

he may, if he thinks fit, either call upon the persons making claim thereto to interplead concerning the same, or pay the debt or other thing in action into court under the provisions of the Trustee Act 1958.

[Index] [Table] [Search] [Notes] [Noteup] [Previous] [Next] [Download] [Help]

Appendix 5

Filed 08/31/11                    Case 11-02337                                    Doc 65

 **New South Wales Consolidated Acts**

[Index] [Table] [Search] [Search this Act] [Notes] [Noteup] [Previous] [Next] [Download] [History] [Help]

## CONVEYANCING ACT 1919 - SECT 12

**Assignments of debts and choses in action**

**12 Assignments of debts and choses in action**

Any absolute assignment by writing under the hand of the assignor (not purporting to be by way of charge only) of any debt or other legal chose in action, of which express notice in writing has been given to the debtor, trustee, or other person from whom the assignor would have been entitled to receive or claim such debt or chose in action, shall be, and be deemed to have been effectual in law (subject to all equities which would have been entitled to priority over the right of the assignee if this Act had not passed) to pass and transfer the legal right to such debt or chose in action from the date of such notice, and all legal and other remedies for the same, and the power to give a good discharge for the same without the concurrence of the assignor: Provided always that if the debtor, trustee, or other person liable in respect of such debt or chose in action has had notice that such assignment is disputed by the assignor or anyone claiming under the assignor, or of any other opposing or conflicting claims to such debt or chose in action, the debtor, trustee or other person liable shall be entitled, if he or she thinks fit, to call upon the several persons making claim thereto to interplead concerning the same, or he or she may, if he or she thinks fit, pay the same into court under and in conformity with the provisions of the Acts for the relief of trustees.

**AustLII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback

# Appendix 6


[Home] [Databases] [WorldLII] [Search] [Feedback]

# High Court of Australia

**You are here:** AustLII >> Databases >> High Court of Australia >> 1969 >> [1969] HCA 3

[Database Search] [Name Search] [Recent Decisions] [Noteup] [Help]

---

# Olsson v Dyson [1969] HCA 3; (1969) 120 CLR 365 (28 February 1969)

## HIGH COURT OF AUSTRALIA

OLSSON V. DYSON [1969] HCA 3; (1969) 120 CLR 365

Assignment - Gift - Contract - Interpleader

High Court of Australia
Barwick C.J.(1), Kitto(2), Menzies(3), Windeyer(4) and Owen(5) JJ.

## CATCHWORDS

Assignment - Equitable assignment - Chose in action - Gift - Non-compliance with statutory requirement for legal assignment - Purported parol assignment of debt.

Gift - Imperfect gift - Chose in action - Non-compliance with statutory requirement for legal assignment - Purported parol assignment of contract debt.

Contract - Novation - Direction by creditor for payment of debt to third party - Whether tripartite contract or contract for benefit of third party - Rights of third party.

Interpleader - Circumstances in &which proceedings available - Nature of orders &which may be made.

## HEARING

Adelaide, 1968, September 12, 13;
Melbourne, 1969, February 28. 28:2:1969
APPEAL from the Supreme Court of South Australia.

## DECISION

1969, February 28.
The following written judgments were delivered:-
BARWICK C.J. I have had the advantage of reading the reasons for judgment reasons he gives, that there was no assignment, legal or equitable, of a debt owing to the deceased by R. T. E. Constructions Limited (the debtor company). The terms of <u>s. 15</u> of the <u>Law of Property Act, 1936</u> (S.A.) were not fulfilled. There was no consideration to support an inchoate assignment. There is no equity to perfect an

imperfect gift. A gift of a thing assignable at law is imperfect if it is not effective as a legal assignment. Nor is there any basis for regarding the deceased as having been at his death a trustee of a debt due to him by the debtor company. Consequently, the respondent could not succeed as the assignee or as the cestui que trust of the debt created by the loan by the deceased to the debtor company. (at p368)

2. I further agree that this is not a case to which the rationale of such cases as Dillwyn v. Llewelyn (1862) 4 De G F & J 517 (45 ER 1285) can be applied. Nor, in my opinion, after due consideration, can the deceased's evident desire be effectuated by the use of an estoppel. I also agree that there is no sound basis to infer a tripartite agreement, to which the deceased, his wife, and the debtor company were parties by which a novation of that kind took place. Thus the respondent cannot succeed as upon a promise made to her by the debtor company. (at p369)

3. However, dependent upon what conclusions of fact are drawn from the evidence before the primary judge, these views do not, in my opinion, necessarily dispose of the matter. The appeal to this Court is by the deceased's executors against an order that moneys paid into court by the debtor company be paid out to the respondent. This payment into court was made by the debtor company in an action by the appellants against it for recovery of a debt claimed to be due to the deceased. The debtor company availed itself of the provisions of O. 16B of the Rules of the Supreme Court of South Australia (Interpleader). The affidavit which founded the payment into court has not been reproduced in the appeal book but doubtless it conformed to the requirements of r. 2 of that Order. Thus the debtor company acknowledged that it was under a liability for a debt for or in respect of which it expected to be sued by two parties, namely, the appellants and the respondent who made adverse claims "thereto". Whilst literally "thereto" refers to a debt, in substance, in my opinion, it indicates that each claimant asserts that the debtor company is liable to pay a fixed amount of money to that claimant. No doubt the interpleader process in general treats the debt as itself the property of which there are adverse claims : it is also available, it seems to me, in a case where the real question is to which of the claimants has the debtor promised to pay the money in question. For example, I would think that a person who had promised to pay money through an agent for an undisclosed principal could interplead, if when sued by that principal, the agent also claimed payment of the money on the footing that the promise was made to him personally : see, for example, Meynell v. Angell ; Calverley, Claimant (1862) 32 LJ QB 14 The money is the relevant subject matter as to which there are adverse claims. For an example of a contrary kind, see Greatorex v. Shackle (1895) 2 QB 249 Rule 3 of the Order following s. 12 of the Common Law Procedure Act, 1860 (U.K.) allows the debtor company to interplead although the title of the claimants does not have a common origin. Although more appropriate to a contest to physical property, this rule would seem to cover the case of claimants to be paid money under different promises and not merely the case of conflicting claims to the benefit of the one promise. (at p369)

4. A debtor, who acknowledges his indebtedness and claims no interest in the money he is prepared to pay into court, may be allowed to interplead. Thus it seems to me that the debtor's acknowledgment of a debt in the amount of money paid in can be ambiguous and can cover both the case of an obligation to pay the plaintiff to which obligation another lays claim, and that of an obligation to pay either the plaintiff or the claimant as upon a promise to the one or to the other according to the proper legal conclusion to be drawn from the proven facts. (at p370)

5. When the debtor company sought to take the benefit of the interpleader provisions of the Rules of Court, it was first ordered that the respondent be substituted as defendant in the appellant's action. Thereafter it was ordered that an issue be tried between the appellants and the respondent as to "whether at the date of death of the deceased ". . . all moneys loaned by the deceased to" the debtor company ". . . were payable to and recoverable by" the appellants or the respondent. This formulation, in my opinion, is wide enough to cover a contest as to whether the debtor company's direct as distinct from derivative obligation was to pay the moneys to the respondent. But in any case the form of the issue is immaterial.

