

FILED

OCT 11 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 09-29162-D-11 |
| SK FOODS, L.P., A CALIFORNIA LIMITED PARTNERSHIP, | |
| Debtor. | |
| BRADLEY D. SHARP, Chapter 11 Trustee, et al., | Adv. Pro. No. 11-2337-D |
| | Docket Control No. SH-1 |
| Plaintiff, | |
| v. | |
| SKMP CORP., INC., SSC & 1 2007 TRUST, MONTEREY PENINSULA FARMS, LLC, FREDRICK SCOTT SALYER AKA SCOTT SALYER IN HIS CAPACITY AS TRUSTEE OF THE SCOTT SALYER REVOCABLE TRUST AND TRUSTEE OF THE SSC&L 2007 TRUST, SCOTT SALYER REVOCABLE TRUST, FAST FALCON, LLC, HENRY JOHN HEATH, AND DOES 1-5, | Date:     September 15, 2011<br>Time:     10:00 a.m.<br>Place:    Courtroom 34<br>          501 I Street, 6th Floor<br>          Sacramento, CA 95814 |
| Defendants. | Judge:    Hon. Robert S. Bardwil |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW RE PRELIMINARY INJUNCTION**

On the 15th day of September 2011, the Court considered the motion of Bradley D. Sharp, Chapter 11 Trustee of SK Foods, LP for a preliminary injunction in the above-referenced action.  The Court considered the submissions and declarations in support of

that motion, and the opposition and submissions of the Defendants in response to that motion. The Court also heard oral argument by counsel for the parties.  After affording the parties the foregoing hearing, and good cause having been shown, the Court granted the Trustee's motion and entered a preliminary injunction, which was filed on September 15, 2011 in the above-referenced action.  The Court makes the following findings of fact and conclusions of law in connection with its decision to enter the foregoing preliminary injunction against Defendants SKPM Corp., Inc., SSC&L 2007 Trust, Monterey Peninsula Farms, LLC, Frederick Scott Salyer aka Scott Salyer, in his capacity as trustee of the Scott Salyer Revocable Trust and trustee of the SSC&L 2007 Trust, Scott Salyer Revocable Trust, and Fast Falcon, LLC (collectively, the "Defendants") in this action.  (Henry John Heath is also named as a defendant in this action, but the preliminary injunction has not been entered against Mr. Heath.)

## FINDINGS OF FACT

The Court makes the following finding of facts based upon the factual record before it at this time.  A trial on the merits has not taken place, and these findings and conclusions are without prejudice to any parties' rights at the time of such trial.  Based on the record currently before the Court, the Court preliminary finds as follows:

### A.  Procedural History

1.  Trustee Bradley D. Sharp ("Trustee") is the duly appointed and acting Chapter 11 trustee for the Chapter 11 estates of SK Foods, L.P., a California limited partnership ("SK Foods"), and RHM Industrial Specialty Foods, Inc., a California

2

corporation, d/b/a Colusa County Canning Co. ("RHM", collectively with SK Foods, the "Debtors").

2.  On May 7, 2009, the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). Involuntary petitions were filed with respect to the Debtors on or about May 5, 2009 (the "Petition Date").

3.  On May 4, 2011, the Trustee initiated this adversary proceeding against the defendants, SKPM Corp., Inc., SSC&L 2007 Trust, Monterey Peninsula Farms, LLC, Fredrick Scott Salyer aka Scott Salyer in his capacity as trustee of the Scott Salyer Revocable Trust and trustee of the SSC&L 2007 Trust ("SSC&L"), Scott Salyer Revocable Trust, Fast Falcon, LLC ("Fast Falcon"), and Henry John Heath.  The complaint concerns assets described below as the "Cedenco Assets," competing claims to which have been made by Fast Falcon and the Trustee.  In his complaint, the Trustee seeks, in the alternative, damages for alleged willful violations of the automatic stay (if the Cedenco Assets are found to have been owned by SK Foods when it filed for bankruptcy), or avoidance and recovery of the Cedenco Assets on the grounds those assets were fraudulently conveyed to the Defendants (if the Cedenco Assets are found to have been transferred pre-bankruptcy to Defendants).

4.  On August 31, 2011, the Trustee filed and served on each Defendant an *ex parte* motion ("Motion") for a temporary restraining order and order to show cause ("Order to Show Cause") why a preliminary injunction ("Preliminary Injunction") should not be granted in the above-captioned adversary proceeding.  *See*

3

Doc. No. 61.  The Trustee sought expedited relief on the grounds

that the Defendants would dissipate or make further transfers of

the assets which are the subject matter of this adversary

proceeding, specifically, but not limited to, 100 shares in SK

Foods Australia Pty Ltd. ("Cedenco Stock") and the right to

payment under an intercompany loan in the approximate amount of

$18 million made by SK Foods, L.P. to SK Foods Australia Pty,

Ltd. or its affiliates ("Intercompany Loan"), and/or the proceeds

of same (hereinafter referred to collectively, the "Cedenco

Assets"), currently being held by the liquidators for SK Foods

Australia Pty, Ltd. ("Australian Liquidation") and related

entities in Australia; and that these activities would deprive

the Trustee of any meaningful remedy in this case.  The Trustee

additionally requested that the Preliminary Injunction *inter alia*

appoints a receiver to take possession of any funds that may be

distributed to Fast Falcon from the Australian Liquidation in

order to prevent Fast Falcon and the other Defendants from

dissipating those funds pending trial on the Trustee's claims in

this action.

    5.  The Trustee's Motion was supported by the following

pleadings and evidence: (a) the Declarations of Bradley D. Sharp

("Sharp Decl.") [Doc. No. 62], Gregory C. Nuti ("Nuti Decl.")

[Doc. No. 63], and Michael M. Carlson ("Carlson Decl.") [Doc. No.

64], and the Exhibits attached to the foregoing, (b) the

Trustee's Request for Judicial Notice ("RJN") [Doc. No. 66-70],

and (c) the accompanying Memorandum of Points and Authorities in

Support of the Motion ("Pts. & Auth.") [Doc. No. 65], and the

/ / /

Plaintiff's complaint in the above-captioned action.  *See* Motion, 12:8-15.

6.  On the evening of August 31, 2011, the Defendants submitted an opposition to the Trustee's *ex parte* motion for a temporary restraining order and order to show cause regarding preliminary injunction [Doc. No.73] and an accompanying Declaration of Kelly A. Woodruff [Doc. No. 74].

7.  The Court held a hearing on the Trustee's Motion on September 1, 2011.  At the conclusion of that hearing the Court granted a Temporary Restraining Order ("TRO") as to all the Defendants, including Fast Falcon, LLC, and issued an Order to Show Cause returnable on September 15, 2011 as to why a Preliminary Injunction should not be issued.  *See* Doc. No. 77.

8.  On September 7, 2011, the Defendants filed their opposition ("Opposition") in response to the Order to Show Cause regarding the Preliminary Injunction [Doc. No. 101], accompanying Declarations of Kelly A. Woodruff [Doc. No. 103] and Jacob Stein [Doc. No. 104] in support of the Opposition, and objections to the Trustee's evidence ("Evidentiary Objections") [Doc. No. 102] that had been submitted in support of the Order to Show Cause regarding the Preliminary Injunction.

9.  On September 9, 2011, the Trustee filed the following: (a) the Trustee's Reply to Opposition in Response to Order to Show Cause re Preliminary Injunction [Doc. No. 113], (b) a supplemental declaration of Bradley D. Sharp [Doc. No. 111] providing further explanation of his custody of all of the business records of the Debtors and his extensive review of such documents, in his capacity as the Trustee, (c) a supplemental

declaration of Gregory C. Nuti [Doc. No. 112] attaching the Rule
2004 examination of Mark McCormick, a former Executive Vice
President and Treasurer of SK Foods, in the Chapter 15
recognition proceedings of the Cedenco Liquidation in Australia,
(d) a response to the Defendants' Evidentiary Objections [Doc.
No. 114], and (e) a nomination of Robert C. Greeley as Receiver
[Doc. No. 110].

10.  On September 14, 2011, Defendants filed their Objection
and Motion to Strike Trustee's Demand for and Nomination of
Receiver [Doc. No. 122].

11.  On September 15, 2011, Plaintiff filed the Declaration
of Natalie Bush-Lents in Support of Motion for a Preliminary
Injunction [Doc. No. 125].

12.  On September 15, 2011, Defendant filed Defendant's
Objection and Motion to Strike Declaration of Natalie Bush-Lents
[Doc. No. 126].

13.  Prior to the September 15, 2011 hearing, having duly
considered the Defendants' Evidentiary Objections, and the
Trustee's responses, the Court considered a hearing unnecessary
on the Evidentiary Objections.  Given the Court's discretion in
weighing evidence offered in connection with a motion for a
preliminary injunction, and given that the estate may well suffer
irreparable harm if the injunction is not issued, the Court
overrules most of the Defendants' objections to the evidence and
holds that it would consider the majority of the evidence offered
by the Trustee as set forth more fully below.  *See* Civil Minutes
on the September 15, 2011 hearing [Doc. No. 124].
/ / /

1   14.   Having duly considered the submissions of the parties,
2   the evidence and the arguments submitted at the September 15,
3   2011 hearing, and having ruled on the Defendants' objections to
4   the evidence, the Court finds that the Trustee is likely to
5   succeed on the merits, and makes the following findings.

6   **B.   Facts Relating to the Cedenco Entities**

7   15.   The Debtors established foreign operations in New
8   Zealand and Australia that mirror the Debtors' operations in
9   California in many respects based on their participation in the
10  tomato and vegetable processing industry and on their corporate
11  interrelationships among each other and with Debtor SK Foods'
12  general partner and limited partner.   The Australian entities are
13  referenced collectively as "Cedenco."[1]   Sharp Decl., ¶ 4.

14  16.   As of the Petition Date, SK Foods was listed on the
15  corporate records of SK Foods Australia Pty, Ltd. ("Cedenco") as
16  the owner of record of stock held in that company ("Cedenco
17  Stock"), but Defendants assert that the Cedenco Stock was
18  transferred to SKPM Corp. and the Scott Salyer Revocable Trust
19  prior to the Petition Date, and then subsequently transferred to
20  Fast Falcon.   *Id.*, ¶¶ 6, 12-13, Exh. 2-3.

21  / / /

22  [1]   Cedenco includes SK Foods Australia Pty Ltd (Aus), Cedenco
23  JV (Aus), and Cedenco Australia (AUS).   *See* Sharp Decl, ¶ 5.

24
25  In New Zealand, the entities are Cedenco Ohakune (formerly
    Mountain Carrots) (NZ), SK Foods International (NZ), and
    Cedenco Foods (NZ).   Another entity, Sunrise Coast (Japan),
26  merged into Cedenco Foods (NZ).   The Trustee has assigned
    claims associated with these entities to BMO under the terms
27  of the settlement with the secured lenders.   The liquidation
    of these New Zealand entities paid general unsecured
28  creditors, but did not generate sufficient funds to make a
    distribution to equity.   *See* Sharp Decl., ¶ 3, n.1.

1    17.  As of the Petition Date, Cedenco's corporate records
2  and audited financial statements reflected that it owed
3  approximately $18 million to the Debtors (the "Intercompany
4  Loan"), but again, Defendants contends that the Intercompany Loan
5  was assigned pre-petition to the SSC&L 2007 Trust, a trust where
6  Scott Salyer is the trustee and sole beneficiary, and then
7  subsequently to Fast Falcon.  *Id.*, ¶ 7, Exh. 5.  Supplemental
8  Declaration of Bradley D. Sharp in Support of Motion for a
9  Preliminary Injunction ("Supp. Sharp Decl.") ¶¶ 7-8, Exh. 17.
10    18.  Based on the facts set forth below, it appears to the
11  Court and the Court finds that a reasonable inference can be
12  drawn that Fast Falcon is another entity controlled directly or
13  indirectly by Scott Salyer.  *See* Findings of Fact re "2009
14  Transfers to Overseas Bank Accounts," *infra*, and Findings of Fact
15  regarding "Service on Fast Falcon, LLC," *infra*.  In its
16  opposition and again at the hearing on September 15, counsel for
17  Defendants were given the opportunity to present the Court with
18  contrary information about the ownership and control of Fast
19  Falcon, but declined to do so, despite having presented this
20  Court with various declarations and pleadings which set forth
21  various factual issues regarding the formation and ongoing
22  constitution of Fast Falcon.  Hearing Transcript dated
23  September 15, 2011 ("Hr'g Tr.") at 9:2-11:20.  Assuming *arguendo*
24  that Salyer declined to submit a declaration based upon a concern
25  that doing so would implicate his Fifth Amendment rights against
26  self-incrimination in the pending criminal action against him,
27  other witnesses, including but not limited to Cary Collins (who
28  as noted below at one time served as Fast Falcon's manager and is

8

Fast Falcon's agent in connection with asserting its claims to the Cedenco Assets) and Jacob Stein (who as noted below at one time was Fast Falcon's corporate Secretary) could have identified who, if not Salyer, exercised actual control and held the beneficial interest in Fast Falcon.

19.    Cedenco is subject to liquidation proceedings in Australia ("Australian Liquidation").  Prior to the commencement of the Australian Liquidation, Cedenco's secured lenders placed it into receivership.  The assets were sold, producing proceeds sufficient to pay all creditors of Cedenco in full, including the Intercompany Loan, and provide payment on account of SK Food's Cedenco Stock in an amount in excess of $32 million.  Sharp Decl., ¶ 8.

20.    After Cedenco was placed into receivership, Scott Salyer applied for the appointment of Ian Lock and John Sheahan of Sheahan Lock Partners in Adelaide, Australia as Joint Liquidators ("Sheahan/Lock" or the "Liquidator").  The Liquidator will take possession of the proceeds remaining after payment of the secured debt, and is obligated to distribute them to Cedenco's unsecured creditors and interest holders.  Under Australian insolvency procedures, the Liquidator makes the initial determination as to which claims should be paid.  Once the Liquidator determines that a claim should be paid, interested parties must petition the Australian court to oppose and enjoin disputed payments.  *Id.*, ¶ 9.

21.    The Trustee submitted claims to the Liquidator for payment on account of the Intercompany Loan and the Cedenco Stock.  *Id.*, ¶ 10.

22.   Fast Falcon, LLC has also submitted claims to the Liquidator for payment on account of the Intercompany Loan and Cedenco Stock, claiming SK Foods transferred the Cedenco Stock to the Scott Salyer Revocable Trust and SKPM Corp. and the Intercompany Loan to the SSC&L 2007 Trust pre-petition, that those entities subsequently transferred these assets to Monterey Peninsula Farming, LLC, another Salyer-controlled entity, and ultimately to Fast Falcon.  *Id.*, ¶ 11, Exh. 1.

### C. **Facts Relating to the Attempted Pre-Petition Transfers of Intercompany Loan and Cedenco Stock**

23.   Documents executed in 2002 show that SK Foods, L.P. was the registered owner of 100 shares of stock in SK Foods Australia Pty Ltd ("SKFA").  Sharp Decl., ¶ 12, Exh. 2.

24.   SK Foods, L.P. also executed a member's consent form dated January 10, 2002, which states that SK Foods agreed to purchase 100 shares of stock in SKFA.  *Id.*, ¶ 13, Exh. 3.