Its purpose is to enable the conscience of the court to be satisfied as to whom the money in court should be paid: see Peake v. Carter (1916) 1 KB 652, at p 656 , and cases there cited. The latter order provided for pleadings to raise the precise issues to be tried. The respondent's points of claim asserted that she was entitled to the sum in court, and after setting out the basic facts on which she relied, placed her entitlement upon an assignment of the debt due to the deceased and alternatively upon an estoppel preventing the appellants from asserting a right to the money in court. Though the Supreme Court and the parties appear to have acted on the footing that at his death the debt to the deceased which arose from the original loan was still due by the debtor company, that matter was not, in my opinion, concluded, certainly not as against the respondent, by the procedures in interpleader which had been adopted. To establish its right to the money in court as against the respondent, it seems to me that the appellants in the circumstances of this case must show that they would have succeeded in the action against the debtor company had the action as originally constituted proceeded to judgment. Thus, the executors as plaintiffs in the interpleader issue seek to enforce the promise to repay the deceased which was made to him by the debtor company at the time of the loan. I agree that if that promise was still on foot at the death of the deceased, the respondent to this appeal, for the reasons already given, must fail. The critical question to my mind, however, is whether or not that promise was still extant at that time. (at p371)

6. The deceased was not content to give or to attempt to give the money due to him to his wife by his own sole activity. Whether by chance or by design he involved the debtor company in his arrangements. That he wished to divest himself of the benefit of that company's promise to pay him is clear enough: so is his intention that the money it represented should be paid by the debtor company to his wife. As a layman he knew nothing of the legal forms he should use. The analysis and interpretation of what he did ought to be resolved as a matter of substance. He told the debtor company that he had given the money to his wife and that the company should pay her the principal and interest. By speaking of gift, he ought not to be confined to an assignment of the debt as the means of effecting the gift: though if he had not made any arrangements with the debtor company, assignment or trusteeship would have been the only mechanism available to effect his intention. The debtor company was willing not to pay the deceased and to pay the respondent: it did so thereafter, no doubt considering itself obliged to do so by reason of what had passed between it and the deceased. But there is no evidence of anything expressly said by the representative of the debtor company when informed by the deceased of the changed situation which he contemplated. (at p371)

7. What then in substance did the deceased bring about when he thus involved the debtor company? What passed between him and the representative of the debtor company cannot, in my opinion, be regarded as notice of an assignment. There had been no assignment and the deceased in any case knew nothing of the need for notice. It could not be interpreted as a mere revocable mandate. I do not think it should be regarded as a mere indication that if the debtor company paid the respondent, the deceased would regard his debt as thereby pro tanto satisfied. The deceased intended, it seems to me, to quit the debtor company as from the time of their conversation from all further liability to him personally. He was regarding the money as no longer his but the respondent's. Thus, if there were no assignment, no revocable mandate, no indication that payment to the respondent in the future would be accepted as a satisfaction, in my opinion, it is permissible to infer from his conversation with the representative of the debtor company, the acquiescence of the debtor company in the deceased's proposal and the subsequent conduct of that company that the deceased intended that the company should be obliged to pay the respondent and that the debtor company accepted the obligation of paying the respondent the principal and interest. Implicit in such a situation is the termination of the obligation of the debtor company to the deceased. Expressed in terms of legal consequence, it could be said either that upon the promise of the debtor company to pay the respondent, the deceased released the debt due to him or that the deceased accepted that promise, as distinct from its performance, in satisfaction of his debt: see text and cases cited in Smith's Leading Cases, 13th ed., vol. 1, pp. 384-385. (at p372)

8. The real question in the case, in my opinion is whether these inferences should be drawn. Not without some hesitation but in the end with sufficient confidence, I have come to the conclusion that they should be drawn, according as I think they do with the realities of the situation disclosed by the evidence. I would regard these as inferred facts rather than as implications, though it may well be that they could be implied in order to account for the situation which the deceased evidently intended to create. Thus, whilst no promise to the respondent could be inferred, I would conclude that upon a proper analysis and interpretation of the evidence, there was in substance a promise given to the deceased by the debtor company to pay the respondent the principal and interest which formerly it owed the deceased. (at p372)

9. Upon that footing, it seems to me that the executors cannot succeed in the interpleader issue. The promise they assert no longer exists. On the other hand, the respondent could not herself enforce at law the promise made to the deceased. Further, unlike the widow in Beswick v. Beswick (1), she is not the executor of the will of the deceased and could not obtain specific performance in her own name as executor of the promise to pay. The executors, in my opinion, could compel the performance of the promise to the deceased to pay the respondent: but that would result in a payment to the respondent and not in a payment to the executors: and, in any case, that is not the claim they were prosecuting against the debtor company. (at p372)

10. The interpleader issue though not a cause is a matter falling within s. 27 of the Supreme Court Act, 1935 (S.A.). It has long been the practice in interpleader proceedings under provisions comparable with O. 16B to recognize and to give effect to equitable rights. As indeed it also was under the interpleader provisions as in force before the passing of the Supreme Court of Judicature Act, 1893, and the making of the orders and rules thereunder: see Rusden v. Pope (1868) LR 3 Exch 269 ; Duncan v. Cashin (1875) LR 10 CP 554 and Engleback v. Nixon (1875) LR 10 CP 645 Therefore, if appropriate claims had been made on behalf of the respondent and supporting submissions argued, the court would have been in a position to decide whether the executors could have been compelled to sue or to allow their names to be used at the instance of the respondent in a suit against the debtor company for the performance of the debtor company's promise or whether the respondent, upon the unwillingness of the executors to sue, could herself claim the specific performance of the promise to pay her. In that event the court in these proceedings, in my opinion, could have reflected its decision on those matters, that is to say, if favourable to the respondent, by treating the money in court as payable to the respondent as upon a specific performance of the debtor company's promise to the deceased. But the points not having been argued, I do not think their decision should at this stage be attempted. The general question was left open in Coulls v. Bagot's Executor & Trustee Co. Ltd. [1967] HCA 3; (1967) 119 CLR 460, at p 479 But I would observe that, in my opinion, nothing in the case of Milroy v. Lord (1862) 4 De G F & J 264 (45 ER 1185) stands in the way of a conclusion favourable to the respondent. Whilst it may not be permissible to treat an intending assignor of a debt as a trustee of it, it may be possible to treat a person who has attempted a gift by way of a release of an existing indebtedness in exchange for a promise to himself to pay a sum of money to the intended donee as coming under equitable obligations in respect of the enforcement of the substituted promise, that promise being enforceable at law and as well in equity though with differing consequences. Further, it seems to me that the approach to be seen in the reasoning in Fletcher v. Fletcher [1844] EWHC J69 (Ch); (1844) 4 Hare 67 (67 ER 564) may go far to support a conclusion favourable to the respondent. (at p373)

11. However, a difficult question arises as to whether on my view of the facts the interpleader issue can be disposed of without deciding those questions. The claim of the appellants is to recover a debt due to the deceased. The claim of the respondent is to be entitled to the sum of money in court. The attitude of the debtor company evinces no intention not to pay the respondent conformably to its arrangements with the deceased. True enough, it may be that it paid in on the assumption that the respondent may be the assignee of the original debt which apparently it assumed it still owed. But the matter is not to be concluded upon what the debtor company may have thought nor for that matter by what the respondent

alleged to be the legal situation arising from the facts which have now been evidenced in the interpleader proceedings: see Peake v. Carter per Pickford L.J. (1916) 1 KB, at pp 660, 661 (at p374)