25.   In 2007, the accounting firm of Moss Adams was engaged to prepare audited financial statements for SK Foods' fiscal years ending October 31, 2006, and June 30, 2007.[2]  During the course of the audits, Moss Adams informed SK Foods that, *inter alia,* because SK Foods held the Cedenco Stock and Intercompany Loan, U.S. accounting standards required that Cedenco's financials be consolidated with those of SK Foods (referred to hereafter as the "FIN 46" issue).  This created a burdensome accounting task as Cedenco's year end differed from the Debtors, and Cedenco's financial statements were audited under Australian accounting standards which required a conversion to U.S.

---

[2]   SK Foods changed the end of its fiscal year from October 31 to June 30 during this period.  *See* Sharp Decl., ¶14, n.2.

accounting standards prior to consolidation.  To avoid the time and cost of the accounting requirements, Scott Salyer, Dan Nutley,[3] Mark McCormick,[4] Gary Perry,[5] Wayne Boos,[6] John Iacopi,[7] and others tried to devise a strategy for eliminating these assets from SK Foods financial statements while still complying with GAAP accounting standards.  *See* Sharp Decl., ¶ 14, Exh. 4.

26.  However, they did not want to create a taxable event,[8] nor did they want to show a decrease in SK Foods' equity on the balance sheets.[9]  *Id.*, ¶¶ 14-15, Exh. 4 at SHARP_CH15 275, 280-281.

27.  The debate on how to manipulate the corporate structure to accomplish this goal continued from July 2007 through at least December 2007.  Included in the debate was whether to make any transfers "effective" November 1, 2006 or June 30, 2007.  *Id.*, ¶ 16.

28.  In August 2007, Gary Perry provided documents to transfer the equity.  Wayne Boos instructed Salyer to destroy those drafts as the transaction as structured created a tax

/ / /

---

[3] An accountant at Moss Adams.  Sharp Decl., ¶ 14, n.3.
[4] SK Foods' Executive Vice President & Treasurer.  *Id.*, ¶ 14, n.4.
[5] Outside attorney.  *Id.*, ¶ 14, n.5.
[6] Outside accountant at Boos & Associates.  *Id.*, ¶ 14, n.6.
[7] Outside accountant at Iacopi, Lenz & Company.  *Id.*, ¶ 14, n.7.
[8] *See* e-mails between Wayne Boos and Scott Salyer dated August 29, 2007, attached to Sharp Decl., Exh. 4 at SHARP_CH 15 275.
[9] *See* e-mail from Scott Salyer to Dan Nutley and Mark McCormick dated September 13, 2007 (attached to the Sharp Decl., Exh. 4 at SHARP_CH 15 280) and dated September 14, 2007 (attached to the Sharp Decl., Exh. 4 at SHARP_CH 15 281).

liability.  *See* Sharp Decl., ¶ 17, Exh. 4 at SHARP_CH15 268 -
275.

29.  E-mails exchanged between SK Foods and its outside
advisors indicate that they continued to debate how to accomplish
the divestiture without any apparent resolution through October
2007.  *See* Sharp Decl., ¶ 17, Exh. 4 at SHARP_CH15 268 - 298.

30.  The Moss Adams audit report for the year ending
October 31, 2006 states that SK Foods, L.P. "formed and became
the sole stockholder" of SKFA in 2002.  *See* Sharp Decl., ¶ 18,
Exh. 5.

31.  On January 15, 2008, Moss Adams issued its audit for
the period ending June 30, 2007 reflecting a transfer of the
Cedenco Stock and the Intercompany Loan "effective" November 1,
2006.  *See* Sharp Decl., ¶ 19, Exh. 6.  It did so, however, based
solely upon a management representation letter, discussions with
management and adjusted journal entries.  *See* Nuti Decl., ¶¶ 17-
19, Exh. 10.  Moss Adams never received nor reviewed any legal
documents purportedly effectuating the transfers prior to issuing
its audit.  *Id.*  Neither SK Foods' subsequent auditor, Stoughton
Davidson, nor its tax advisor, Wayne Boos, reviewed executed
copies of the underlying legal documents evidencing these
purported transactions.  *See* Nuti Decl., ¶¶ 20-24, Exh. 11-12.

32.  The June 30, 2007 audited financial statements
reflected a reduction in owner's equity by approximately $4.8
million.  The Intercompany Loan remained as an asset on the
balance sheet, but now payable by the SSC&L 2007 Trust.  No cash
or other property was transferred to the Debtors at any time in
exchange for the assets Defendants claim were transferred to

1  them.   There is no document evidencing the SSC&L 2007 Trust's
2  purported obligation to SK Foods for payment of the Intercompany
3  Loan.  *See* Sharp Decl., ¶ 19, Exh. 6.

4      33.  On March 28, 2008, Gary Perry emailed to an SK Foods
5  employee, Lisa Crist, what appear to be execution copies of
6  documents intended to evidence a transfer of the Cedenco Stock
7  ("2008 Transfer Documents").  *See* Sharp Decl., ¶ 20, Exh. 7.
8  Ms. Crist left two days later to attend conferences in Australia
9  and New Zealand.  *See* Sharp Decl., ¶ 21, Exh. 8.  Although Salyer
10 was present in Australia and New Zealand at the same time, Salyer
11 did not sign any documents during the trip.  *See* Nuti Decl. ¶¶
12 25-26, Exh. 13.  Salyer's itinerary indicates he was scheduled to
13 arrive back to Monterey on Friday, April 11, 2008.  *See* Sharp
14 Decl., ¶ 21, Exh. 9.

15     34.  On October 27, 2008, Jeanne Johnston sent an email to
16 Mark McCormick attaching signed copies of the 2008 Transfer
17 Documents.  *See* Sharp Decl., ¶ 22, Exh. 10 at SHARP_CH15 968-970.
18 This is the earliest record of signed copies of documents
19 purporting to transfer the Cedenco Stock.  *Id.*, ¶ 22.

20 **D.     Facts Related to the Attempted Post-Petition Transfer
        of Cedenco Stock**
21

22     35.  Article 5.1 of the Cedenco Constitution specifies
23 certain requirements that must be met in order to effect a valid
24 transfer of Cedenco's shares.  Sharp Decl., ¶ 24, Exh. 11.
25 Subparagraph (d) of Article 5.1 further provides that:

26                (d)  A transferor of shares remains the holder
               of the shares transferred until the transfer is
27             registered and the name of the transferee is
               entered in the register of members in respect of
28             the shares.

   Sharp Decl., ¶ 25.

                                    13

36.    In addition, Article 2.4 of the Cedenco Constitution provides in pertinent part:

> A.    Except as otherwise required by law or provided by this constitution, the company is entitled to treat the registered holder of a share as the absolute owner of that share and is not:
>
>> 1.    compelled in any way to recognize a person as holding a share upon any trust, even if the company had notice of that trust; or
>>
>> 2.    compelled in any way to recognize, or bound by, any equitable, contingent, future or partial claim to or interest in a share on the part of any other person except an absolute right of ownership in the registered holder, even if the company has notice of that claim or interest.

Sharp Decl., ¶ 26.

37.    As noted, on the Petition Date, SK Foods, L.P. remained listed as the record owner of the Cedenco Stock on the Share Register and in the official public records maintained by ASIC. *See* Sharp Decl., ¶¶ 12-13, Exh. 2-3.

38.    Scott Salyer traveled to and was in Australia/New Zealand on May 15, 2009. *See* Sharp Decl., ¶¶ 21 & 28, Exh. 9; Supp. Sharp Decl. ¶ 5, Ex. 16.  On May 15, 2009, Nick Frankish, then the CFO of Cedenco, transmitted the 2008 Transfer Documents prepared by Gary Perry in late March 2008 (now executed by Salyer) via facsimile to Henry John Heath, a Cedenco director. *Id.*, ¶ 28.  The facsimile transmission sheet begins with the instruction, "Looks like we need to advise ASIC of ownership change."  *See id.*, ¶ 28, Exh. 12 at SHARP_CH15 1438 – 1448.

39.    On May 15, 2009, Mr. Heath and Blayney Morgan, a Client Manager in the Melbourne office of Deliotte Touche Tohmatsu exchanged emails. *See* Sharp Decl., ¶ 29, Exh. 12; Supp. Sharp Decl. ¶ 6.  Mr. Heath asked Ms. Morgan how to advise ASIC of the

ownership change.  Ms. Morgan responded by indicating that the
2008 Transfer Documents were not sufficient, and that she would
need to prepare other documentation required by Australian law
and the Cedenco Constitution (she notes that approval from
Cedenco's lenders also needed to be obtained).  Mr. Frankish is
copied on Ms. Morgan's email, to which he responds "The
notification of [SK Foods Australia] ownership change needs to be
done ASAP so please advise once forms are ready for signing and
submission."  *See* Sharp Decl., Exh. 12 at SHARP_CH15 1450.
Ms. Morgan and Mr. Frankish exchange further emails discussing
the share transfer issue, including the fact that ASIC will
impose a fine due to the apparently late submission based upon a
November 1, 2006 transfer date.  Mr. Frankish confirmed to her
that the November 1, 2006 date should be used, despite the fact
that it will result in the imposition of a fine.  *See* Sharp
Decl., ¶ 29, Exh. 12 at SHARP_CH15 1449 – 1450. *See also* Supp.
Sharp Decl. ¶ 6.

     40.  Ms. Morgan ultimately sent the required share transfer
forms to Nick Frankish and Mr. Heath on July 16, 2009 ("2009
Share Transfer Documents").  *See* Sharp Decl., ¶ 30, Exh. 13 at
SHARP_CH 15 1453 – 1469.  Mr. Frankish then forwarded them on to
Richard Lawrence, Cedenco's former CEO and director, on July 19,
2009, stating "These are the share transfer documents for you,
Scott, and Harry [Heath] to sign.  Shall I get Scott to sign in
NZ next week or email JJ [Jeannie Johnson, Scott's assistant]."
*See* Sharp Decl., ¶ 30, Exh. 13 at SHARP_CH15 1453.  *See also*
Supp. Sharp Decl. ¶ 6.
/ / /

41.   The foregoing establishes that the 2009 Share Transfer Documents were not created until July 16, 2009, and that Salyer executed those documents on or after July 19, 2009.   *See* Sharp Decl., ¶¶ 31-32, Exh. 14.

42.   SKPM Corporation, Inc. and the Scott Salyer Revocable Trust purportedly transferred their interest in the Cedenco Stock to Monterey Peninsula Farming effective January 17, 2009, and Monterey Peninsula Farming purportedly further transferred the Cedenco Stock to Fast Falcon, LLC effective as of June 29, 2009 (the "Fast Falcon Transfer Documents").   *See* "Nuti Decl. ¶ 16, Exh. 9.

**E.   Facts Relating to Debtors' Insolvency in April 2008**

43.   The record supports a preliminary finding that SK Foods was insolvent in April 2008.   SK Foods' audited financial statements for the period ending June 30, 2008 indicate that the Debtors' assets totaled $276.068 million, and its liabilities were $191.166 million.    *See* Sharp Decl., ¶ 33, Exh. 15.   The June 30, 2008 audited financial statements do not take into account liabilities the Debtors had incurred as a result of criminal activities to which several officers and agents of SK Foods subsequently plead guilty.   *See* RJN, Exh. 9-11; Sharp Decl., ¶ 34.   The bribery, price-fixing, and fraudulent mislabeling of product to which guilty pleas have been entered became public on April 16, 2008 when the FBI raided the Debtors' premises.   The auditor preparing the June 30, 2008 financial statements, Stoughton Davidson, subsequently withdrew its opinion.   *See* Sharp Decl., ¶33.

/ / /

16

44.  A former director of SK Foods, Randall Rahal, and three former high level officers/employees of the Debtors, Steve King, Alan Huey, and Jennifer Dahlman, have already entered plea agreements in which they admit to having engaged in criminal conduct over a period spanning 1999 to 2008 - bribery and price-fixing in the case of Mr. Rahal, falsifying product documentation in the cases of Mr. King, Mr. Huey, and Ms. Dahlman.  *See* RJN, Exh. 9-11.

45.  Morningstar Packing Co., Inc., a competitor of the Debtors, filed an action against SK Foods in January 2009 alleging that the bribery activity caused it damage through lost sales.  *Morning Star Packing Company, et. al.  v. SK Foods, et.al.*, United States District Court for the Eastern District of California, Case No. 09-cv-00208.  The Debtors were also sued in 2008 and 2009 by representatives ("Class Representatives") of a class of purchasers of tomato products seeking damages for the alleged price-fixing activity.[10]  In addition, after the bankruptcy cases were filed, several customers of the Debtors who were induced to purchase tomato products as a result of the bribery filed un-liquidated proofs of claim seeking compensation for damages they suffered.  *See* RJN, Exh. 12-18.  All the acts

---

[10]    The complaints are as follows: (1) *Four In One Company, Inc.  v. SK Foods, et.al.*, pending in the United States District Court for the Eastern District of California, case no. 08-cv-03017 filed on December 12, 2008; (2) *Diversified Foods and Seasonings, Inc.  v. SK Foods, et.al.*, pending in the United States District Court for the Eastern District of California, case no. 08-cv-03074, filed on December 18, 2008; (3) *Bruce Foods Corporation v. SK Foods, et.al.*, pending in the United States District Court for the Eastern District of California, case no. 09-cv-00027, filed on January 5, 2009; (4) *Cliffstar Corporation  v. SK Foods, et.al.*, pending in the United States District Court for the Eastern District of California, case no. 09-cv-00442, filed on February 13, 2009.

giving rise to these liabilities occurred from 1999 through April 2008. *Id.*

46. Pursuant to compromises approved by this Court on or about January 24, 2011, Morningstar and the Class Representatives were allowed claims against the Debtors' estate totaling $121 million. *See* RJN Exh. 19.

47. The Trustee has conducted a preliminary analysis of liabilities the Debtors incurred to customers who, according to the plea agreements, were induced to purchase product as a result of bribes, and estimated that these additional damage claims would exceed $40 million as of April 2008. *See* Sharp Decl. at ¶35.

48. When these additional liabilities are added to the Debtors' June 30, 2008 balance sheet, it is more likely than not that the Debtors were insolvent on June 30, 2008.

49. No material change occurred to the Debtors assets, liabilities, or financial condition between April 2008 and June 30, 2008, *See* Sharp Decl., ¶ 33, and so it is more likely than not that the Debtors were insolvent on and after April 12, 2008.

F.   **Facts Establishing Need for Injunctive Relief**

1.   *2009 Transfers to Overseas Bank Accounts*

50. In the fall of 2009, Salyer caused assets held by Salyer-affiliates (assets which the Trustee alleges are either properly considered assets of the estate or are the subject to avoidance claims) to be transferred to overseas bank accounts

/ / /

/ / /

1    held in the name of Fast Falcon. *See* RJN, Exh. 4 (Artley

2    Affidavit, ¶92).[11]

3       51. At Salyer's direction, approximately $5.3 million was

4    transferred from different accounts held in the name of Salyer

5    affiliates at Mechanic's Bank to Cary Collins, Salyer's personal

6    accountant. *See* RJN, Exh. 4 (Exhibit KK of the Government's

7    Motion). One of the overseas accounts was in the name of "Fast

8    Falcon", and Salyer's personal notes indicate that he intended to

9    distribute the "F. Falcon $" to himself personally. *See* RJN,

10   Exh. 4 (Exhibit FF of the Government's Motion). Mr. Salyer

11   identifies himself as "Manager" of Fast Falcon. *See* RJN, Exh. 5

12   (Exhibit NN of the Supplemental Exhibits in Support of Its Motion

13   Seeking Defendant Frederick Scott Salyer's Pretrial Detention).

14   Volksbank AG maintained the accounts for Fast Falcon. It

15   submitted a Portfolio Valuation for the Fast Falcon accounts to

16

17   [11]       Mr. Artley's Affidavit states as follows:

18      . . . in aid of SALYER's flight to avoid prosecution,
she [J.J.] along with certain other individuals,
19      assisted SALYER in transferring millions of dollars to
banks in foreign countries. Specifically, J.J. has
20      indicated that SALYER instructed J.J. to move **millions
of dollars in assets from accounts that were originally
21      associated with various SK Foods entities involved in
the tomato processing business,** and which were located
22      at Bank of the West and Wells Fargo Bank, to other
accounts located at Mechanics Bank in San Francisco,
23      According to J.J., SALYER then instructed certain
personal accountants and individuals at Mechanics Bank
24      to transfer the funds at Mechanics Bank to financial
institutions in the West Indies and in Liechtenstein.
25      I have reviewed email correspondence, provided to the
government by J.J., from a bank employee at Mechanics
26      Bank to SALYER and J.J., which references two bank
accounts that have been established for SALYER in
27      Liechtenstein and Charlestown, West Indies,
respectively. [emphasis added].