12. I would conclude that the debtor company was willing to perform whatever obligation towards the respondent to which it was subject. It paid into court so that the obligation with respect to the money that the court decided it to be under could be performed. It disclaims any interest in the money. Therefore, without deciding whether, if the debtor company had been unwilling to pay the respondent, the appellants could have been compelled to proceed against it for the performance of the promise to pay or whether on their refusal to do so the respondent could in equity enforce that performance, the money in court can, in my opinion, properly be ordered out to the respondent in performance by the debtor company of that promise. This, to my mind, is the proper course to pursue. (at p374)

13. This result will be achieved by affirming the actual order of the Supreme Court, as distinct from that Court's findings and reasons therefor. (at p374)

14. Accordingly, in my opinion, this appeal for these reasons should be dismissed. (at p374)

KITTO J. This appeal is against an order of the Supreme Court of South Australia (Chamberlain J.) (1967) SASR 343 made upon the trial of an interpleader issue as to whether a debt of 2,000 pounds which at the death of one Dyson had been owing to him by a company called R.T.E. Constructions Limited for money lent and interest thereon was payable to his executors or to his widow. The widow's claim, which succeeded in the Supreme Court, rested primarily upon an assertion that the deceased in his lifetime had made her a gift of the debt and accruing interest. She proved that on an occasion in December 1961 her husband told her she "could have the 2,000 pounds". She added: "He just simply said it would be mine." Asked to state what he had said, her reply was that he said: "You can have the 2,000 pounds that I have loaned to Tom", and "I will advise Tom to pay the interest to you." (It was common ground that "Tom" was a Mr. Francis, the managing director of the debtor company, and that in the two sentences last quoted the reference was to that company.) No document was executed. The company's receipt for the loan was already in Mrs. Dyson's keeping and it remained there. Mr. Francis in the following February called upon the deceased for the purpose of paying interest on the loan and was given to understand, by some form of words, that the deceased had given the widow the principal sum so that the loan money was hers and interest should be paid to her in future. This was done, a cheque for each subsequent interest payment being posted to her. The deceased died on 9th July 1962. The loan, for which no period had been agreed and which was therefore repayable on demand, was not called up either in the deceased's lifetime or afterwards, until the executors, who appear to have known nothing of the matter at first, learned of it in 1964 and then claimed the debt, but not past interest, for the estate. (at p375)

2. It has not been contended that the testator's words amounted to a declaration of trust, and it would not be right, I think, to construe them as such. So far as can be gauged from the scanty evidence, the deceased evinced no intention of taking any obligation upon himself with respect to the debt, but, on the contrary, thought that his words to his wife and his instructions to the company were sufficient to make the debt hers in every sense and for all purposes. His whole intention seems to have been to make an immediate gift, and the rule is well established by such cases as Milroy v. Lord (1862) 4 De G F & J 264 (45 ER 1185) and Richards v. Delbridge (1874) LR 18 Eq 11 that words which express an intention of making a gift by a transfer of property cannot properly be construed as a declaration of trust, great though the temptation may be to find a way of giving effect to the general intention of benefaction. (at p375)

3. Considered as an intended gift by assignment, the deceased's endeavour to vest the debt in his wife must plainly be held ineffectual. It was ineffectual as a legal assignment, for a debt for money lent

Filed 08/31/11

(leaving aside Crown debts) cannot be assigned at law except as provided by statute, and there is no statute applicable to this case. In particular, the general provision in s. 15 of the Law of Property Act, 1936 (S.A.) enabling debts to be assigned in the manner there provided is inapplicable here, for there was no "writing under the hand of the assignor". There was no valid assignment in equity either, for property which is assignable at law but is not assigned in the manner which the law requires for a legal assignment of it cannot be held in equity to be assigned unless by reason of some fact or circumstance which a court of equity regards as binding the legal owner in conscience to hold the property upon trust for the assignee. A promise for valuable consideration to assign the property is enough for this purpose, for equity, regarding that as done which ought to be done in return for the consideration given, holds the assignee to have an equitable interest commensurate with the legal interest which specific performance of the promise would give him. But there is no equity to perfect an imperfect gift: because of the absence of consideration a purported assignment, if incomplete as a legal assignment, effects nothing in equity. True it is that some subsequent conduct of the intending donor, encouraging or inducing the intended donee to act to his prejudice on the footing that the property or some interest in it has become his, may make it unconscionable for the donor to withhold the property or interest from the donee, and equity may on that ground hold the donee to be entitled to the property; but that is another matter, and must be considered separately. (at p376)

4. One submission that was made on behalf of the widow was that consideration for the assignment may be found by deducing from the evidence that the deceased, who by an oral antenuptial agreement had promised to leave her an annuity of 20 pounds a week but had made a will leaving her only 780 pounds a year, in effect offered her, and she accepted, an assignment of the debt by way of substituted performance of his promise as to the deficiency. The evidence, however, will not support such a view of the facts. It is true that the deceased had said on several occasions that he had "let her down", and although his meaning was never made clear - his speech was affected by a recent stroke - he may have been referring to the insufficiency of his will to carry out his promise concerning the annuity. This is a mere guess and not a very likely one, for if he had a sense of guilt in relation to his will he could easily have executed a codicil or a new will. But even assuming that he was expressing regret for having left his wife less than he had promised her, one may search the evidence in vain for anything to suggest that the making of the purported gift of the debt had anything to do with it, and may search again in vain for anything to suggest that Mrs. Dyson at the time expressed, or in fact had, any intention of accepting an assignment of the debt in lieu of what the will failed to leave her. (at p376)

5. It would be out of the question, as the evidence stands, to hold that any tripartite agreement was made by the deceased, the widow and the company, by which the deceased released the company from the debt in consideration of its promising to pay Mrs. Dyson. The managing director, Mr. Francis, the only person who took any part in the relevant years as representing the company, gave evidence in the case but did not say that he had promised Mrs. Dyson anything; and her own evidence was that she had no discussion with Mr. Francis on the occasion when the deceased told Mr. Francis that he had given the debt to her. (at p377)

6. A further question arises in reference to the same occasion, in February 1962. Mr. Francis had brought a cheque for the interest.

> "The indication in words", Mr. Francis said in his evidence, "was that he (the deceased) had given the money, that is the principal, to Mrs. Dyson and I would pay her the interest in future and the loan moneys were hers. Mrs. Dyson was in the room at the time he said this, well present in the room. I think the conversation took place in the hall and Mrs. Dyson was in the adjacent lounge near the hall. I was aware that - she was aware of the facts that had been

spoken. I handed over the cheque on this occasion and I couldn't say whether it went to Mr. or Mrs. Dyson. The interest thereafter was paid to Mrs. Dyson. The interest from February 1962 has been paid to Mrs. Dyson. She has been paid personally and she has been paid by me posting the cheque to her." (at p377)

7. If it were right to construe this evidence as proving that the deceased requested the company to agree that it would owe the amount of the debt and future interest to Mrs. Dyson instead of to him and that the company so agreed, then even though Mrs. Dyson were no party to the contract so established she might perhaps be entitled in equity as cestui que trust to enforce the company's promise. But the only conclusion fairly open on the evidence is that the deceased presented Mr. Francis with a fait accompli (as he believed): he asserted that his wife had become the owner of the debt, and that the company had to govern itself accordingly, not to choose whether or not it would give the deceased a new promise to pay Mrs. Dyson in place of its original promise to pay him. (at p377)