28

Mr. Salyer indicating that Fast Falcon, LLC had $4,382,077 in assets. *See* RJN, Exh. 6 (Exhibit RR to the Government's Opp. To Review of Salyer's Detention Order).

52.    Cary Collins assisted Salyer in moving the foregoing sums overseas. *See* RJN, Exh. 6 (Exhibits Y, Z, and AA-LL to the Government's Opp. To Review of Salyer's Detention Order).   Mr. Collins facilitated the transfer of funds to Fast Falcon using his own personal bank accounts at Mechanics Bank. *Id.*   The size and amount of the transactions drew them to the attention of the Bank's security officer, who interviewed Mr. Collins's account manager.   The account manager reported that Mr. Collins admitted to her that the funds were being transferred to Fast Falcon in order to conceal Salyer's interest in those funds. *See* RJN, Exh. 7.   Mr. Collins is a convicted felon, having plead guilty to charges of bank fraud. *See* RJN, Exh. 8.

  2.    *Previous Preliminary Injunction Violations*

53.    This Court has previously issued two other preliminary injunctions in adversary proceedings brought by the Trustee against entities under the control of Scott Salyer.   Those preliminary injunctions were entered in *Sharp v. CSSS, LP*, AP No. 09-2543, (the "Drum Line Action") and in *Sharp v. SSC Farms I, LLC*, AP No. 09-02692 D (the "Quiet Title Action"); *Sharp v. Scott Salyer, as trustee of the Scott Salyer Revocable Trust*, AP No. 10-02014 D (the "Substantive Consolidation Action") and *Sharp v. SKF Aviation*, LLC, AP No. 10-02016 D (the "SKF Aviation Action").

54.    The evidence presented in this and these other adversary proceedings leaves the Court with the clear impression, and the Court preliminary finds, that Mr. Salyer has and does

control, directly or indirectly, the defendants in this adversary proceeding as well as the defendants in the Drum Line, Quiet Title, Substantive Consolidation and SKF Aviation Actions. As a result, the Court finds that evidence of violations of the preliminary injunctions entered in those other actions is relevant to the Court's evaluation of whether injunctive relief in appropriate in the present action.

55. The Court finds that the evidence presented justifies a preliminary finding that the preliminary injunctions in the Drum Line, Quiet Title, Substantive Consolidation and SKF Aviation Actions have been violated.

        a.   **Violation of the Preliminary Injunction in the Drum Line Action.**

56. In the Drum Line Action, this Court issued a temporary restraining order on August 24, 2009 prohibiting CSSS, LP ("CSSS") from selling, transferring out of the United States or encumbering a piece of equipment referred to as the "Drum Line" [Doc. No. 15 in that adversary]. On September 3, 2009, the Court issued a preliminary injunction continuing the restraints and injunctions imposed in the August 24, 2009 order [Doc. No. 34 in that adversary]. *See* Nuti Decl., ¶ 4, Exh. 1 (Court's Memorandum Decision on Larry Lichtenegger's Motion for Summary Judgment in the Drum Line litigation).

57. After the preliminary injunction was entered in the Drum Line Action, the Drum Line was shipped to New Zealand. *See* Nuti Decl., ¶ 4, Exh. 1, 2:17-21 ("[i]t is undisputed that on August 24, 2009, the day of the [TRO] hearing, the drum line was in the Port of Oakland awaiting documentation that would allow it

1  to be exported, and it did not leave the Port of Oakland for New
2  Zealand until a week later, August 31.").

3      58.  On January 20, 2010, the Trustee filed a motion for an
4  order to show cause why the defendant CSSS, LP, dba Central
5  Valley Shippers ("CVS"), and Monterey Peninsula Farms LLC, Scott
6  Salyer, Gerard Rose and Larry Lichtenegger should not be held in
7  contempt for violation of the temporary restraining order and
8  preliminary injunction in the Drum Line Action.  *Id.*, 1:20 – 2:3.
9  Proceeding in the Drum Line case has been stayed and the Court
10  has not reached the merits of the Trustee's motion.

11      59.  Although the Court has not made any determination
12  regarding whether any party should be held in contempt for
13  violation of the temporary restraining order in the Drum Line
14  Action, it is clear that the Court's Order did not prevent the
15  Drum Line, an asset claimed by the Trustee to be a part of the
16  estate of the Debtor, from being shipped beyond the power of this
17  Court.  It also appears to the Court that the individuals with
18  the responsibility to ensure compliance with the temporary
19  restraining order have not done so.

20          **b.    *Violations of the Preliminary Injunction in the***
21          ***Substantive Consolidation, Quiet Title and SKF***
               ***Aviation Actions***

22      60.  On March 20, 2010, this Court entered a Preliminary
23  Injunction in three adversary proceedings, *Sharp v. SSC Farms I,*
24  *LLC*, AP No. 09-02692 D (the "Quiet Title Action"); *Sharp v. Scott*
25  *Salyer, as trustee of the Scott Salyer Revocable Trust*, AP No.
26  10-02014 D (the "Substantive Consolidation Action") and *Sharp v.*
27  *SKF Aviation*, LLC, AP No. 10-02016 D (the "SKF Aviation Action").
28  The defendants in those three adversary proceedings are Scott

22

Salyer, as a trustee of the Scott Salyer Revocable Trust, SK PM
Corporation, SK Foods, LLC, SKF Canning, LLC, Blackstone Ranch
Corporation, Monterey Peninsula Farms, LLC, Salyer Management
Company, LLC. SK Farms Services, LLC, SK Frozen Foods, LLC, SS
Farms, LLC, SSC Farming, LLC, SS Farms I, LLC, SS Farms II,
LLC, SS Farms III, LLC, SKF Aviation, LLC, CSSS, LP d/b/a Central
Valley Shippers (collectively "Sub. Con. Defendants"). The
Preliminary Injunction enjoined the Sub. Con. Defendants and
their officers, agents, servants, employees and attorneys and
those in active concert with them from selling, transferring,
encumbering or moving any of their assets or funds, except for
making payments in the ordinary course of business for regular
salaries, lease payments, mortgage payments or utilities that
become due and payable.  The March 20 Preliminary Injunction has
been modified six times, on October 13, 2010, January 20, 2011,
February 16, 2011, May 1, 2011, May 10, 2011 and September 2,
2011.  Collectively, the March 20 Preliminary Injunction and the
subsequent amendments will be referred to herein as the
"Preliminary Injunction Orders."

        61.   The Court finds that the evidence presented by the
Trustee, as set forth in the following paragraphs, raises a high
degree of conviction in the Court's mind that the individuals
with the responsibility to ensure compliance with the Preliminary
Injunction Orders have not done so, and have in fact violated
those Orders repeatedly and in very substantial amounts.  In
addition, the Court finds that a reasonable inference can be
drawn that the accountings provided to the Trustee by the Sub.
Con. Defendants - as required by the Preliminary Injunction

Orders – have in several respects been inaccurate, and no
explanation has been offered.

*(1) Facts Showing Inappropriate Withdrawals of Funds*
*Subject to the Preliminary Injunction Orders.*

*(a)   Withdrawals in Violation of the October 13 Order.*

62.   October 13, 2010, this Court entered the first of its
amendments to the March 20 Order, (the "October 13 Order").   The
October 13 Order allowed SSC Farming, LLC, to sell certain
properties (the Colusa Properties") which were subject to the
March 20 Order.   The October 13 Order provides that funds
realized from this sale ("Sales Proceeds") could be used only to
pay "regular salaries, lease payments, mortgage payments or
utilities of SSC Farming, incurred by it, in the ordinary course
of its business, that become due and payable, up to the amounts
listed on the budget attached hereto as Exhibit C for the months
of August through December 31, 2010."   *See* October 13 Order (RJN,
Exh. 2), ¶ 5. The budget attached to the order provides for total
monthly expenditures not exceeding $27,400.   *Id.*   Thus, the total
amount that could be spent for the five month period of August
through December was $137,000.   The October 13 Order goes on to
provide (a) that "no [other] withdrawals will be made from [the
account] without further order of the Court" and (b) that monies
in the account "may not be used to pay the expense of any entity
other than SSC Farming or to pay expenses other than those
specified in Paragraph 5, without further order of the Court."
*Id.*, ¶ 6.

63.   Pursuant to the October 13 Order, a bank account was at
Metro United Bank to hold the Net Sales Proceeds (the "Sale

24

Proceeds Account"). Carlson Decl., ¶ 3. The Trustee has subpoenaed and received the records of Metro United Bank regarding the Sales Proceeds Account. Carlson Decl., ¶¶ 3-5. Portions of the documents received by the Trustee have been introduced to the Court and are referred to hereinafter as the Metro United Bank documents.

64.  The Metro United Bank documents show the following:

a.  On November 1, 2010, a wire transfer of $150,000.00 was made out of the Sales Proceeds Account. An "Advice of Charge" document evidencing this wire transfer lists "Beneficiary's[sic]: SSC Farming LLC." Carlson Decl., Exh. 3. However, the Metro United Bank documents contain another "Advice of Charge" on the same date "for outgoing wire fee" of $20.00. This second Advice of Charge list "Beneficiary's [sic]: Collins & Associates." *Id.,* Exh. 4.

b.  Also on November 10, 2010, an unnumbered check for $53,000.00 was written. *Id.,* Exh. 5. Based on a comparison of the signature on the check, to the signature on the signature card included in the Metro United Bank documents, the check appears to have been signed by Robert Pruett. *Id.,* Exh. 2. No payee is shown on this check. The back of this check shows that it was deposited to an account at Mechanics Bank "BR 29," which I interpret to mean Mechanics Bank branch 29. Other documents show that Collins and Associates had an account at Mechanics Bank and made deposits at that branch. *See id.,* Exh. 1, page 2 (back of the check).

c.  On December 3, 2010, check 1003 for $100,000 was written to Collins and Associates on the Sales Proceeds Account. This check was also signed by Mr. Pruett. *Id.,* Exh. 6.

/ / /

d.   On January 11, 2011, check 1008 for the amount of $50,000.00 was written to Collins and Associates on the Sales Proceeds Account.   *Id.* Exh. 1.   This check is also signed by Robert Pruett.   *Id.*, Exhs. 1 & 2.

65.   Thus, the Metro United Bank documents show that, on November 1, 2010, November 10, 2010, December 3, 2010 and January 11, 2011, a total of $353,000 was withdrawn from the Sales Proceeds Account.   This exceeds the total amount of Sales Proceeds that Sub. Con. Defendants were allowed to spend the five month period of August through December ($137,000) by over $200,000.

66.   Additionally, at least $150,000 of the money withdrawn from the Sales Proceeds Account went to Collins & Associates.   *See id.,* Exhs. 1 & 6.

67.   Collins & Associates is an accounting firm that provided accounting services to Mr. Salyer and the Sub. Con. Defendants, and prepares the Accountings regarding the Sales Proceeds Account, which is Sub. Con. Defendants provide to the Trustee pursuant to the Preliminary Injunction Orders.   Collins & Associates prepares all the checks that are written on the Sales Proceeds Account, before they are signed by Mr. Pruett.   Carlson Decl., ¶ 9.

68.   Nothing in the October 13 Order provided for the payment of accountants.   See RJN, Exh. 2.

69.   Although the Metro United Bank documents do not show exactly who received the balance of the $353,000 that was withdrawn from the Sales Proceeds Account on November 1, November 10 and December 3, there are clear indications that the additional $203,000 also went to Collins & Associates.   In addition to the information identified above, a bank statement included in Metro United Bank documents shows

that, on January 24, 2011, a wire transfer of $353,000.00 was deposited into the Sales Proceeds Account. In other words, the entire amounts withdrawn on November 1, November 10, December 3, 2010 and January 11, 2011 were returned to the account on January 24, 2011. Carlson Decl., Exh. 7. The Metro United Bank documents contain an "Advice of Credit," dated January 24, 2011, indicating the "originator" of the $353,000.00 wire transfer as Cary S. Collins dba Collins & Associates. *Id.*, Exh. 8.

70. The return of $353,000.00 to the Sales Proceeds Account took place shortly after the Trustee made it clear that he was going to insist on receiving monthly bank statements for that account. *Id.*, ¶¶ 12-14. This fact strongly suggests to the Court that the repayment was made in order to cover up earlier violations of the Preliminary Injunction Orders.

71. In addition to the foregoing withdrawals, on December 1, 2010, check 1002 was written to F. Scott Salyer for $15,000.00. This check was also signed by Mr. Pruett. *Id.*, Exh. 9. The Accounting that was provided by Sub. Con. Defendants for the month of December shows a payment on December 1 of $15,000 for "Farm Manager – December." *Id.*, Exh. 10.

72. Although, the October 13 Order did provide for payments to a farm manager, it was never the Court's intention that any of the Sales Proceeds could be paid to Scott Salyer; indeed, the Court's intentions were exactly the opposite. The Court believes this was clear to all of the parties subject to the Preliminary Injunction and their counsel. Additionally, the Court finds that it is very unlikely that Mr. Salyer provided any farm management services at this time, since / / /

27

the terms of his bail restricted him to his house in Monterey County, California during November and December 2010.

        (b)   *Withdrawals in Violation of the Jan. 20 Order.*

73.   This Court's Amended Preliminary Injunction, dated January 20, 2011 (the "Jan. 20 Order") amended the earlier Preliminary Injunction Orders to allow monies from the Sales Proceeds Accounts to be used to pay lawyers for Sub. Con. Defendants in connection with certain adversary proceedings and the bankruptcy proceeding.  Carlson Decl., ¶ 18.

74.   On Monday, March 7, 2011 counsel for Scott Salyer provided counsel for the Trustee with an accounting of funds paid out of the Sales Proceeds Account for January and February 2011 (the "Jan.-Feb. Accounting").  *Id.,* ¶ 20 & Exh. 11.

75.   The Jan.-Feb. Accounting indicated that on February 1, 2011 in a series of three separate checks, SSC Farming paid Gary Perry, another counsel for Mr. Salyer, in excess of $510,000.  The payments are identified on the Accounting as "Gary Perry Legal Fees Per Court Order" and are shown as check 1015 for $339,690; check 1016 for $122,279.41 and check 1018 for $48,439.60.  Id., ¶ 21.

76.   Copies of checks 1015, 1016 and 1018 are included in the Metro United Bank documents.  Checks 1015 and 1016 were not written to Gary Perry.  Both checks were written to Collins & Associates.  The checks total $461,969.41.  Both checks were signed by Mr. Pruett.  Id., Exh. 12 and 13.  (Check 1018 for $48,439.60 was written to Gary Perry.) Id., ¶ 22.