8. Next it is said on behalf of the widow that the antenuptial promise by the deceased to leave her 20 pounds a week, though for lack of writing it was unenforceable at law, was enough to give her good prospects of success if she had applied under the Testator's Family Maintenance Act (S.A.) for additional provision out of the deceased's estate, and that in reliance upon the purported assignment as being effectual she abstained from taking any proceedings for an order under that Act. The learned judge evidently accepted evidence that she gave to the effect that it was her belief in the efficacy of the assignment that led her to desist from making such an application; and on the footing that this was so an argument is submitted, expressed in terms of estoppel, that the executors will not now be allowed to deny her title to the debt owed by the company. In so far as this refers to estoppel properly so called, it is a sufficient answer, even if the assumption be made that all the necessary elements of estoppel are present, that the negative proposition which is asserted is not the same as the positive proposition that the widow is entitled to the money as against the company; and the question in the interpleader proceedings is, which of the parties was entitled, at the time of the payment into court, to be paid by the company. As the debt was never assigned to the widow at law or in equity, and a mere estoppel is not equivalent to an assignment, the only question to which the conduct of the deceased or the executors may give rise seems to be that which has been foreshadowed above, namely whether any such conduct plus a change of position for the worse on the part of the widow in reliance upon it created an equity in the widow to have the debt made over to her. If it did, the company was in equity bound to make the payment to her. (at p378)

9. The principle which a contention to this effect invokes is that for which Dillwyn v. Llewelyn (1862) 4 De G F & J 517 (45 ER 1285) is usually cited. In that case a father, having made an incomplete gift of land to his son for the express purpose of the son's building a house on the land, thereafter assented to and approved of the son's proceeding with the building. The decision was that the conduct of the father after the making of the incomplete gift, together with the son's expenditure thereby induced, entitled the son in equity to call on the father's executors "to complete the gift" (as Halsbury's Laws of England puts it: 3rd ed., vol. 18, p. 399, par. 758). The judgment seems to contain two concurrent lines of reasoning. One treats the case as

> "somewhat analogous to that of a verbal agreement not binding
> originally for want of the memorandum in writing signed by the party
> to be charged but which becomes binding by virtue of the subsequent
> part performance";

that is to say, by analogy with Gregory v. Mighell (1811) 18 Ves Jun 328 (34 ER 341) , that even

assuming there was no contract the conduct of the father after making the incomplete gift was such as to bind him in conscience to make the legal situation correspond with the implication in the encouragement that he gave to his son to lay out the money. The other line of reasoning was that the father's conduct amounted to a promise that if the son should build the house the land should be the son's, and that the son, by building the house, accepted the offer and so concluded a binding contract. The only signed memorandum in the case, however, was insufficient to enable this contract to be specifically enforced, and for that reason the ultimate basis of the decision must again have been that the father's subsequent conduct in encouraging the son to build the house on the footing that the land would be his, when acted upon by the son, created an equity which bound the father to make good the son's expectation. Thus in a case of this kind what gives rise to an equity which the attempted making of the gift did not by itself create is the conduct of the intending donor after the act of incomplete gift : cf. Ramsden v. Dyson (1865) LR 1 HL 129 ; Plimmer v. Wellington Corporation (1884) 9 App Cas 699 These cases are, I think, correctly explained in the judgment of Ungoed-Thomas J. in Ward v. Kirkland (1967) 1 Ch 194 , approved by the Court of Appeal in E. R. Ives Investment Ltd. v. High (1967) 2 QB 379 It seems to me impossible to apply the principle to the present case, for there is not the slightest evidence that after the making of the purported gift the deceased ever adverted to the question whether his purported gift might be treated by his wife as a reason for abstaining from making a testator's family maintenance application after his death or acting in any other way to her prejudice. He intended to make her a gift ; he went some distance towards doing so and assumed that he had done so completely ; no doubt he realized that she too assumed he had completely done so; but there the matter ended, without his thereafter offering her any encouragement or inducement to adopt a course prejudicial to herself, and without his doing anything else that can be held to have bound him in conscience to perfect the imperfect gift. (at p379)

10. Finally it was suggested that either on some ground of estoppel or on the principle just discussed the executors, by reason of conduct on their own part, may be bound to acknowledge the widow's title to the debt. But there is no evidence that they did anything to induce the widow to alter her position for the worse in the belief that the debt was hers. In particular, they had nothing to do with her omitting to apply for a testator's family maintenance order. So far as appears, they knew nothing of the debt or of the purported gift until more than two years had elapsed from the deceased's death, and when they became aware of the facts they promptly challenged the validity of the gift. (at p379)

11. Accepting both the encouragement and the warning in the statement of Isaacs J. in Anning v. Anning [1907] HCA 13; (1907) 4 CLR 1049, at p 1070 that there must always be a desire on the part of any court, if it be possible to see its way to do so in accordance with law, to carry out the real wishes of an intending donor, I can find nothing in this case but an incomplete and therefore nugatory attempt to make a gift. In my opinion the appeal should be allowed and an order made for the payment of the moneys in court to the executors. (at p380)

MENZIES J. I agree with the judgment of Kitto J. (at p380)

2. With respect to those who take a different view, I cannot regard the events which happened as producing the result that the debt was discharged in 1961. It can hardly be doubted that it was always intended by debtor and creditor alike that the debtor should remain a debtor until discharged by payment. After 1961 was there not still in existence a debt which carried interest? Furthermore, had the creditor gone into liquidation after the date of the supposed discharge in 1961, would the only claim upon the liquidator have been an unliquidated claim by the original debtor for nominal damages? (at p380)

3. The question, as I see it, is whether the respondent became the creditor or otherwise entitled to the debt. The judgment of Kitto J., in my opinion, establishes that she did not in 1961 or at any later time. (at p380)

Filed 08/31/11                                                                                                      Doc 65

WINDEYER J. The events out of which this appeal arises were as follows - so far as it is necessary to narrate them for the purpose of this judgment. (at p380)

2. The respondent, Mrs. Ethel Pearl Dyson, is the widow of one Ernest Edward Dyson who died on 9th July 1962. He had married the appellant in May 1960. He was then a widower, she a widow. Neither of them was young. He was a man of some means. In February 1961 Dyson lent 2,000 pounds to a company, R.T.E. Constructions Limited, which I shall call "the company". It carried on business as a builder. It is a private company, wholly controlled at all relevant times by one Thomas William Francis. A receipt for 2,000 pounds given by the company is the only documentary record of this loan. The money was lent for an indefinite period and upon an oral agreement between Francis, on behalf of the company as borrower, and Dyson, the lender, that interest at the rate of eight per centum per annum would be paid half-yearly. The first instalment of interest was paid by Francis calling upon Dyson at his home and delivering a cheque to him for the amount due. In September 1961 Dyson suffered a stroke and was for some weeks in hospital; but he had returned home, to the house where he and his wife were living. He was there until his death, in rather poor health but well able to manage his affairs and to make his intentions and wishes known. (at p380)

3. The next happenings, which began in December 1961, are best related in the words of the evidence given by the respondent and by Francis in the court below. Mrs. Dyson said:

"My husband told me I could have the 2,000 pounds that he had invested or loaned to the R.T.E. Constructions - Mr. Francis. He just simply said it would be mine. He said, 'You can have the 2,000 pounds that I have loaned to Tom'. He said, 'I will advise Tom to pay the interest to you'. He didn't hand me something during that discussion. I had already had the receipt - he had given it to me to put away for him before that. He did not make any mention about the receipt. He knew I had it - he had given me the receipt to put away for him, to keep for him. I just put it in the deed box that I had my papers in. All the papers were there together in the desk and in the box. My papers were in it and his papers also. I received my first payment of interest when Mr. Francis brought a payment around in February and gave it to Mr. Dyson. I was not actually present then. My husband gave it to me after - he gave the cheque to me after. I was not present at any discussion between my husband and Mr. Francis concerning this debt. It was after Mr. Francis left that he gave me the cheque and told me to pay it into my account."