        (2) *Facts showing inaccurate accountings pursuant to the Preliminary Injunction Orders.*

/ / /

28

77.   This Court amended the Preliminary Injunction Orders on February 16, 2011 (the "February 16 Order.")  *See* RJN, Exh. 3.  The February 16 Order required Sub. Con. Defendants to provide both an Accounting and bank statements for the Sales Proceeds Account.  *See* February 16 Order (RJN, Exh. 3), ¶ 8.  A previous order had also required Accountings, but there had been no requirement to provide bank statements.  *See* October 13 Order (RJN, Exh. 2) ¶ 5.

78.   The Sub. Con. Defendants never provided the Trustee with bank statements for Sales Proceeds Account for November and December 2011; the first bank statement received by the Trustee was the January 2011 bank statement, received on March 7, 2011.  Carlson Decl. ¶ 23 & Exh. 11.

79.   As noted above, the Court finds that that a reasonable inference can be drawn that the accountings provided to the Trustee by the Sub. Con. Defendants – as required by the Preliminary Injunction Orders – have in several respects been inaccurate, and no explanation has been offered.  Providing inaccurate accounting would also violate the Preliminary Injunction Orders.

80.   On February 22, 2011, Sub. Con. Defendants provided the Trustee with an accounting for the Sales Proceeds Account for November and December 2010 (the "Nov.-Dec. Accounting").  Carlson Decl., ¶ 15 & Exh. 10.  The Nov.-Dec. Accounting did not reflect all of the expenditures from the Sales Proceeds Account; $303,000 in withdrawals were not disclosed.  The following items were not reflected, in any way, in the Nov.-Dec. Accounting:  (a) the November 1, 2010, a wire transfer of $150,000.00, (b) the unnumbered check (dated November 10, 2010) for $53,000.00, and (c) check 1003 (dated December 3, 2010) in / / /

the amount of $100,000 to Collins & Associates. *Compare id.*, Exh. 10 *to* Exhs. 3, 5 and 6.

81.   The Nov.-Dec. Accounting also did not accurately describe the $15,000 payment to Mr. Salyer.  As noted above, check 1002 to Mr. Salyer (Carlson Decl, Exh. 9) is identified on the Nov.-Dec. Accounting (Carlson Decl., Exh. 10) as a payment for "Farm Manager – December."  The October 13 Order did allow payments for a farm manager, and the Trustee had been informed that farm management services were being provided by Grewal Consulting.  *Id.*, ¶ 25.  The Nov.-Dec. Accounting shows two payments to Mr. Grewal for September, October and November farm management.  The Nov.-Dec. Accounting gave the impression that the November payment was also to Mr. Grewal.  *Id.*

82.   On March 7, 2011, Sub. Con. Defendants provided the Trustee with an accounting for the Sales Proceeds Account for January and February 2011 (the "Jan.-Feb. Accounting")  *Id.*, ¶ 20 and Exh. 11. The Jan.-Feb. Accounting did not reflect Check 1009 (dated January 11, 2011) in the amount of $50,000.00 to Collins & Associates.  *Compare id.,* Exhs. 1 to 11.  The Jan.-Feb Accounting also did not reflect the redeposit of $353,000.00, to cover earlier violations of the Preliminary Injunction Orders.  As explained above, on January 24, 2011, $353,000 was wire transferred into the Sales Proceeds Account, apparently to replace monies that had been withdrawn from that account in November and December in violation of the Preliminary Injunction. This redeposit is not reflected in the Jan.-Feb. Accounting.  *Compare id.*, Exhs. 7 *to* 11.

83.   The Nov.-Dec. Accounting (*id.*, Exh. 10) and the Jan.-Feb. Accounting (*id.*, Exh. 11) inaccurately reflect the balance of the Sales Proceeds Account.  Comparing the bank statement for the Sales

30

Proceeds Account, from the Metro United Bank, for the period ending
November 30, 2010 (*id.*, Exh. 14) and for the period ending
December 31, 2010 (*id.*, Exh. 15) to the Nov.-Dec. Accounting and the
Jan.-Feb. Accounting reveal the following.

| Date | Actual Balance (per bank statement) | Balance Shown on Sub. Con. Defendants' Accounting |
|------|------|------|
| 11/30/10 | $1,824,676.72[12] | $2,027,696.72[13] |
| 12/31/10 | $1,674,237.29[14] | $1,976,715.20[15] |

84.   These discrepancies in the closing balances of the Sales
Proceeds Accounts were necessary to hide from the Trustee the $353,000
in undisclosed withdrawals.  If accurate Accounting had been provided,
these withdrawals would have been discovered.  *Id.*, ¶ 28.

85.   The Jan.-Feb. Accounting (*id.*, Ex. 11) misidentified $461,969
paid to Collins & Associates as payment of legal fees to Gary Perry
pursuant to the Amended Preliminary Injunction.  *Compare id.*, Exh. 11
*with id.*, Exhs. 12 and 13.

86.   The March Accounting misidentified the return of the $461,969
paid to Collins & Associates as the return of legal fees by Gary
Perry.  Counsel for the Trustee complained to counsel for Scott Salyer
that the payment of $510,000 to Gary Perry was not permitted under the
Preliminary Injunction Orders, and counsel for Salyer agreed that the
money would be repaid into the Sales Proceeds Account.  *Id.*, ¶ 30.  On

--------

[12]   Carlson Decl., Exh. 14.
[13]   *Id.*, Exh. 10.
[14]   *Id.*, Exh. 15.
[15]   *Id.*, Exhs. 10 & 11.

April 7, 2011, Sub. Con. Defendants provided the Trustee with an accounting for the Sales Proceeds Account for March 2011 (the "Mar. Accounting"). *Id.*, ¶ 30 & Exh. 16. The Mar. Accounting shows a deposit of $510,408.41 into the Sales Proceeds Account, which is identified as "Reversal of Gary Perry – Legal Fees." Mr. Perry was not the source of the entire $510,408.41 deposit. Mr. Perry wrote two checks totaling $48,439.60. The third check was written by Collins & Associates for the amount of $461,969.41. *Id.*, Exh. 17.

**G.    Facts Regarding Appearance by Farella Braun + Martel on Behalf of the Defendants**

87.   On August 5, 2011, Dean Gloster and Kelly Woodruff of Farella Braun + Martel LLP ("FBM") entered a general notice of appearance and request for notice on behalf of all of the Defendants, except Henry John Heath, but expressly including Fast Falcon, LLC and Scott Salyer in his capacity as Trustee for the SSC&L 2007 Trust [Doc. No. 28].

88.   Having received notice of FBM's appearance, the Trustee then served the summons and complaint on FBM, as counsel for all of the Defendants in this action [Doc. No. 34].

89.   On August 26, 2011, FBM withdrew its notice of appearance and filed a *corrected* notice of appearance, indicating that the previous notice contained numerous errors and instead declared its appearance on behalf of Defendants Scott Salyer, as trustee of the Scott Salyer Revocable Trust;  Scott Salyer Revocable Trust; SKPM Corp.;  SSC&L 2007 Trust; and Monterey Peninsula Farms LLC [Doc. No. 58].

90.   FBM explained, "Although FBM filed a notice of appearance on behalf of, among others, Fast Falcon and Scott Salyer as Trustee of the SSC&L 2007 Trust [Dkt. No. 28], FBM was mistaken on both counts."

/ / /

1 Opposition to Trustee's *Ex Parte* Motion for a Temporary Restraining
2 Order, 5:24-25, n.2 [Doc. No. 73].

3 **H.   Facts Regarding Service on SSC&L 2007 Trust**

4    91.   On August 25, 2011, Trustee served the summons and complaint on
5 SSC&L 2007 Trust, by serving Scott Salyer, as the trustee   [Doc. No.
6 56].

7    92.   The Defendants assert that service on SSC&L was improper
8 because Robert Pruett, not Salyer, is the trustee.   Opposition, 4:18-
9 20.

10    93.   On September 9, 2011, the Trustee served the complaint,
11 summons, TRO, and preliminary injunction papers on Robert Pruett, as
12 trustee of the SSC&L 2007 Trust [Doc. No. 118 & 119].

13    94.   SSC&L continues to object to the sufficiency of service.

14    95.   The Court finds that SSC&L was sufficiently served with the
15 summons and complain and with the TRO and preliminary injunction
16 papers through the service on Mr. Salyer and Mr. Pruett.

17    96.   The Court further finds that SSC&L has waived its objection to
18 sufficiency of service through its appearance in this proceeding.

19    97.   FBM appeared on behalf of SSC&L on multiple occasions since
20 August 5, 2011.   FBM's first notice of appearance and request for
21 notice filed on August 5, 2011 expressly states that FBM "hereby
22 appears in the above-captioned adversary proceeding as counsel for . .
23 . SSC&L."   *See* Doc. No. 28.

24    98.   FBM reiterated its appearance on behalf of SSC&L in its
25 corrected notice of appearance [Doc. No. 58].

26    99.   SSC&L is one of the Defendants, represented by FBM, who filed
27 the following three motions in this adversary proceeding seeking
28 affirmative relief from the Court:

1          -    Motion to Stay the Adversary Proceeding, filed August 15,
2    2011 [Doc. No. 36];

3          -    Motion for Order Shortening Time on Motion to Stay the
     Adversary Proceeding, filed August 22, 2011 [Doc. No. 47]; and

4          -    Motion for Withdrawal of Reference, filed September 7, 2011
5    [Doc. No. 90]

6    **I.   Facts Regarding Service on Fast Falcon, LLC**

7    100.   Fast Falcon is a holding company that has no business

8    operations or physical location.   Hearing Transcript dated

9    September 1, 2011 ("Hr'g Tr.") at 10:17-22.

10   101.   Fast Falcon asserts (through FBM, which purports not to

11   represent Fast Falcon) that it has not been adequately served with

12   process.

13   102.   Based on its review of the facts set forth below, the Court

14   finds that Fast Falcon has demonstrated a degree of gamesmanship, as

15   far as who it is the Trustee has to serve to gain jurisdiction over

16   Fast Falcon.   Hrng. Trs. at 10:3-6.

17   *1.   Service on Scott Salyer*

18   103.   Scott Salyer, a resident of Pebble Beach, California, served

19   as Fast Falcon, LLC's manager at least as of January 2, 2010.   *See*

20   Exhibit NN of the Supplemental Exhibits in Support of Its Motion

21   Seeking Defendant Frederick Scott Salyer's Pretrial Detention,

22   attached as RJN, Exh. 5.

23   104.   Fast Falcon acquired its asserted interest in the Cedenco

24   Stock from Monterey Peninsula Farms, a California limited liability

25   company indirectly owned and/or controlled by Scott Salyer; Fast

26   Falcon acquired its asserted interest in the Intercompany Loan from

27   the SSC&L 2007 Trust, at a time when Scott Salyer served as the SSC&L

28   2007 Trust's trustee.   *See* Nuti Decl. ¶ 16, Exh. 9 (Fast Falcon

Transfer Documents obtained through discovery produced by Cary Collins in the Chapter 15 proceedings); Sharp Decl., ¶ 11, Exh. 1 (proof of debt filed by Cary Collins on behalf of Fast Falcon, LLC in the Australian liquidation proceedings).

105.   Scott Salyer was served with the summons and complaint on August 25, 2011, as "Manager" of Fast Falcon [Doc. No. 55].

2.   *Service on Cary Collins*

106.   Cary Collins was appointed Fast Falcon, LLC's manager "effective as of" February 18, 2010. *See* Declaration of Kelly Woodruff in Support of Opposition to Trustee's *Ex Parte* Application for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction ("Woodruff Decl.") [Doc. No. 74], ¶2, Exh. B.

107.   Fast Falcon appointed Collins as its designated agent and representative to file claims on Fast Falcon's behalf in the Australian liquidation proceedings for the Cedenco Stock and Intercompany Loan. *See* Sharp Decl., ¶ 11, Exh. 1 (proof of debt filed by Cary Collins on behalf of Fast Falcon, LLC in the Australian liquidation proceedings: "I am the creditors agent authorized to make this statement." (page 1, ¶ 3) & "The authorized representative of Fast Falcon LLC who has executed such Form 535 declares . . . ." (page 2, attachment to proof of debt)).

108.   The contact address Fast Falcon used on its proof of debt filed with the Liquidators is the same address as Cary Collins's residence and business address, 3450 21st Street, San Francisco, California 94110. *See* Sharp Decl., ¶ 11, Exh. 1 (proof of debt filed by Cary Collins on behalf of Fast Falcon, LLC in the Australian proceedings).

/ / /

109.   Although counsel for the Defendants claims not to represent Fast Falcon, the same counsel has presented this Court with evidence with they claim shows that Fast Falcon terminated Cary Collins as its manager "effective as of" May 16, 2011.  *See* Woodruff Decl., ¶3, Exh. C (Appointment of Manager of Limited Liability Company).   However, Defendants supplied no evidence confirming when the Appointment of Manager of Limited Liability was in fact executed (*i.e.*, no declaration by Mr. Collins confirming when he was terminated as manager and when that was communicated to him).   Furthermore, no evidence was submitted establishing that Fast Falcon terminated Mr. Collins's role as Fast Falcon's agent and authorized representative in connection with asserting Fast Falcon's claims in the Australian Liquidation.

110.   The Court finds that Ms. Woodruff's declaration fails to establish any foundation establishing that she has knowledge of Fast Falcon's business sufficient to allow her to authenticate the Appointment of Manager of Limited Liability document, even applying the relaxed evidentiary standards applicable on a motion for preliminary injunction.   On that basis, the Court has not been presented with credible evidence that Mr. Collins had been replaced as Fast Falcon's manager at the time he was served with the summons and complaint.

111.   The unreliability of the unauthenticated and unsubstantiated documentation purporting to indicate that Fast Falcon terminated Cary Collins as manager is further supported by statements made by Ms. Woodruff's partner at the September 15, 2011 hearing on the Preliminary Injunction, in which he stated that he did not know the entity that controls the manager of Fast Falcon:

36

1    [THE COURT]:  Is it fair to say that Mr. Salyer is the primary
     person in control of Fast Falcon?
2

3    MR. PETERSON:  I can't say that, Your Honor.  I don't believe
     that to be true.  There's a manager . . . who is responsible.

4    THE COURT:  How about the entity that control the manager of
     Fast Falcon?
5

6    MR. PETERSON:  I don't know, Your Honor.

7    THE COURT:  And the reason I ask i[f] your office really
     doesn't represent . . . Fast Falcon [is because] in various
     declarations and in pleadings and seem to represent many
8    factual issues that pertain to the formation in the ongoing
     consistency of Fast Falcon.
9

10   Hr'g Tr. at 9:9-21.

11      112.  Cary Collins was served with the summons and complaint in this

12   action on May 18, 2011 and June 10, 2011, as Fast Falcon's "authorized

13   representative" [Docs. No. 10 & 21].

14      3.   _Service on Jacob Stein_.

15      113.  Jacob Stein, an attorney at Klueger & Stein in Los Angeles,

16   California, served as Fast Falcon's Secretary until at least February

17   18, 2010.  _See_ Woodruff Decl., ¶3, Exh. B (Secretary's Incumbency

18   Certificate and its attached Appointment of Manager of Limited

19   Liability for Fast Falcon, LLC dated February 18, 2010); Declaration

20   of Jacob Stein in Support of Opposition, ¶ 6.