Later she said:

"I did not have any discussion with Mr. Francis on that occasion. As far as this loan, or the interest, was concerned, my husband told me that he had advised Mr. Francis to pay all other interests to me and after that the other cheques were always paid to me. He always brought them and gave them to me. The next cheque would have been received in about the middle of the year 1962, in July I think it was. That was posted to me in an envelope addressed to me, Mrs. Dyson."

Francis said:

"The second amount of interest was for the full period of six months from the 1st July to the end of December. I went to Dyson to give him the cheque for that interest - I think it was February I went to him. I had a discussion with him and he said something to me when I handed him the cheque. I can't remember the exact words but the indication in words was that he had given the money, that is the principal, to Mrs. Dyson and I would pay her the interest in future and the loan moneys were hers. Mrs. Dyson was in the room at the time he said this, well present in the room. I think the conversation took place in the hall and Mrs. Dyson was in the adjacent lounge near the hall. I was aware that - she was aware of the facts that had been spoken. I handed over the cheque on this occasion and I couldn't say whether it went to Mr. or Mrs. Dyson. The interest thereafter was paid to Mrs. Dyson. The interest from February 1962 has been paid to Mrs. Dyson. She has been paid personally and she had been paid by me posting the cheque to her. When I heard from Mr. Dyson that he had given the principal of the loan to Mrs. Dyson I did consult the lass who made the cheque out the next time - the initials were the same. I subsequently did tell the accountant that the loan was now Mrs. Dyson's and not Mr. Dyson's."

And later, in cross examination,

"Q. You never, in fact, had any written communication from Mr. Dyson about passing this loan over to Mrs. Dyson? A. No.
Q. You know that Mr. Dyson died in July 1962? A. About that time.
Q. Remember making payments of interest just before his death? A. Not specifically, but interest would have been paid about

that time. I don't recall if I took the cheque or posted it. If the cheque was taken I always took it myself to Mrs. Dyson." (at p382)

4. The respondent had no reason to think that the company's indebtedness to her husband had not become an indebtedness to her. The company continued to pay the interest to her for two years after her husband's death and never questioned that the capital indebtedness was hers. (at p382)

5. By his will executed on 27th May 1960, that is some ten days after the marriage, Dyson had appointed the present appellants his executors, given an annuity of 780 pounds to his wife and left the residue of his estate to his sons by his first marriage. The respondent in her evidence said that in conversations which her husband had with her before their marriage he had promised that if to marry him she gave up her position as a postmistress, with its emoluments and pension, he would provide an annuity of 20 pound a week per week. It was suggested at the trial that it was because he had left her only 780 pound a year by his will that, to make up the difference, he gave her the company's debt to him of 2,000 pounds. This may have been so, but it was not established by the evidence. So far as appears, his "gift" of the 2,000 pounds was independent of and not intended to fulfil any prior agreement. It was not claimed that it was referable to any undertaking given before marriage until the respondent's lawyers began looking for some consideration to support an equitable assignment. That appears from the correspondence in which the matter now in question was first raised. This correspondence was as follows. (at p382)

Filed 08/31/11

6. On 13th May 1964 the solicitors for the executors sent a letter to the respondent, the relevant part of it being:

> "As you are aware the Investigation Branch of the Income Tax
> Department have, over a lengthy period, been making a most detailed
> examination of the late Mr. Dyson's affairs.
> The investigation has, amongst other things, brought to notice the
> fact that on or about 15th February 1961, Mr. Dyson lent to R.T.E.
> Constructions Limited, the company which built the house at 5 Ross
> Street, Everard Park, a sum of 2,000 pounds.
> According to the information which has been given us the above
> loan is not evidenced by writing of any kind. According to Mr.
> Francis (of R.T.E. Constructions Limited), Mr. Dyson got him to
> write out a cheque for the 2,000 pounds which he (Mr. Dyson) then
> signed and handed to him intimating that he (Mr. Francis) need not
> pay the amount back until he found it convenient to do so.
> It was arranged between Mr. Dyson and Mr. Francis that until such
> time as the loan was repaid R.T.E. Constructions Limited should pay
> interest thereon at the rate of 8% per annum by half-yearly
> payments. We are informed by Mr. Francis that interest has in fact
> been paid on this basis.
> Mr. Francis states that about twelve months after the loan was
> made Mr. Dyson informed him when he went to make an interest payment
> that he wished all future interest to be paid to you as he had
> passed over the debt to you. Mr. Francis states however, that he
> never had anything in writing from Mr. Dyson to this effect but that
> he has, as desired by Mr. Dyson, since made all interest payments
> to you.
> The loan principal is, we understand, still owing and we gather
> from our conversation with Mr. Francis that his company has no
> present intention of repaying it unless it has to do so.
> Will you please let us know whether the above facts are correct
> and whether there is, to your knowledge, anything in writing to
> indicate that Mr. Dyson intended you to have the loan money.
> On the facts as at present known to us there would appear to be
> grave doubt as to whether there was ever a legally effective gift of
> the loan from Mr. Dyson to yourself. If there has in law been no
> effective gift it will, as you will readily appreciate, be the duty
> of the executors to get in the loan moneys as portion of the late
> Mr. Dyson's estate and to look to you for reimbursement of the
> interest which you have received since the death of the late Mr.
> Dyson, unless all the residuary beneficiaries expressly direct them
> to refrain from doing so."

The respondent replied to this immediately as follows:

> "Replying to your letter of 13th May 1964, re gift to me of 2,000
> pounds from my late husband.
> The information you received from Mr. Francis is quite correct.
> Mr. Dyson made me a gift of this money in Dec. 1961, he advised
> Mr. Francis to that effect and the interest was to be paid to me

half-yearly, which Mr. Francis has done.
I have nothing in writing to this effect. I did not know a gift
from husband to wife had to be covered by a written statement.
However if you wish to deprive me of this money there is nothing I
can do about it as I have nothing in writing." (at p384)


7. The next thing that happened was that on 2nd December 1964 the present appellants, who are the
executors and trustees of Dyson's will, commenced an action against the company claiming the sum of
2,000 pounds for moneys lent by the deceased, repayable on demand, together with interest from 21st
July 1964. The company then commenced proceedings in accordance with the interpleader procedure of
the Supreme Court of South Australia. An order was made that the company pay the sum of 2,000
pounds and any accrued interest into the Supreme Court, and that the present respondent be substituted
for the company as defendant in the action which the present appellants had brought. It was further
directed that an issue be tried whether at the date of Dyson's death the money lent by him to the
company, and interest since the date of his death, was "payable to and recoverable by the plaintiffs as
executors of the will of the deceased or the claimant". It is not surprising that the question when put in
this form was taken by the learned judge at the trial, Chamberlain J., to be whether Dyson had
effectively assigned to his wife the company's debt to him. The arguments before his Honour and the
arguments in this Court revolved round the law concerning the assignment of debts. But the question
which arises on the facts as I see them is not whether there was an assignment by Dyson to his wife of
the debt the company owed him. As I see the matter, it is whether there was not a novation of his
contract with the company. But, before I come to that, I think I should consider the approach his Honour
took. He expressed his finding on the facts as follows:

"I may say at once that I fully accept the defendant's evidence,
including, in particular, her evidence as to the pre-nuptial
agreement, and the gift. I am also satisfied that the deceased meant
to make the gift and believed that he had done all that was
necessary to perfect it. I also think that the probabilities are
that he meant it to compensate for his failure to carry out in full
his promise to leave the defendant 20 pounds per week, although this
was never discussed between them, and it is, of course, possible
that all he meant by the statement that he had 'let her down' was an
expression of his regret for having become ill after so short a
period of married life" (1967) SASR 343, at p 345

His Honour then went on to consider whether what Dyson had done constituted a valid equitable
assignment. We were referred to a South Australian Act of 1860 by which choses in action were made
assignable at law: The Property Act of 1860, s. 19. This provision was supplemented by the Supreme
Court Act, 1878 (S.A.), s. 6 (vi). The effect of these enactments was considered in Robinson v. South
Australia (1928) SASR 42 and Goldsbrough, Mort and Co. Ltd. v. Commonwealth Agricultural Service
Engineers Ltd. (1930) SASR 201 I think it unnecessary to consider these decisions; for both the
statutory provisions had been repealed long before the transactions of the present case occurred. In their
stead stands s. 15 of the Law of Property Act, 1936 (S.A.). It is in the well-known terms of s. 25 (6) of
the Judicature Act, 1873 (now s. 136 of the Law of Property Act, 1925) of the United Kingdom. The
result is that a creditor who wishes to give to a donee a debt owed to him must follow the statutory
procedure: he must sign a document by which he assigns the debt to the donee; and his gift will be
complete in law when express notice in writing of his having done so is given to the debtor. An oral
statement to the intended donee that the debt was henceforth to be his will not suffice even if the debtor
has notice of it. (at p385)

8. This is simply the result of a general rule that to make a gift of any thing the intending donor must actually give it to the donee in a way which the law recognizes. The owner of a thing does not effectively give it away by simply saying "it is yours as a gift". He must not only say it is a gift, he must give it to the donee, who must, by words or conduct, accept it. How a thing can be given away depends on what it is. Since the decision in Cochrane v. Moore (1890) 25 QBD 57 , it is certain that if it be a chattel capable of manual delivery the donor must deliver it to the donee by actually handing it over, or else do some act which in the eye of the law amounts to delivery of possession, as for example handing over some indicia of ownership or the means of obtaining possession. If the donor means to give some thing which is not a chattel, but is an intangible thing such as a share in a company or a debt owing to him or other chose in action, he must give it by some way which the law provides for the transfer of a thing of that kind. In such a case his gift is not of rights of ownership in respect of a visible and tangible thing, but of rights to be asserted against a person or persons natural or artificial. (at p386)

9. If there were consideration for an intended, but incomplete, assignment, the Chancellor would compel the assignor to make good his intention and complete the transfer in due form of law. And because this could be compelled in equity, and equity treated as done that which ought to be done, it came to be said that an assignment incomplete in law was valid in equity if supported by some consideration recognized in equity for the purpose. But a gift is, by its very name, an assignment without consideration. So much is I suppose trite. I have said it because, for want of remembering it, arguments were it seems advanced which led the learned trial judge to a conclusion that a pure gift of a debt could be effective although the creditor donor had not executed any written assignment. His Honour sought to support this proposition by reasoning mistakenly from the judgment I delivered in the case of Norman v. Federal Commissioner of Taxation [1963] HCA 21; (1963) 109 CLR 9 I adhere to all that I there said about equitable assignments in general. (I should note, however, that the reference to Professor Bailey's articles should be to the Law Quarterly Review, vols. 47 and 48, not 27 and 28 as printed.) (at p386)

10. There is no equity to perfect an imperfect gift. This sentence, extracted from the well-known judgment of Turner L.J. in Milroy v. Lord (1862) 4 De G F & J 264 (45 ER 1185) has become an aphorism. People have deplored it and regretted that the Chancery Court did not display a more benevolent attitude in some cases where intended generosity was frustrated because of a failure to give effect to good intentions by doing what law required. But, because equity does not assist a volunteer, the rule stands firm. It would perhaps be better expressed by saying that an intending donor cannot be compelled to perfect his intended gift. To put it in those words rather than in the more brief form commonly used is desirable in the case of an assignment of a debt by way of gift. For if the assignor does all that the statute requires him to do on his part to effect the assignment it will be regarded as effective in equity. He must execute an instrument under his hand which is an absolute assignment in writing. Why? Because the statute so requires. Express notice in writing of the assignment must be given to the debtor to make it effective at law: because the statute so requires. But that notice need not be signed by the assignor or given by him. Why not? Because the statute does not so require. It can be given by the assignee and the gift will then be complete in law. In the meantime the assignor is bound in equity, notwithstanding that the assignment is by way of gift, for he has done all that the law required of him to complete his gift. Equity interposes to prevent his retracting it. But this does not mean that if he omits to do what he must to do make a gift, the omission can be overlooked and the gift take effect. It seems to me that his Honour's view that there was an effective assignment by Dyson of the debt to his wife must be held erroneous. (at p387)

11. His Honour also apparently accepted an argument put for the respondent that the attempted assignment was not by way of gift but was in performance of an ante-nuptial contract. There was evidence of some such agreement as is alleged; but, as I have said, I think there was no evidence that the attempted assignment of the debt was made in satisfaction of a contractual obligation. His Honour's decision cannot be supported on that ground. (at p387)

12. An alternative argument put to his Honour, as it was to us, was that the respondent could rely upon a promissory estoppel. It was said that, relying on the gift of 2,000 pounds, she had not sought, while there was still time for her to have done so, to bring proceedings under the Testator's Family Maintenance Act (S.A.), or to make a claim against her husband's estate based on his failure to perform his promise made before marriage. The whole subject of promissory estoppel is a new and growing chapter of our law is interesting. I have been helped in my consideration of it by Sir Alexander Turner's recent edition of Spencer Bower on Estoppel by Representation. But I have not been able to see how in this case any estoppel could be relied upon by the respondent to give her a cause of action. She might perhaps turn to estoppel in answer to a claim against her by the appellants if these proceedings be regarded as of that nature. However, I can leave that altogether aside. It is not necessary to resort to it in order to do justice to the respondent. Her case is based on the undisputed intention of her husband to make a gift to her of the company's debt to him, and on his belief that he had done so. To give effect to her claim is thus to meet the demands of justice. And in my view it is what the law requires because, as I see it, the husband carried his intention into effect by a novation of his contract with the company. Whether this was so or not depends upon what view one takes of the facts. (at p387)

13. First I should notice one view which was pressed by the appellants. This was that the transaction between the creditor, Dyson, and the debtor, the company, was a revocable mandate. It was said there was merely an authority given by Dyson to the company, as his agent, to pay to his wife a debt due to him. If that were all that the facts shewed, the authority was revocable by him at any time, and it would have been revoked by his death. But was that all? The question of mandate is one of fact. It depends in every case upon ascertaining the nature of the transaction between the creditor and the debtor. If what the creditor intended by his words and deeds was to assign his debt to a third party the result cannot be a mere mandate to the debtor. I cannot construe Dyson's statements to the company that it was to pay the interest to his wife as it accrued due, because he said he had given the debt to her, as an instruction by him that the company was to pay her the interest only until he countermanded the instruction, on the basis that he had not given the debt to her. The facts do not support the proposition that Dyson meant to give, or that the company thought he had given, a mere mandate. (at p388)