21      114.  Jacob Stein was served with the summons and complaint, TRO,

22   and preliminary injunction papers on September 1, 2011, as Fast

23   Falcon's secretary [Doc. No. 80].

24      115.  Mr. Stein resigned as Fast Falcon's secretary on February 19,

25   2010, and claims to have no continuing relationship with Fast Falcon.

26   _See_ Declaration of Jacob Stein in Support of the Opposition, ¶¶ 6-7

27   [Doc. No. 104].  Despite his claim of a lack of continued relationship

28   with Fast Falcon, six days after being served with the summons and

complaint, Mr. Stein submitted a declaration in support of Defendants' opposition to the preliminary injunction.  *See* Opposition, 5:5-6.

    4.   *Service on Farella Braun + Martel LLP.*

    116.  As noted above, on August 5, 2011, Farella Braun + Martel LLP entered a general notice of appearance and request for notice on behalf of Fast Falcon [Doc. No. 28].  FBM later attempted to withdraw this appearance.  [Doc. No. 58].

    117.  Fast Falcon is the only Defendant who has asserted claims to the Cedenco Assets in the Australian Liquidation.  *See* Sharp Decl., ¶ 11, Exh. 1.  In mid-August, 2011, FBM appeared on behalf of the "Salyer Parties" in examinations conducted in Fresno and Sacramento, California, pursuant to orders issued under Rule 2004 of the Federal Rules of Bankruptcy Procedure in a proceeding under Chapter 15, commenced by the Liquidator to investigate competing claims of ownership to the Cedenco Assets.  See Nuti Decl., Exh. 10-13.  The Court finds that FBM was representing the interests of Fast Falcon in those proceedings.

    118.  On August 11, the Trustee served the summons and complaint on FBM, as counsel for all of the Defendants in this action, including Fast Falcon [Doc. No. 34].  As the proofs of service on file with the Court demonstrate, FBM has subsequently been served with all documents related to the TRO and preliminary injunction.

    5.   *Service on Morning Star Holdings Limited.*

    119.  On September 8, 2011, Trustee accomplished personal service on Fast Falcon, LLC through its registered agent Morning Star Holdings Limited, located in Nevis, West Indies [Doc. No. 120].

/ / /

/ / /

38

**CONCLUSIONS OF LAW**

1.   The Court will first address its jurisdictional authority and issues regarding service, then the Court will set forth its ruling on the Evidentiary Objections, before turning to the merits of issuing the Preliminary Injunction in this matter.

**A.   Jurisdiction and Service**

2.   Pursuant to section 1334(e) of Title 28, this court has exclusive jurisdiction over "all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."  28 U.S.C. § 1334(e)(1).  Property of the estate is defined to include all legal or equitable interests of the debtor in property as of the commencement of the bankruptcy case, wherever such property may be located and by whomever held.  11 U.S.C. § 541(a)(1).  Property of the estate also includes any chose in action available to the trustee under the Bankruptcy Code, including under section 548.  <u>In re Gross</u>, 278 B.R. 557 (Bankr. M.D. Fla. 2002).

3.   Based upon the record presented, there was an attempt to transfer the Intercompany Loan and the Cedenco Stock prior to SK Foods' bankruptcy, but no actual transfer of those assets occurred. As of the Petition Date, SK Foods, LP remained listed as the owner of record of the Cedenco Stock on the Share Register, which, pursuant to Articles 5.1 and 2.4 of the Cedenco Constitution, meant that SK Foods, LP remained the holder of the Cedenco Stock.[16]  The Cedenco Stock therefore is properly viewed as property of the Debtors' bankruptcy estate for purposes of 11 U.S.C. § 541(a).  Similarly, section

---

[16]   Although it is unnecessary for the Court to draw conclusions about Australian law, based upon what has been presented, Section 231 of the Australian Corporations Act 2001 (Cth) appears to require that a the transferee of shares in an Australian company be listed on the company's share register in order to be effective.

1624.5(a) of the California Civil Code provides that a contract for
the sale of personal property worth more than $5,000.00 must be in
writing, and must be signed by the party charged with the conveyance
of its interest.  Cal. Civ. Code § 1624.5(a).  Sections 955 and
955.1(a) of the California Civil Code further provide that transfers
of non-negotiable instruments and general intangibles must be in a
writing that is endorsed and delivered to the transferee.  Cal. Civ.
Code §§ 955 & 955.1(a).  No writing has been shown to exist
establishing that the Intercompany Loan was transferred to the SSC&L
2007 Trust.  Moreover, no document signed by the SSC&L 2007 Trust
obligating it to the Debtors has been shown to exist.  Accordingly, it
does not appear the requirements of California law to transfer the
Intercompany Loan had occurred as of the Petition Date, and therefore,
the Intercompany Loan remained an asset of the Debtors and is property
of the Debtors' bankruptcy estate for purposes of 11 U.S.C. §
541(a)(1).

    4.  Alternatively, this Court has *in rem* jurisdiction over the
assets in question – the Cedenco Stock and the right to payment under
the Intercompany Loan.  <u>Central Va. Comm. College v. Katz</u>, 546 U.S.
356, 369 (2006) ("[b]ankruptcy jurisdiction, as understood today and
at the time of the framing, is principally in rem jurisdiction).  The
Court's *in rem* jurisdiction extends to property transferred from a
debtor pre-bankruptcy which is subject to an avoidance claim.
<u>Whitlock v. Worrall (In re American Aluminum Window Corp.)</u>, 15 B.R.
803, 805 (D. Mass. 1981) ("recovery of a preference requires an *in rem*
jurisdiction over the property of the estate and not necessarily an *in
personam* jurisdiction over the defendant.")  *see also* <u>Millbury Nat'l
Bank v. Palumbo (In re Palumbo)</u>, 353 B.R. 37, 41-42 (Bankr. D. Mass.

2006) (court has *in rem* jurisdiction to order the return property to
the estate even if it does not have *in personam* jurisdiction over the
transferee); <u>Official Comm. of Unsecured Creditors of 360networks</u>
<u>(USA) Inc. v. PUC (In re 360networks (USA) Inc.)</u>, 316 B.R. 797, 803-
805 (Bankr. S.D.N.Y. 2004) (*in personam* jurisdiction not required
where remedy does not impose a money judgment against a defendant).
Here, at a minimum, this Court has *in rem* jurisdiction to avoid and
return the Cedenco Assets to the Trustee under 11 U.S.C. § 550(a).

5.   To the extent the Court must establish personal jurisdiction
over the Defendant, it is satisfied that it is appropriate to exercise
personal jurisdiction over all Defendants.

6.   The Defendants do not contest this Court's jurisdiction over
Defendants SKPM Corp., Monterey Peninsula Farms, LLC, and Scott
Salyer, in his capacity as trustee of the Scott Salyer Revocable
Trust.   These Defendants voluntarily appeared in this proceeding,
filed opposition papers and introduced evidence.   However, the
Defendants have objected to sufficiency of service over Defendants
SSC&L 2007 Trust and Fast Falcon, LLC.   Opposition, 4:18-22.
Defendants have also asserted that the Court lacks personal
jurisdiction over Fast Falcon, LLC.   Hr'g Tr. at 6:4-5.

7.   The Court finds that, as to <u>all</u> of the Defendants, "the record
is sufficient that there's been proper service or waiver of service in
consent to the court's jurisdiction."   Hr'g Tr. at 32:11-13.

     a.   *SSC&L 2007 Trust*

8.   The Court concludes that SSC&L Trust has been properly served
with the summons, complaint and all documents related to the TRO and
preliminary injunction.

/ / /

41

9.   On August 25, 2011, the Trustee properly served SSC&L 2007 Trust with the summons and complaint in a manner permitted under Federal Rule of Bankruptcy Procedure 7004(b)(3), by serving Scott Salyer.

10.   On September 9, 2011, the Trustee properly served SSC&L 2007 Trust with the complaint, summons, TRO, and preliminary injunction papers in a manner permitted under Federal Rule of Bankruptcy Procedure 7004(b)(3), by serving Robert Pruett.

11.   If there were any defects in the service on SSC&L 2007 Trust, which the Court does not find, such defects have been waived by SSC&L.

12.   Rule 7005 of the Federal Rules of Bankruptcy Procedure (incorporating Rule 5 of the Federal Rules of Civil Procedure) provides that pleadings and other papers served after the filing of the original complaint are to be served on party's attorney if it is represented by counsel in the action. Fed. R. Civ. Proc. 5(b)(1).

13.   FBM has expressly appeared on behalf of SSC&L on multiple occasions since August 4, 2011 in the notices of appearance filed. See Doc. Nos. 28 & 58.   Moreover, SSC&L is one of the Defendants who filed several motions in this adversary proceeding seeking affirmative relief from the Court.   See Doc. Nos. 36, 47 & 90.

14.   The Court finds that the Defendants' failure to timely raise an objection to service of process results in waiver of the objection under Federal Rule of Civil Procedure 12(h)(1), made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7012.   A general appearance "that fails to dispute personal jurisdiction will waive any defect in service or personal jurisdiction."   <u>DR JKL Ltd. v. HPC IT Educ. Ctr.</u>, 749 F. Supp. 2d 1038, 1047 (N.D. Cal. 2010)(quoting <u>Benny v. Pipes</u>, 799 F.2d 489, 492 (9th Cir. 1986).)   The Ninth Circuit describes a general appearance

1  as an "overt act by which the party comes into court and submits to
2  the jurisdiction of the court" and "an affirmative act involving
3  knowledge of the suit and an intention to appear." Benny, 799 F.2d at
4  492.

5     15.  The Court agrees with the Trustee that SSC&L has waived its
6  objection to sufficiency of service and holds that SSC&L submits to
7  this Court's jurisdiction by appearing in this adversary proceeding
8  and affirmatively seeking relief in this case.

9          b.  *Fast Falcon, LLC*

10              i.  *Jurisdiction*

11    16.  Personal jurisdiction can be asserted against an entity so long
12  as "minimum contacts" exist between defendants and the forum state.
13  See International Shoe Co. v. State of Washington, 326 U.S. 310, 315
14  (1945) (for due process to be satisfied, a defendant, if not present
15  in the forum, must have "minimum contacts" with the forum state such
16  that the assertion of jurisdiction "does not offend traditional
17  notions of fair play and substantial justice").

18    17.  The "minimum contacts" test is satisfied when,

19        (1) the defendant has performed some act or consummated some
        transaction within the forum or otherwise purposefully availed
20        himself of the privileges of conducting activities in the
        forum, (2) the claim arises out of or results from the
21        defendant's forum-related activities, and (3) the exercise of
        jurisdiction is reasonable.
22
23  Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086
    (9th Cir. 2000).

24    18.  Here, Fast Falcon purposefully availed itself of this
25  jurisdiction by: (a) entering into agreements with California entities
26  pursuant to which it purportedly was assigned rights to the Cedenco
27  Assets which are the subject matter of this action, See Nuti Decl.
28  ¶ 16, Exh. 9, (b) it retained Jacob Stein, an attorney with offices in

Los Angeles, California, to serve as its corporate secretary,
Declaration of Jacob Stein in Support of the Opposition [Doc. No.
104], ¶6, (c) two of Fast Falcon's managers (first Scott Salyer, and
then Cary Collins) resided and conducted business in California on
Fast Falcon's behalf from its formation at least through May 2011,[17]
(d) in 2009, Salyer, who was at that time Fast Falcon's manager,[18]
caused Cary Collins to wire transfer funds to Fast Falcon from bank
accounts at Mechanics' Bank in San Francisco, See Exhibit LL to the
Government's Opp. To Review of Salyer's Detention Order, attached as
RJN, Exh. 7, (e) Volksbank AG transmitted Fast Falcon's Portfolio
Valuation to Mr. Salyer who resided and conducted business in
California, see RJN, Exh. 6, and (f) Salyer, or others acting as Fast
Falcon's *de facto* agents, directed Farella Braun Martell to
participate in the Chapter 15 Rule 2004 examinations conducted in
Fresno and Sacramento, California (where, according to Defendants
representations, only Fast Falcon's economic interests were at stake),
and directed Farella Braun Martell to make objections to the adequacy
of service upon Fast Falcon in proceedings in this Court.

            ii.  *Service Upon Fast Falcon*

    19.  The court cannot exercise jurisdiction until defendant has been
properly served under Federal Rule of Civil Procedure 4.  Such service

---

[17]    *See* Exhibit NN of the Supplemental Exhibits in Support of
Its Motion Seeking Defendant Frederick Scott Salyer's Pretrial
Detention, attached as RJN, Exh. 5 (Salyer is a resident of
Pebble Beach, CA); Sharp Decl., ¶ 11, Exh. 1 (proof of debt filed
by Cary Collins on behalf of Fast Falcon, LLC in the Australian
proceedings, showing that the contact address Fast Falcon used on
its proof of debt filed with the Liquidators is the same address
as Cary Collins's residence and business address in San
Francisco, CA).

[18]    *See* Woodruff Decl., ¶3, Exh. B (Notice of Appointment of
Manager indicating in para. 1 that Scott Salyer was being removed
as manager effective as of February 18, 2010).

assures adequate notice of the litigation and opportunity to be heard for due process purposes.  <u>Jackson v. Hayakawa</u>, 682 F.2d 1344, 1347 (9th Cir. 1982); <u>Direct Mail Specialists, Inc. v. Eclat Computerize Technologies, Inc.</u>, 840 F.2d 685 (9th Cir. 1988).

20.  The Court concludes that Fast Falcon has been properly served with the summons, complaint and all documents related to the TRO and preliminary injunction.

21.  On September 8, 2011, the Trustee accomplished in-person service of an alias summons, complaint, the TRO, and preliminary injunction motion and supporting documents upon Morning Star Holdings Limited ("Morning Star"), Fast Falcon's registered agent in Nevis, West Indies.  See Doc. No. 120; Reply, 5:10-14.  The Court finds that at least as of September 8, 2011, Fast Falcon was properly served in the manner permitted under Federal Rule of Civil Procedure 4(f)(2)(A) and 4(b)(2), as incorporated by Federal Rule of Bankruptcy Procedure 7004.  Rule 4(f)(2)(A) provides that in the absence of an international agreement, service can be made upon a foreign entity in any manner permitted under the laws of that jurisdiction.  The Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention") does not apply, as Nevis and St. Kitts are not listed as current members or signatories to the Hague Service Convention.[19] Hence, Fast Falcon may be served by any means permitted under the laws of Nevis and St. Kitts.  The Certificates of Service filed by the

_____

[19]   *See* Hague Conference on Private International Law , http://www.hcch.net/index_en.php?act=conventions.status&cid=17  (the list of contracting states to the Hague Convention on Service Abroad does not include St. Kitts or Nevis as signatories) (last visited Sept. 21, 2011).

1 │ Trustee establish that in-person service was effected upon
2 │ Morningstar, Fast Falcon's agent, by a Senior Bailiff of the Eastern
3 │ Carribean High Court, and that he was duly authorized to serve process
4 │ in that jurisdiction.

5 │   22.   However, even if the Hague Service Convention did apply, the
6 │ Court concludes that service was appropriate under the circumstances.
7 │ On May 18, 2011 and June 10, 2011, the Trustee served Fast Falcon with
8 │ the summons and complaint in a manner permitted under Federal Rule of
9 │ Bankruptcy Procedure 7004(b)(3), by serving Cary Collins [Doc. Nos. 10
10 │ & 21]. On August 25, 2011, the Trustee served Fast Falcon with the
11 │ summons and complaint in a manner permitted under Federal Rule of
12 │ Bankruptcy Procedure 7004(b)(3), by serving Scott Salyer [Doc. No.
13 │ 55]. On September 1, 2011, the Trustee served Fast Falcon with the
14 │ summons, complaint, TRO, and preliminary injunction papers on Jacob
15 │ Stein.