14. In my view the facts establish a novation of the contract between Dyson and the company. That the result of a novation may be the same, or much the same, as if there had been an effective assignment is not surprising. At one stage of the history of our law, when debts were not freely assignable at law, novation was a common method of circumventing the common law rule and accomplishing the same result as can now be accomplished directly by assignment pursuant to the statute. Novation can still be used as it was in earlier times. It can still be the means to the end which the law now allows to be reached by other means. The ultimate distinction, in juristic analysis, between a transfer of a debt by assignment and by novation is simple enough. Novation is the making of a new contract between a creditor and his debtor in consideration of the extinguishment of the obligations of the old contract: if the new contract is to be fully effective to give enforceable rights or obligations to a third person he, the third person, must be a party to the novated contract. The assignment of a debt, on the other hand, is not a transaction between the creditor and the debtor. It is a transaction between the creditor and the assignee to which the assent of the debtor is not needed. The debtor is given notice of it; for notice is necessary to complete an assignment pursuant to the statute or in the case of an equitable assignment to preserve priorities. But the debtor's assent is not required. He is not a party to the transaction. (at p388)

15. In Scarf v. Jardine (1882) 7 App Cas 345, at p 351 Lord Selborne said novation "means this - the term being derived from the civil law - that there being a contract in existence, some new contract is substituted for it, either between the same parties (for that might be) or between different parties; the consideration mutually being the discharge of the old contract". In that sense "novation" means simply a new contract standing in the place of the old. It may be a new contract between the parties to the old contract, A (in this case Dyson) and B (in this case the company); or it may be a contract between them

and a new party, or parties, e.g., between A, B and C (in this case the respondent). It is in the latter sense that the word is most often used in common law countries in connexion with the transfer of debts from one creditor to another. As put in Corbin on Contracts, vol. 6, p. 189, speaking of the law in the United States:

> "All novations are substituted contracts; and the converse is also
> true that all substituted contracts are novations, unless we follow
> the more usual custom of using the word novation only in cases where
> the substituted contract involves a substituted debtor or creditor
> as a new party."

The present case must I think be decided by seeing what was the result as a matter of contract law of the transaction between A (Dyson) and B (the company). As I see the undisputed facts, two interpretations of them are open. (at p389)

16. One is that Dyson made an agreement with Francis, acting as agent for the company: that this agreement was in effect that, in consideration of Dyson's promise to release the company of its obligation to pay him, the company promised him, he acting for both himself and his wife, that it would accept her as its creditor in his place. That seems to me to be a possible interpretation of the facts. It is true that the respondent, although apparently within earshot, was not present at the conversation between Dyson and Francis. Therefore, unless her husband was her agent to accept the undertaking of the company to pay her, there was no privity of contract between her and the company. But she had been made aware by her husband of what he proposed for her benefit; she knew that he intended to give effect to his intentions by a transaction with Francis; and she left it to him to do so. That being so, it is not impossible that he should be regarded as having been her agent as well as acting on his own account, and that in both capacities he accepted the promise of the company to pay the debt to her and to treat her as the creditor. It is true that no consideration moved from her: but that I think does not matter if she and her husband were in fact joint promisees of a promise by the company to pay the amount of its indebtedness to her: she becoming the creditor in place of her husband in consideration of his promise not to sue for the debt himself: see Coulls v. Bagot's Executor and Trustee Co. Ltd. [1967] HCA 3; (1967) 119 CLR 460 (at p390)

17. If both privity between promisor and promisee and consideration moving from the promisee are essentials of a valid contract, there is a serious theoretical difficulty in every case of novation when the only consideration for the debtor's assumption of an obligation to a new party is the extinguishment of his obligation to the original creditor. This question is adverted to in Williston on Contracts, revised ed. (1938), vol. 6, p. 5243. I can only say that it arises in every case of simple novation when a new creditor is substituted for the former creditor. Allowing the new creditor to sue in the old creditor's name could never be more than a formal device in such a case, because ex hypothesi the obligation of the debtor to the original creditor had been contractually extinguished. (at p390)

18. Quite apart from the question whether the extinguishment of a prior obligation by B to A can provide consideration for a promise by B to C, is the question whether there can be an implied as distinct from an express extinction of the prior obligation. This was a problem for early Roman law too - and it is of some significance that much of the learning concerning novation, as well as the word itself, has an origin in Roman law: see e.g. Wilson v. Lloyd (1873) LR 16 Eq 60, at p 74 Justinian met the difficulty by providing that a stipulation should not operate as a novation unless the parties expressly declared that their object in making the new contract was to extinguish the prior obligation: Institutes, Bk. III, 29, 3. However, the requirements of our law are satisfied by a tacit agreement to extinguish the former obligation, and this is inferred when an inconsistent obligation is by agreement substituted. That this occurred in this case is, I think, the proper inference to be drawn from the unquestioned facts. It is true

that Dyson did not converse with Francis in terms of offer and acceptance as in a textbook on contract law. Dyson did not expressly offer to relinquish his right as a creditor in consideration of the company promising to pay the money to his wife. He simply told Francis that, as he had made over the debt to his wife, all amounts falling due were thenceforth to be paid to her. To this proposition Francis tacitly, and the company by its conduct, assented. (at p390)

19. But, although I think that the company did undertake, and for good consideration, to pay to the respondent instead of to Dyson the money it had previously owed him, I am not convinced that this undertaking should be regarded as having been given to him and to her jointly, he being her agent in the transaction. I have said that that is a possible view of the facts, but I now put it aside. On the whole I do not think the facts warrant an inference of a tripartite agreement. The other view, and I think the correct view of the facts, is that the transaction was between the company and Dyson alone: that in legal effect it amounted to the company agreeing with him that, in consideration of his releasing it from its obligation to him, it would hold itself bound to pay to his wife any moneys which it would have had to pay to him. Considering the matter now on that basis, what then is the result? (at p391)

20. It is the old and much discussed question of a contract for the benefit of a third party - a contract between A and B that B will pay money to C. I stated my views on this topic in what I wrote in Coulls's Case [1967] HCA 3; (1967) 119 CLR 460 I shall not go over the ground again. The judgments since delivered in the House of Lords in Beswick v. Beswick [1967] UKHL 2; (1968) AC 58 enable me to adhere to what I said. But before coming to the common law result in the present case, it is necessary to ask whether a trust can be spelt out of the undisputed facts. Can Dyson be held to have at any stage constituted himself a trustee for his wife of his contractual rights? There is, of course, no doubt that, as Lord Wright said in Vandepitte v. Preferred Accident Insurance Corporation of New York:

> ". . . a party to a contract can constitute himself a trustee for
> a third party of a right under the contract and thus confer rights
> enforceable in equity on the third party" (1933) AC 70, at p 79 (at p391)