16 │   23.   As noted, both Cary Collins and Scott Salyer have held
17 │ themselves out as Fast Falcon's manager, and Cary Collins serves as
18 │ Fast Falcon's agent for purposes of asserting its claims to the
19 │ Cedenco Assets. See Exh. NN of the Supplemental Exhibits, attached as
20 │ RJN, Exh. 5 (as Fast Falcon's manager, Mr. Salyer had the power to
21 │ transfer funds); Sharp Decl., ¶ 1, Exh. 1 (according to
22 │ representations made in the proof of debt filed in the Cedenco
23 │ Liquidation, Cary Collins was Fast Falcon's agent and had authority to
24 │ execute and attest to the proof).

25 │   24.   When the activity of a defendant foreign corporation in a
26 │ district is sufficient to make it amenable to suit, service of process
27 │ can be made upon a responsible person in charge of any substantial
28 │ phase of that activity. Remington Rand, Inc. v. Knapp-Monarch Co.,

1  139 F.Supp. 613, 620-22 (E.D. Penn. 1956) (defendant in patent

2  infringement suit was properly served through its agent appointed to

3  perform warranty work related to defendant's sales within the

4  district).

5      25.  Although Fast Falcon (through FBM) claims that Mr. Collins was

6  removed as Fast Falcon's manager "effective as of" two days before he

7  was served with the summons and complaint, Cary Collins remained Fast

8  Falcon's authorized agent in connection with the assertion of its

9  rights to the Cedenco Assets.  As indicated by the address used on the

10 proof of debt, Cary Collins engaged in activities on Fast Falcon's

11 behalf related to the assertion of its claims to the Cedenco Assets in

12 California.  Accordingly, he continued to hold a position of

13 responsibility over a "substantial phase" of Fast Falcon's activities

14 in California – i.e., the assertion of Fast Falcon's claims to the

15 Cedenco Assets – and therefore service may properly be made upon him.

16 Knapp-Monarch Co., 139 F.Supp. at 620-22; Manchester Modes, Inc. v.

17 Lilli Ann Corp., 306 F.Supp. 622, 626 (S.D.N.Y. 1969) ("Even assuming

18 that Greenberg was not defendant's officer, director, managing or

19 general agent, or authorized by appointment of law to receive service

20 of process, he was the agent in charge of defendant's New York

21 showroom. As such, service upon him justifies the belief that

22 defendant will be apprised of the suits pending against it. Boryk v.

23 deHavilland Aircraft Co., 341 F.2d 666 (2d Cir. 1965); Raul

24 International Corp. v. Nu-Era Gear Corp., 28 F.R.D. 368, 372

25 (S.D.N.Y.1961); Kamen Soap Products Co. v. Struthers Wells Corp., 159

26 F.Supp. 706, 710-711 (S.D.N.Y.1958); United States v. Imperial

27 Chemical Industries, Ltd., 100 F. Supp. 504 (S.D.N.Y.1951); see Bomze

28 v. Nardis Sportswear, Inc., supra 165 F.2d at 37-38.").

26.   Service of a complaint and summons upon a former officer and shareholder of a corporation is deemed effective service upon the corporation where the surrounding circumstances establish that the former owner/officer's relationship supports the inference that he remains an agent for the corporation.  United States v. Ayer, 857 F.2d 881, 888 (1st Cir. 1988) ("It was, we think, permissible for the district court to conclude that Mr. Ayer was such an agent.  On this point, the evidence is admittedly meager. Ayer had been the president, and a stockholder, of Universal. He claims to have abandoned the roles: to have been supplanted as president by his eldest son in 1984, and to have given up his stock interest well before he was served. Yet the government offered evidence that, as late as March 1987, support payments due to Ayer's minor child 10 were sent monthly from Universal in the form of checks written on its account.").

27.   Here, the record and surrounding circumstances of this case support the inference that Scott Salyer has a sufficiently close relationship to Fast Falcon and that he directs its affairs (deeming him to be Fast Falcon's agent), notwithstanding his claims, like in Ayer, that he had been "removed" as manager and is not a shareholder. First, the evidence indicates that Salyer formed Fast Falcon to conceal his interest in several million dollars transferred to Fast Falcon from Salyer affiliates in 2009.  See RJN, Exh. 7 (statement submitted by Debra Larrick, Vice-President of Mechanics Bank, to the FBI on or about March 5, 2010, entered on July 7, 2010 [Docket No. 129-5] in United States v. Salyer, pending in the United States District Court for the Eastern District of California (case number 2:10-cr-00061-LKK).  It is not reasonable to conclude that he would do so without retaining some means to recover those funds.  More

significantly, FBM has repeatedly taken positions on behalf of Fast
Falcon in this proceeding (i.e., challenging the effectiveness of
service upon it) and in the Chapter 15 case, despite claiming that it
does not represent Fast Falcon.  The only reasonable conclusion to
draw is that it is asserting these positions and taking these actions
at the direction of the clients it has officially appeared for –
Salyer and other Salyer controlled affiliates.  Directing his counsel
to act on Fast Falcon's behalf demonstrates that Salyer is in fact
Fast Falcon's agent.  Moreover, it is reasonable to infer that if
other individuals in fact directly control Fast Falcon at this time,
by virtue of Salyer's relationship to and economic interest in Fast
Falcon, he would have advised Fast Falcon of the pendency of this
adversary proceeding and the preliminary injunction proceedings.

    28.  Jacob Stein's actions further support the conclusion that Fast
Falcon has received proper and actual notice of these proceedings.
Jacob Stein was Fast Falcon's secretary, although he submitted a
declaration stating that he resigned on February 19, 2010, and was not
authorized to accept service on Fast Falcon's behalf.  *See*
Opposition, 5:5-6; Declaration of Jacob Stein in Support of the
Opposition [Doc. No. 104].  Farella Braun Martell filed Mr. Stein's
declaration six days after he was served with the summons, complaint,
and preliminary injunction papers.  The declaration is silent
concerning how or why he came to supply the declaration on Defendants'
behalf.  However, the Court concludes that having served as its
Secretary, Mr. Stein knew who organized or held an interest in Fast
Falcon at least as of the date of his resignation.  The only
reasonable conclusion to draw is that he contacted those individual(s)
to inform them that he had been served, who then directed Farella

49

1  Braun Martel to contact him and obtain a declaration.  This further
2  confirms that the individuals responsible for Fast Falcon's affairs
3  had actual notice of the summons, complaint, and proceedings in this
4  action on or shortly after September 1, 2011.

5      29.  In light of the foregoing events, the Court holds that the
6  Trustee's service upon Fast Falcon (first through Cary Collins and
7  Scott Salyer, then Jacob Stein) demonstrate that Fast Falcon had
8  actual notice of these proceedings and the opportunity to interpose a
9  defense, which is what the rules related to service of process are
10 intended to accomplish. Volkswagenwerk Aktiengesellschaft v. Schlunk,
11 486 U.S. 694, 705 (1988).

12     30.  As has been frequently noted, "federal courts generally take a
13 permissive attitude towards the mechanism employed for service of
14 process when defendant actually receives notice." Kitchens v. Bryan
15 County Nat. Bank, 825 F.2d 248, 256 (10th Cir. 1987) *citing* Wright and
16 Miller, 4 Federal Practice and Procedure Sec. 1074 at 295; Nowell v.
17 Nowell, 384 F.2d 951 (5th Cir.1967), *cert. denied*, 390 U.S. 956, 88
18 S.Ct. 1053, 19 L.Ed.2d 1150 (1968).

19     31.  Considering the underlying policy that courts generally take a
20 permissive attitude on strict compliance with the rules related to
21 service of process when there is actual notice, and, considering the
22 multiple attempts at serving Fast Falcon and its apparent gamesmanship
23 to avoid service, the Court is satisfied that Fast Falcon has received
24 actual notice in an appropriate manner under the circumstances, and
25 that Fast Falcon had adequate advance notice of the hearing on the
26 motion for preliminary injunction and the opportunity to participate
27 in the hearing.
28 / / /

32.   Thus, the Court concludes that it has personal jurisdiction over Fast Falcon.

33.   Accordingly, the Court is satisfied that service on all Defendants was either in compliance with Rule 4 or service was waived by appearance of counsel.  Hr'g Tr. at 31:17-20.

**B.   Evidentiary Objections**

34.   The Defendants make numerous objections to the evidence submitted by the Trustee.  Generally, these objections relate to a lack of authenticity, foundation and hearsay.  The court will overrules the majority of the objections.

35.   The rules of evidence are not as strictly enforced in considering a motion for a preliminary injunction as they would be at trial.  The court also considers that in this case, the Trustee has been hampered in his efforts to obtain information and admissible evidence by the various stays in effect in this and other adversary proceedings.

36.   At the preliminary injunction stage, it is often difficult to obtain affidavits from persons that are unquestionably competent to testify at trial.  This is especially true here, where the stay imposed has prevented the Trustee from conducting full discovery of the matters involved.  For that reason, Courts have discretion to consider evidence that might ultimately be inadmissible at trial on the merits.  As the United States Court of Appeals for the Ninth Circuit has held:

> The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.  11 C. Wright and A. Miller, Federal Practice and Procedure, Civil, § 2949 at 471 (1973).

51

1  <u>Flynt Distributing Co. v. Harvey</u>, 734 F.2d 1389, 1394 (9th Cir. Cal.

2  1984).  *See also* <u>Republic of Philippines v. Marcos</u>, 862 F.2d 1355,

3  1363 (9th Cir. 1988) ("It was within the discretion of the district

4  court to accept this hearsay for purposes of deciding whether to issue

5  the preliminary injunction.").

6    37.  It is well established that the rules of evidence to not

7  strictly apply to preliminary injunction hearings.  For instance, in

8  <u>Gonzalez v. Wells Fargo Bank</u>, 2009 U.S. Dist. LEXIS 101036 (N.D. Cal.

9  Oct. 29, 2009) , the Court cited <u>Flynt Distributing and *Houdini* Inc.

10 v. Goody Baskets LLC</u>, 166 Fed. Appx. 946, 947 (9th Cir. 2006) ("[T]he

11 district court did not abuse its discretion in considering hearsay. .

12 . because the rules of evidence do not strictly apply to preliminary

13 injunction proceedings.").  The <u>Gonzalez</u> court held that: "Given the

14 evidentiary discretion granted to district courts entertaining a

15 motion for a preliminary injunction, this court accepts the documents

16 submitted by Defendants.  In particular, because <u>Gonzalez</u> does not

17 suggest that any of the documents are anything other than what they

18 purport to be, the court sees no reason to presume otherwise.

19 <u>Gonzalez</u>'s motion to exclude the documents is DENIED."  Similarly, in

20 <u>Dr. Seuss Ents. v. Penguin Books USA, Inc.</u>, 924 F. Supp. 1559, 1562

21 (S.D. Cal. 1996), the Court held as follows:

22          The exigencies of preliminary relief often prevent the
           movant from procuring supporting evidence in a form that
23          would meet Rule 56(e)'s requirement of evidence
           admissible at trial.  Such evidence may yet be considered
24          by the court, which has discretion to weigh the evidence
           as required to reflect its reliability.
25

26 *See also* <u>Puricle, Inc. v. Church & Dwight Co.</u>, 568 F. Supp.2d 1144,

27 1147 (C.D. Cal. 2008) (citing <u>Flynt</u>, and holding that the "Court may

28 consider inadmissible evidence on a motion for preliminary

injunction"); <u>Rosen Ent. Sys., LP v. Eiger Vision</u>, 343 F. Supp. 2d
908, 912 (C.D. Cal. 2004) (where Court used its discretion in
considering otherwise inadmissible evidence); <u>Moose Creek, Inc. v.
Abercrombie & Fitch Co.</u>, 331 F. Supp. 2d 1214, 1225 n.4 (C.D. Cal.
2004) (in a preliminary injunction hearing, the Court held: "Rule
901(a) defines a standard of admissibility that is rather general or
elastic: the evidence must be 'sufficient to support a finding that
the matter in question is what its proponent claims.'  Although
Plaintiffs are correct that these internet documents are not
individually authenticated, the Court finds that at this stage they
satisfy Rule 901(a).  Moreover, the Court expects that Abercrombie
could properly authenticate the materials before trial or summary
judgment proceedings.").

     38.  Given the Court's discretion in weighing evidence offered in
connection with a motion for a preliminary injunction, and given that
the estate may well suffer irreparable harm if the injunction is not
issued, the Court will consider the majority of the evidence offered
by the Trustee.

          a.  *Declaration of Bradley D. Sharp and Exhibits Thereto*

     39.  In his declaration, the Trustee sets forth information about
the Debtor's related companies in Australia referred to as the
"Cedenco Entities," including the Intercompany Loan and the Cedenco
Stock; alleged transfers of those assets to another Salyer-related
entity; the Cedenco Entities' receivership, the appointment of the
Australian Liquidators, and the general process of the liquidation;
the claims submitted by Salyer-related entity Fast Falcon, LLC to the
Australian Liquidators; discussions among Salyer accountants and
advisors as to how best to structure the divestiture by the debtor of

1 the Cedenco assets; and the contents of the debtor's financial
2 statements.

3     40.   The Defendants contend ¶¶ 4, 5, 7, 9, 11 - 26, 28, 29, 30, 32
4 in the declaration lack sufficient foundation; lack personal
5 knowledge; are speculative and vague; constitute hearsay and improper
6 legal and expert opinion; and violate the best evidence rule.   The
7 Defendants object to Exhibits 4, 8, 9, 10, 12, and 13 to the
8 declaration on grounds of hearsay, lack of authentication, and
9 violation of the best evidence rule.   The Trustee responds that he has
10 gleaned this information from his review of the books and records of
11 the debtor, including books and records of the Cedenco Entities, and
12 from his participation as a claimant in the Australian liquidation
13 proceedings.   He states that Exhibits 4, 8, 9, and 10 were found in
14 the debtor's business records or on its e-mail servers, and that,
15 based on his knowledge of the debtor's business, these are all
16 documents that were created in the course of the Debtor's regularly
17 conducted business activities and that it was the regular practice of
18 the debtor to make records of this type.   He testifies he obtained
19 Exhibits 12 and 13 from a former director of Cedenco.

20     41.   The Court is aware of the Trustee's active role in this case
21 during a period of over two years, and accepts his testimony that he
22 has developed an extensive familiarity with the Debtor's books and
23 records, which are under his custody and control, as well as a
24 significant knowledge base from his participation as a claimant in the
25 Australian liquidation proceedings.   The Court concludes the Trustee
26 has laid a sufficient foundation for his testimony.   The Court also
27 agrees with the Trustee's responses to the Defendants' other
28 objections - speculative and vague, hearsay, improper opinion, and

best evidence rule, and with his responses to the objections to the exhibits – as those responses are set forth in detail as to each of the particular paragraphs and exhibits objected to.

42.   In particular, as to the hearsay objection, the Defendants would exclude financial records and e-mails found by the Trustee in the Debtor's business records and on its e-mail servers.  The Court finds that these documents satisfy the elements of FRE 807 – having been found among the Debtor's records, the documents and e-mails have equivalent circumstantial guarantees of trustworthiness, and (1) they are offered as evidence of material facts, (2) they are more probative on the points for which they are offered than any other evidence the trustee can procure through reasonable efforts, and (3) the general purposes of the rules of evidence and the interests of justice will be served by admission of the documents, at least for purposes of the present motion.