21. It would however be contrary to principle to say that Dyson constituted himself a trustee for his wife of the debt the company owed him. His purpose was to give it to her, not to hold it himself as a trustee for her. He failed to give it to her in the way the law provides; and an imperfect gift will not be treated as a declaration of trust. But, although his statement that he gave her the debt did not make him a trustee while it was in law payable to him, a very different situation arose as soon as he made a new contract with the company that it would pay the money to her and not to him. The company's promise to him that it would pay her was specifically enforceable at his suit: Beswick v. Beswick [1967] UKHL 2; (1968) AC 58 Is it far-fetched to say that he had then become a trustee for her of his rights under the novated contract? He had told her that the debt was to be hers; and thereafter, by a new agreement with the company, he had put himself in a position to make good this statement. I appreciate that the cases on this topic of trusts of contractual obligations are not all easy to reconcile. That has been well demonstrated in textbooks and learned articles. I do not find it necessary here to go at length into the question. All that I would say is that it seems to me to be a possible interpretation of, or inference from, the facts of this case that Dyson should be regarded as holding as a trustee for his wife his right to enforce the new contract which for her benefit he had made with the company. The judgments in Lloyd's v. Harper (1880) 16 Ch D 290 shew how in cases of this sort a trust can arise, enforceable at the instance of a person to be benefited. The use of the word "trust" is not necessary for this result. Reliance upon the concept of a trust in cases of this kind has been described sometimes as a "device" and sometimes as a "fiction". It is effective to overcome the rigidity of the obstacles the common law doctrine of privity of contract places in the way of justice to third parties. But this case can be decided, and I think it is best decided, according to purely common law principles. (at p392)

22. On that view of the case the result may be stated as follows. The appellants, as Dyson's executors, can enforce his contracts, including his contract with the company that it would pay his wife the respondent. But that does not mean that they can recover from the company the sum it contracted with him to pay to her. If the company had failed to perform its novated contract with Dyson while he was alive, he could have recovered damages for breach of contract. Since his death the appellant could do so. These damages would be measured by his loss, not his wife's loss, flowing from the company's breach of its contract with him to pay her. These damages could not I think be more than nominal in this case. Alternatively Dyson, or he being dead his executors, could by obtaining an order for specific performance compel the company to perform its contract with him by paying his wife. Mrs. Dyson could not herself have sued, nor can she now sue directly for the money - that is assuming, as I now am, that no promise was made by the company to her either directly, or indirectly through her husband. No consideration moved from her. (at p392)

23. Lord Denning hoped a right of action at common law could be found for a third party by looking behind Tweddle v. Atkinson (1861) 1 B & S 393 (121 ER 762) This hope has proved unfounded. In Coulls's Case [1967] HCA 3; (1967) 119 CLR 460 , I gave my reasons for thinking that on historic grounds it was, regrettably, doomed to fail. That does not mean that the present doctrine was always firmly established. It was not, as Dixon J. recognized in Birmingham v. Renfrew [1937] HCA 52; (1937) 57 CLR 666, at p 686 But it is now firmly established and it binds us. It is not however a rule which is necessarily inherent in the idea of contract. It is true that it accords with the classical Roman law, although not with the modern civil law of France or Germany: see Ryan, An Introduction to the Civil Law, pp. 67-71. It is not accepted in Scots' law. And, most importantly, it has been modified or abandoned in very many jurisdictions in the United States. This means that many American decisions on novation, although based on the common law, can provide little guidance for us. But it does perhaps offer some hope that what Lord Denning could not accomplish by looking back to the past may yet be accomplished, as Lord Reid has hinted, by looking to the future. It may be that their Lordships in the House of Lords could use the law's inherent capacity for growth, as displayed in America in this field, undeterred now by their own previous decisions and by "Parliamentary procrastination": see Beswick v. Beswick [1967] UKHL 2; (1968) AC 58, at p 72 And it may be that someday this Court too, expounding the common law as Australia has inherited it, will see the way clear to take the same path. But, for the present time at all events, decisions of high authority stand directly in the way. We must take the law as it is and refuse to recognize a ius tertii arising by way of contract. In jurisprudence and legal theory and for recent commentators, this may be seen as a regrettable example of the rigidity of conceptual thinking. Doubtless the common law of contract is developing in England, and along parallel lines here, by re application of old principles in new situations. But we cannot yet go further than the decisions in In re Schebsman; The Official Receiver v. Cargo Superintendents (London) Ltd. and Schebsman (1944) Ch 83 and Beswick v. Beswick [1967] UKHL 2; (1968) AC 58 in England and Coull's Case [1967] HCA 3; (1967) 119 CLR 460 here can carry us. However, for present purposes that is far enough. We are not concerned with speculative problems of legal theory and ultimate analysis, but with a practical question, the destination of money now held in the Supreme Court of South Australia. If, as I think, the right view of the facts is that, by novation of its contract with Dyson, the company became bound to him to pay Mrs. Dyson, then the only way in which it could perform its obligation to him would be by paying her. Of course by a further novation this contract could have been cancelled by the parties to it and another new arrangement made in substitution for it. But that has not occurred. Two sentences, out of many that are pertinent in the judgments in In re Schebsman (1944) Ch 83 are peculiarly apposite at this point. Lord Greene M.R. said (1944) Ch, at p 92:

> "The trustee" (here read the appellants as executors) "could,
> presumably, release the company from its undertaking, but this would
> do no more than deprive the trustee of the right to sue for damages
> for its breach. The fact that such a release can be effected is no

argument for saying that the trustee can claim the moneys as his own." (at p394)

24. The issue which, by interlocutory order, the Supreme Court directed to be tried was formulated as whether the money in question was "payable to and recoverable by the plaintiffs (the present appellants) or the claimant (the present respondent)". As I see the facts, the rights of the parties being governed by a novated contract, the money was not, strictly speaking, "recoverable" by either party at common law. Dyson had ceased to be a creditor of the company; but his wife had not become a creditor in strict sense of law. Unless there were a trust - a question I have left undecided - she could not compel the company to perform its contract with her husband and pay the money to her. But for the company to pay it to anyone else would have been a breach of its contract. This unsatisfactory situation has been recognized in other cases. It points out a deficiency in our law as it stands, and emphasizes the superiority of the American doctrine which is succinctly stated in the Restatement, Contracts, vol. ii, s. 426. But the question in this case being to whom should the money in the Supreme Court go, the answer I think must be, to the person to whom the company had bound itself to pay it, Mrs. Dyson. Only thus can justice be done and the needs of justice met that promises should be honoured and bargains kept. The maxims Fides servanda est, and Pacta sunt servanda today express a principle of justice as much as ever they did; and, in the facts in this case, I think they provide a sufficient answer in law to the question we have to decide. I am unable to decide it by following the path of his Honour the trial judge; but I reach the same ultimate conclusion; I would therefore dismiss the appeal. (at p394)

OWEN J. I have had the opportunity of reading the judgment of my brother Kitto. I agree with it and have nothing to add. For the reasons which he has given I am of opinion that the appeal should be allowed. (at p395)

## ORDER

Appeal allowed. Costs of both parties to be paid out of the deceased estate of Ernest Edward Dyson, those of the appellant as between solicitor and client. Order of the Supreme Court of South Australia in so far as it ordered that the moneys standing in court to the credit of an account entitled "No. 1534 of 1965 Olsson v. Dyson - debt due from R.T.E. Constructions Pty. Ltd. be paid out of court to the respondent or to the solicitors upon production of the written authority" be set aside and in lieu thereof order that the said moneys be paid out to the appellants or their solicitors upon production of their written authority.

AustLII: Copyright Policy | Disclaimers | Privacy Policy | Feedback
URL: http://www.austlii.edu.au/au/cases/cth/HCA/1969/3.html