43.   It is also significant, as the Trustee points out, that the Defendants have not suggested the facts are other than what the Trustee has testified to, see <u>Gonzalez  v. Wells Fargo Bank</u>, 2009 U.S. Dist. LEXIS 101036, *7 (N.D. Cal. 2009), and they have not challenged the trustworthiness of his testimony or the authenticity of any of the exhibits.  Given the relaxed admissibility standards for evidence in connection with a motion for a preliminary injunction, the Court overrules the objections to the above-listed paragraphs of the Trustee's declaration and the exhibits to the declaration.

44.   Finally, the Defendants have objected to ¶¶ 33, 34, and 35 of the declaration, in which the Trustee testifies to his analysis of the Debtor's solvency in June 2008, including his review of the Debtor's audited financial statements and his analysis of the Debtor's

potential liabilities attributable to the criminal activities to which
several officers and agents of the Debtor have pled guilty.  The
Defendants object to this testimony on the same grounds they
interposed with respect to the paragraphs discussed above.  As with
those paragraphs, the Court agrees with the Trustee's responses,
noting especially that the Trustee's analysis falls within the scope
of his duties as trustee, he properly relied on the debtor's financial
statements as business records, and he has properly stated the basis
for his calculations.  Thus, the Court overrules these objections.  In
short, the Court overrules all the Defendants' objections to the
Trustee's testimony and the exhibits to his declaration.

    b. *Declaration of Gregory C. Nuti and Exhibits Thereto*

  45. The Defendants object to ¶¶ 3, 4, 5, and 6, and Exhibit 1 to
the declaration of Gregory C. Nuti, attorney for the Trustee, as
irrelevant, prejudicial, without foundation, without personal
knowledge, improper character evidence, hearsay, and in violation of
the best evidence rule.  Except as to portions of ¶ 6, discussed
below, the Court agrees with the Trustee's responses to these
objections, and the objections will be overruled.  The Court notes
that these paragraphs primarily refer to or quote from this Court's
earlier rulings and orders, of which the Court can take judicial
notice, and that to the extent these paragraphs go beyond that, they
are more argument than evidence, and the Court will consider them as
such.

  46. As to the following sentences in ¶ 6, the Court sustains the
Defendants' objection that the statements are made without a proper
foundation: "I understand from my dealings with opposing counsel
[that] Cary Collins prepared the accounting and wrote the

checks . . . .  Robert Pruett signed the checks for SSC Farming." As
to Ex. 2 to the declaration, the Court finds the letter would likely
come under the residual exception to the hearsay rule, FRE 807, but
the sentence relied on by Mr. Nuti – "I am also informed that Cary
Collins is 'involved in assisting Mr. Salyer with legal representation
on behalf of Mr. Salyer and his entities'" – is sufficiently
conclusory that the Court will exclude it.

47.  Paragraph 7 – 11, also objected to, discuss the accountings
required by the preliminary injunction in the other adversary
proceedings, as modified, and the checks and bank statements for the
account established to hold the funds subject to the injunction.  As
documents produced in response to a subpoena and pursuant to an order
of this Court, these documents have guarantees of trustworthiness and
meet the other requirements for admission under Rule 807, and thus,
the Court overrules the hearsay objection.  The Court also finds that
Mr. Nuti, based on his representation of the Trustee in these matters,
his personal review of the documents, and his direct involvement in
negotiations and discussions concerning compliance with the
injunction, has sufficiently established a foundation for admission of
the documents.

48.  As to the best evidence rule, the duplicates submitted by the
Trustee are admissible under FRE 1003, as no question has been raised
as to the authenticity of the originals and it has not been alleged
that it would be unfair to admit the duplicates in lieu of the
originals.  Finally, the Defendants object that Mr. Nuti's statements
regarding alleged payments made from the bank account are speculative
or are improper opinion testimony.  The Court agrees that in some
instances the statements represent inferences; such as, for example,

the statement that the Defendants misidentified payments going to
Collins & Associates as payments going to Gary Perry.  The Court is,
however, capable of drawing its own reasonable inferences from the
documents themselves, and need not rely on Mr. Nuti's testimony to do
so.

49.  Finally, the Defendants object to ¶¶ 12 – 15 and Ex. 6,
concerning use of land, leases, and rents subject to the injunction;
¶¶ 16 – 19, 21, 22, and 24 – 26, concerning documents produced and
depositions taken in connection with the Australian liquidation
proceeding; and ¶ 27, concerning an exchange of e-mails with the
Defendants' counsel.  The Court overrules the objections for the
reasons set forth above with respect to the other paragraphs of Mr.
Nuti's declaration.

c.  *Declaration of Michael M. Carlson and Exhibits Thereto*

50.  As with the above declarations, the Defendants seek to exclude
virtually all of the declaration of Mr. Carlson, which consists of
descriptions and summaries of and inferences drawn from the
accountings required by the Court's preliminary injunction in the
other adversary proceedings and from the checks and bank statements
produced in response to a subpoena.  The objections raised are
hearsay, violation of the best evidence rule, improper legal
conclusion, improper opinion testimony, lack of foundation, lack of
personal knowledge, and speculation.  For the reasons discussed above
with respect to Mr. Nuti's declaration, the Court overrules all of
these objections.  The Court notes that the Defendants have not
objected to the documents themselves, from which the court can and
will derive the same inferences Mr. Carlson has.  In short, the
documents raise a high degree of conviction that the individuals with

the responsibility to ensure compliance with the Court's preliminary
injunction have not done so, and have in fact, violated the injunction
repeatedly and in very substantial amounts.   In addition, a reasonable
inference can be drawn that the accountings produced to the Trustee
have in several respects been inaccurate, and no explanation has been
offered.   The Court need not rely heavily on Mr. Carlson's conclusions
in this regard.

### d.  Request for Judicial Notice - Exhibits

51.   The Defendants object to the Trustee's Exhibits 4 through 11 -
documents filed in the district court in connection with Scott
Salyer's pretrial detention, a statement submitted to the FBI in
connection with the criminal case against Scott Salyer, the criminal
docket in United States v. Collins, and plea and cooperation
agreements entered into by three individuals connected to the Debtor.
The Defendants object that these documents are irrelevant to the
present motion, are unreasonably prejudicial, constitute improper
character evidence, and are not properly subject to judicial notice.
The Court agrees with the Trustee's responses, and thus, overrules the
objections.

52.   The Court does take judicial notice of all of those matters
included in the Trustee's Request for Judicial Notice [Doc. No. 66-
70].

### e.  Declaration of Natalie Bush-Lents and Exhibits Thereto

53.   The Court overrules and denies Defendant's Objection and Motion
to Strike Declaration of Natalie Bush-Lents.   The declaration was
served on counsel for Defendants prior to the start of the hearing on
September 15.   The Court reviewed the declaration and the exhibit
thereto, but there was nothing in the that information of which the

1  Court was not already generally aware, i.e., that there are certain
2  jurisdictions that have a reputation for being places to set up
3  accounts that are very, very difficult to reach.

4          f.  *Conclusion*

5      54.  With respect to the above-quoted sentences in ¶ 6 of Mr. Nuti's
6  declaration and Exhibit 2 to that declaration, the objection as to
7  lack of foundation is sustained.  With those exceptions, the
8  objections are overruled.

9  **C.  Standards for Granting a Preliminary Injunction**

10     55.  Injunctive relief is available to enforce the automatic stay,
11  Coben v. Lebrun (In re Golden Plan of California, Inc.), 37 B.R. 167,
12  170 (Bankr. E.D. Cal. 1984) (preliminary injunction granted for stay
13  violations), as well as to prevent the dissipation or further transfer
14  of assets a trustee seeks to recover under his avoidance powers.  In
15  re Focus Media, Inc., 387 F.3d 1077, 1087 (9th Cir. 2004) (preliminary
16  injunction in fraudulent transfer action).

17     56.  A plaintiff in a fraudulent transfer action is entitled to
18  preliminary equitable relief if it shows a likelihood of success on
19  the merits, and the possibility of irreparable injury.  Focus Media,
20  387 F.3d at 1087.  A "substantial likelihood of success on the merits"
21  does not require absolute certainty in terms of the outcome in the
22  litigation, but rather, means that the evidence in support of
23  preliminary injunctive relief is sufficient for the court to conclude
24  that plaintiff has "a fair chance of success."  Republic of the
25  Philippines v. Marcos, 862 F.2d 1355, 1362 (9th Cir.1988) (en banc).
26  Irreparable harm consists of harm that cannot be remedied by an award
27  of monetary damages, or an injury that cannot be quantified
28  monetarily.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d

60

12, 18 (1st Cir. 1996); <u>Campbell Soup Co. v. ConAgra, Inc.</u>, 977 F.2d 86, 91 (3d Cir. 1992).  However, the possibility of irreparable harm is established where the plaintiff can show prior instances where the defendant has dissipated or concealed assets, or they have defied court orders regarding asset location and information, because such conduct demonstrates a significant risk that the defendant will seek to conceal or move assets beyond the jurisdiction of the court. <u>Connecticut Gen. Life Ins. Co., v. New Images of Beverly Hills</u>, 321 F.3d 878, 881 (9th Cir. 2003).

**D.    The Trustee Has Established a Likelihood of Success on the Merits**

57.   Based on the evidence, the Court holds that the Trustee has established a likelihood that he will succeed on the merits of his claims for violation of the automatic stay, or alternatively, that any transfers of the Debtors' assets are avoidable fraudulent conveyances.

    *a)    The Trustee Has Demonstrated He is Likely to Succeed on the Merits of His Claims for Violation of the Automatic Stay*

58.   The filing of a bankruptcy petition creates an estate consisting of all legal and equitable interests of the debtor in property held as of that date.  11 U.S.C. § 541(a).  Among other things, actions seeking to exercise control over property of the estate violates Section 362(a)(3) of the Bankruptcy Code. 11 U.S.C. § 362(a)(3).  Actions taken in violation of the automatic stay are void. <u>40235 Wash. St. Corp. v. Lusardi</u>, 329 F.3d 1076, 1080 (9th Cir. 2003) ("Section 362(a) of the Bankruptcy Code provides that the filing of a bankruptcy petition creates an automatic "stay, applicable to all entities, of," inter alia, "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a). Transfers in

1  violation of the automatic stay are void.") citing <u>Schwartz v. United</u>
2  <u>States (In re Schwartz)</u>, 954 F.2d 569, 575 (9th Cir. 1992).

3      59.   Upon his appointment, the Trustee assumed sole and exclusive
4  control and authority over the Debtors' property.   11 U.S.C. §
5  1106(a).   The Trustee's appointment completely divested the rights and
6  powers the Debtors' management and Board of Directors (i.e., Salyer)
7  previously could exercise over the Debtors' property.   <u>Commodity</u>
8  <u>Futures Trading Comm'n v. Weintraub</u>, 471 U.S. 343, 351-52 (1985);
9  <u>Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n</u>, 997 F.2d 581, 587
10 (9th Cir. 1993) ("Where a trustee is appointed, he may assume control
11 and operation of the debtor's business.   11 U.S.C. § 1108.   In such
12 circumstances the debtor corporation's directors are completely ousted
13 and retain virtually no management powers.").

14     60.   Execution of a stock transfer instrument post-petition
15 memorializing a pre-petition agreement to convey stock is void as a
16 violation of the automatic stay.   <u>In re Beverly Mfg. Corp.</u>, 29 B.R.
17 513, 515 (Bankr. S.D. Fla. 1983).

18     61.   As of the Petition Date, Cedenco's share register and ASIC's
19 database disclosed that only SK Foods, L.P. (not SKPM Corp., the Scott
20 Salyer Revocable Trust, or Fast Falcon, LLC) owned the shares in
21 question.   See Sharp Decl., ¶¶ 12-13, 24-26; Exh. 2, 3, & 11.   The
22 documentation necessary to effect a valid transfer of the Cedenco
23 shares from SK Foods to the Scott Salyer Revocable Trust and/or SKPM
24 Corp. was not created until July 16, 2009.   See Sharp Decl., ¶¶ 31-32,
25 Exh. 14; Section 231 of the Australian Corporations Act 2001 (Appendix
26 1 to the Pts. & Auth.) & Articles 2.4 and 5.1 of the Cedenco
27 constitution (cited supra).   Salyer's execution of the 2009 Transfer
28 Documents purporting to transfer the Cedenco Stock occurred after the

1  Trustee was appointed and after he had no authority to act on SK

2  Foods's behalf.  See Sharp Decl., ¶¶ 28-29, Exh. 12.  Therefore, the

3  purported transfer of the Cedenco Stock is void as a violation of the

4  automatic stay.

5     62.  Accordingly, the Court concludes that the facts are sufficient

6  in showing that the Defendants' actions in executing the July 2009

7  transfer documents and causing Cedenco to change the ownership of the

8  Cedenco Stock and Share Register altered the Debtors' interests in

9  property, and that the Trustee is likely prevail on the merits of

10  demonstrating a violation of the automatic stay.  See <u>Beverly Mfg.</u>

11  <u>Corp.</u>, 29 B.R. at 515.

12     63.  As noted above, section 1624.5(a) of the California Civil Code

13  provides that a contract for the sale of personal property worth more

14  than $5,000.00 must be in writing, and must be signed by the party

15  charged with the conveyance of its interest.  Cal. Civ. Code §

16  1624.5(a).  Sections 955 and 955.1(a) of the California Civil Code

17  further provide that transfers of non-negotiable instruments and

18  general intangibles must be in a writing that is endorsed and

19  delivered to the transferee.  Cal. Civ. Code §§ 955 & 955.1(a).  No

20  writing has been shown to exist establishing that the Intercompany

21  Loan was transferred to the SSC&L 2007 Trust.  Moreover, no document

22  signed by the SSC&L 2007 Trust obligating it to the Debtors has been

23  shown to exist.  Accordingly, the requirements of California law to

24  transfer the Intercompany Loan did not occur as of the Petition Date.

25  Moreover, the liability continued to be reflected on Cedenco's balance

26  sheet as an obligation owed to SK Foods, rather than the SSC&L 2007

27  Trust or Fast Falcon as of the Petition Date.  Therefore, the

28  / / /

Intercompany Loan remained an asset of the Debtors and is property of the Debtors' bankruptcy estate for purposes of 11 U.S.C. § 541(a)(1).

64.   Accordingly, the Court holds that the Trustee has established a likelihood of success on the merits that Fast Falcon violated the automatic stay by asserting the proof of debt in the Cedenco Liquidation claiming to be owner of the Intercompany Loan.  11 U.S.C. § 362(a)(3).

> b)   *The Trustee Has Demonstrated He is Likely to Succeed on the Merits of His Claims for Avoidance and Recovery of Fraudulent Transfers of the Cedenco Stock and Intercompany Loan*

65.   Alternatively, assuming arguendo that the Cedenco Assets were in fact transferred pre-bankruptcy, the Trustee has presented sufficient evidence to demonstrate a likelihood of success that that any such transfer of the Cedenco Assets is avoidable under 11 U.S.C. § 548(a) and those assets maybe recovered by the Trustee in this action.

66.   Section 548(a)(1)(B) and Section 544(a) (incorporating the correlating provision of the California Civil Code) provide that a trustee may avoid any transfer of an interest in property of the debtor made within two years (four years under Cal. Civ. Code § 3439) of the Petition Date where the Debtor received less than reasonably equivalent value in exchange for the transfer, and was insolvent on the date of the transfer. 11 U.S.C. § 548(a)(1)(B).  "Value" for purposes of Section 548 means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or a relative of the debtor."  11 U.S.C. § 548(d)(2).

67.   A "transfer" for avoidance purposes is deemed to occur when such transfer would be deemed valid against a bona fide purchaser of

the asset under non-bankruptcy law. 11 U.S.C. § 548(d)(1); <u>Frierdich</u> <u>v. Mottaz</u>, 294 F.3d 864, 868-69 (7th Cir. 2002) (analyzing whether instruments executed by debtor were sufficient to convey stock under Illinois law).

68.   The Court concludes that the Trustee is likely to succeed in showing that, even if the 2008 Transfer Documents prepared by Gary Perry effected a transfer of the Cedenco Stock, the earliest possible date Mr. Salyer could have executed the 2008 Transfer Documents is sometime after April 11, 2008, when he returned from Australia, which is within two years of when the Debtors filed for bankruptcy.   See Nuti Decl., ¶¶ 25-26, Exh. 13.

69.   With respect to the Intercompany Loan, no documentation memorializing a transfer of that asset has been show, and no evidence has been presented that Cedenco had notice of a purported assignment. In view of the fact that the Intercompany Loan continued to be recorded as a liability owed to SK Foods, LP, not the SSC&L 2007 Trust, on Cedenco's books as of the Petition Date, negates any inference that Cedenco received notice of the purported assignment to the SSC&L 2007 Trust.   See Sharp Decl. ¶ 7.

70.   A transfer of a debt not contained in a negotiable instrument or transfers of general intangibles remain unperfected vis-à-vis a subsequent bona fide purchaser until notice of the assignment is given to the account debtor. See Cal. Civ. Code §§ 955 & 955.1; <u>Graham Paper</u> <u>Co. v. Pembroke</u>, 124 Cal. 117, 120 (1899); <u>Rogers v. Transamerica</u> <u>Corp.</u>, 36 Cal. App. 2d 233, 241 (1939); <u>Rosenblatt v. Credit Discount</u> <u>Co.</u>, 37 Cal. App. 2d 108, 109 (1940).   Given the absence of notice of any assignment of the Intercompany Loan to the SSC&L 2007 Trust, any transfer of the Intercompany Loan for avoidance purposes is deemed to

have occurred immediately prior to the Petition Date.  11 U.S.C. §
548(d)(1).

71.   The record reflects that no money or property was given to the
Debtor in exchange for the Cedenco Stock.  No written instrument
obligates the SSC&L 2007 Trust to pay anything to the Debtors in
exchange for the Intercompany Loan, which makes it unenforceable.
Cal. Civ. Code § 1624.5.  Thus, for purposes of 11 U.S.C. § 548(d)(2),
the Court concludes that the Trustee is likely to succeed in showing
that the Debtors received no value in exchange for purported transfers
within the meaning of the fraudulent transfer laws.

72.   As to insolvency, the Court concludes that the Trustee is
likely to show that the Debtor was insolvent at the time of the
purported transfers of the Cedenco assets.

73.   One approach of determine a debtor's solvency is the so-called
"balance sheet" approach.  Under this approach, the Court must account
for liabilities resulting from the Debtors' criminal activities in
assessing the Debtors' true financial condition.  See In re Xonics
Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1988) (contingent
liability must be discounted by the probability that the contingency
will occur and the liability will become real); see also Statement of
Financial Accounting Standards No. 5 promulgated by the Financial
Accounting Standards Board ("FAS 5") (contingent liability must be
reflected on a company's balance sheet if the auditor determines that
future realization of the loss is within the "probable" range, that
is, the future event(s) causing the liability to mature are likely to
occur).

74.   The Debtors' financial statements for the period ending
June 30, 2008 on their face reflect that the Debtors were solvent, but

66

they fail to account for any liabilities resulting from the criminal
activities to which SK Foods's officers and agents have plead guilty.
All of the criminal acts occurred prior to April 2008.  Pursuant to
the Court-approved compromises with Morninstar Packing Co. and the
Class Representatives, additional claims were allowed for activity
occurring prior to April 2008 totaling $121 million.  Moreover, the
Trustee's preliminary analysis estimates that damage claims that
bribed customers would be legally entitled to assert would be in
excess of $40 million as of April 2008, exclusive of any exemplary,
punitive damages or attorneys fees.  See Sharp Decl., ¶ 34; RJN, Exh.
9-11.  The Trustee's evidence of these potential damages was
unchallenged by Defendants.  Accordingly, on the record, the Court
concludes that it is more likely than not that the Trustee will
prevail on his claims that the Debtors actual liabilities were at
least $161 million more than appear on the June 30, 2008 financial
statements.  When those additional liabilities are included, the fair
value of the Debtors assets as reflected on the financial statements
are more than $80 million less than its true liabilities, and
therefore, SK Foods was insolvent on June 30, 2008.

75.  It is accepted practice to establish insolvency at a prior date
through "retrojection," an approach in which later-in-time financial
reports or indices showing insolvency are coupled with an analysis of
whether or not changes occurring in the intervening period would have
affected the debtor's solvency. Hopkins v. D.L. Evans Bank (In re Fox
Bean Co.), 287 B.R. 270, 282 (Bankr. D. Idaho 2002), aff'd, 144 Fed.
Appx. 697 (9th Cir. 2005).

76.  Nothing significantly affected the value of the Debtors' assets
of liabilities between April 12, 2008, the earliest date the Cedenco

Stock could have been transferred, and June 30, 2008.  See Sharp
Decl., ¶33.  Thus, given the absence of intervening events occurring
in the short interval between the deemed transfer date and June 30,
2008, the Court concludes that this is more than sufficient to
establish a "fair chance" of proving at trial the Debtors' insolvency
as of April 12, 2008.

77.  As to transfer of the Intercompany Loan, it can be reasonably
inferred that, given that the Debtor was insolvent on June 30, 2008,
and given that no events occurring between June 30, 2008 and May 4,
2009 would have substantially reduced the Debtors' liabilities or
increased the value of its assets, there is more than sufficient
evidence to establish a "fair chance" of proving at trial that the
Debtors were insolvent one day prior to the Petition Date.

78.  In sum, the Court concludes that, "when considering the
issuance of a preliminary injunction, in looking at the likelihood of
success on the merits, . . . the trustee has demonstrated [in the]
various causes of action, that he will be more likely than not to
success on the merits, . . . that the Cedenco assets or the Cedenco
distribution that may flow through the Australian receiver, . . .
likely will be property of the estate.  Accordingly, that prong has
been met."  Hr'g Tr. at 27:6-13.

         *c.*    *The Trustee Has Demonstrated a Likelihood of Immediate and Irreparable Harm*

79.  The Court concludes that, without the issuance of the
preliminary injunction, the estate is likely to suffer immediate and
irreparable harm.  Hr'g Tr. at 27:14-16.

80.  It is well-settled that irreparable harm consists of harm that
cannot be remedied by an award of monetary damages, or an injury that

cannot be quantified monetarily.  Ross-Simons of Warwick, Inc. v.
Baccarat, Inc., 102 F.3d 12, 18—(1st Cir. 1996); Campbell Soup Co. v.
ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992).  In the event an
injunction is not issued and the Defendants are permitted to dissipate
or transfer assets beyond the reach of this Court, the Trustee will
suffer irreparable harm.

    81.  Return of the fraudulently transferred property is a remedy
provided by both federal and California law under these circumstances.
See 11 U.S.C. §§ 548(a), 550(a); Cal. Civ. Code §§ 3439.04, 3439.05,
3439.07.  If Defendants dissipate or move them beyond the reach of the
Court, then this Court cannot provide the Trustee with the remedy to
which he is entitled.

    82.  Thus, courts have held that a preliminary injunction freezing
the transfer of assets is proper where fraudulent conveyance is
alleged in a bankruptcy case.  Focus Media, 387 F.3d at 1086-87;  See
also United States ex rel. Rahman v. Oncology Assocs., P.C., 198 F.3d
489, 501 (4th Cir. 1999).

    83.  The present situation is similar to Focus Media, where the
Ninth Circuit approved the granting of a temporary restraining order
and preliminary injunction freezing assets that the trustee sought to
recover from the defendant.  There, the trustee had brought an
adversary proceeding against the sole shareholder of debtor, alleging
that the debtor had fraudulently conveyed substantial sums of money,
through loans and otherwise, to the shareholder.  On the same day that
the complaint was filed, the trustee also sought to freeze the
shareholder's assets by filing an ex parte motion for a temporary
restraining order and a motion for a preliminary injunction.  The ex
parte motion alleged the trustee's belief that the shareholder

1   defendant resided in France and that the TRO was necessary to preserve
2   the assets.   The bankruptcy court granted the TRO, and the Ninth
3   Circuit affirmed, finding that evidence that the shareholder might
4   "ma[ke] away" with the funds that the trustee sought to recover
5   "raise[d] the specter of irreparable harm to the bankruptcy estate if
6   these funds are not frozen."   Focus Media, 387 F.3d at 1086.

7      84.   The same is true here.   If an injunction is not granted, the
8   Defendants might "make away" with the Cedenco Assets that the Trustee
9   seeks to recover in the adversary proceeding by further transferring
10  them to other offshore entities.   This possibility raises the specter
11  of irreparable harm to SK Foods's estate.

12     85.   The Court also concludes that there is substantial evidence of
13  violations of the preliminary injunctions entered in the Drum Line,
14  Quiet Title, Substantive Consolidation and SKF Aviation Actions, and
15  of the willingness of Scott Salyer and those acting in concert with
16  him (such as Cary Collins and Robert Pruett) to misappropriate assets
17  and conceal those activities by giving false accountings, even in the
18  face of a Court order.   See Carlson Decl., ¶¶ 3, 6, 7, 11-15, 23-25,
19  27, 29-31.   Prior misconduct in hiding or depleting assets is
20  "extremely relevant to the concern that [Defendants] might conceal or
21  dissipate assets" again and is properly considered in granting an
22  injunction.   New Images of Beverly Hills, 321 F.3d at 882.

23     86.   Moreover, through its criminal investigation, the Government
24  has uncovered evidence of actual transfers of assets to overseas
25  accounts, and a stated intent to continue doing so.   See RJN, Exh. 4-
26  8.   Given the Defendants' past conduct in improperly transferring
27  assets (as evidenced both by the Drum Line litigation and the criminal
28  / / /

complaint), it is reasonably foreseeable that these entities will do the same unless an injunction is granted.

87.   Accordingly, the Court finds that the Defendants' prior misconduct demonstrates that the Trustee risks suffering irreparable harm unless the Defendants are enjoined from any access to the $50 million held in the Cedenco Liquidation.

### d. *The Balance of Equities Favors an Injunction*

88.   Because a preliminary injunction is an extraordinary remedy, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"   Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008).   The issue is whether the injury that the defendant will suffer if it is enjoined outweighs the injury that plaintiff will suffer from defendant's conduct if it is not enjoined.   Scotts Co. v. United Industries Corp., 315 F.3d 264, 284 (4th Cir. 2002).

89.   In this case, the assets at issue consist of rights to payment of money, and the proceeds thereof.   The Court concludes:

> The question here is although the Australian receiver may not distribute funds tomorrow or the next day, there's a certainty of putting that into the context in this case where if those fund were distributed to Fast Falcon and were they to be dissipated or moved, that it would virtually make it close to impossible for the trustee to ever reach any of those funds or to have any kind of remedy for the underlying adversary proceeding in balancing the hardships in this case, which it clearly did, in favor of preserving the status quo . . . .

Hr'g Tr. at 27:17-25.

90.   It appears Fast Falcon, LLC has no business, other than to shield Salyer's interest in funds he has transferred overseas.   While granting preliminary injunctive relief will interfere with Salyer's

/ / /

71

1 plans to keep the Cedenco Assets for himself, this is not a cognizable
2 harm.
3    91.   In contrast, the harm to the estate if these assets are
4 dissipated or further transferred is obvious.  If Salyer/Fast Falcon
5 is permitted to do so, the principal source of repayment to creditors
6 in this case will vanish.
7    92.   For these reasons, the balance of equities weighs strongly in
8 favor of granting the injunction.
9        e.   *An Injunction is in the Public Interest*
10   93.   In deciding whether to grant preliminary injunctive relief,
11 Court must "pay particular regard for the public consequences …."
12 Winter, *supra*, 129 S.Ct. at 376-77.  The public has an interest in the
13 successful and just resolution of the affairs of a bankrupt debtor.
14 *See* In re PTI Holding Corp., 346 B.R. 820, 832-33 (Bankr. D. Nev.
15 2006); In re Stadium Management Corp., 95 B.R. 264, 269 (Bankr. D.
16 Mass 1988);  In re Monroe Well Service, Inc., 67 B.R. 746, 756 (Bankr.
17 E.D. Pa. 1986).  Specifically here, there is a public interest in
18 preserving the assets of the estate of SK Foods for the benefit of its
19 creditors.  Moreover, it is certainly in the public interest to
20 prevent fraudulent transfers of assets for the purpose of avoiding the
21 claims of creditors, especially where the individuals involved have a
22 track record of doing so.
23 **E.   The Court is Disinclined to Appoint a Receiver At This Time**
24   94.   In addition to a preliminary injunction, the Trustee also
25 requests that the Court appoint a receiver "to take possession of any
26 instruments underpinning Fast Falcon's claim to the Cedenco Assets, to
27 serve notice of his authority upon the Liquidators or courts in
28 Australia, and to accept and hold any distribution that may be

72

1  determined to be payable to Fast Falcon from the Cedenco Liquidation."
2  Motion, 30:15-18.

3      95.   After duly considering the parties' written submissions in
4  support of and in response to the Motion and hearing oral arguments by
5  counsel for the parties on the Motion, the Court concludes that, it
6  has authority to appoint a receiver in an adversary proceeding that is
7  pending within a Chapter 11 case where there is a complaint filed
8  against a third party, as is the case here, and state law allows for
9  such appointment.  Hr'g Tr. at 28:7-16.

10     96.   Notwithstanding, the Court is not inclined to appoint a
11 receiver at this time, as long as the Trustee "upon due investigation
12 can have the comfort level that the trustee needs with the issuance of
13 the preliminary injunction, that that is going to ensure that the
14 funds don't fall into the hands of Fast Falcon until further order of
15 the Court."  Hr'g Tr. at 28:17-22.

16     97.   Furthermore, in the event that the Australian courts decline to
17 implement or otherwise give effect to the Court's preliminary
18 injunction order, the Court authorizes the Trustee to seek additional
19 relief as necessary, including but not limited to, a request for
20 appointment of a receiver.  Hr'g Tr. at 28:24 - 29:19.

21     98.   These findings of fact and conclusions of law are to preserve
22 the status quo pending a trial on the Trustee's claims and are not
23 binding at the time of trial on the merits.  Accordingly, the Court
24 may come to different findings and/or conclusions at the trial on the
25 merits.  University of Texas v. Camenisch, 451 U.S. 390 (1981);
26 Horphag Research, Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007).
27 / / /
28 / / /

73

## CONCLUSION

In conclusion, the Court finds that the Trustee has demonstrated a likelihood of success on the merits of his claims in the above-captioned adversary proceeding. The Court further finds that the Trustee has demonstrated a likelihood of immediate, irreparable harm if the requested relief is not granted. The Court further finds that no other remedies would provide appropriate relief. The Court further finds that the balance of equities weighs in favor of granting an injunction and that an injunction is in the public interest. For the foregoing reasons, the Court finds that good cause exists for entry of a Preliminary Injunction in the form entered by the Court on September 15, 2011.

Dated:   10/11/11          By: _Robert Bardwil_
                              ROBERT S. BARDWIL
                              UNITED STATES BANKRUPTCY JUDGE